AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court

**for the**
**Western District of New York**

**United States of America**

v.

Case No. 20-MJ-611

JANCARLOS GONZALEZ-RIVERA a/k/a/ "LOS"
JONATHAN CRUZ-VEGA a/k/a/ "TEGO"
EARNEST BAKER a/k/a/ "SLAY"
AMANTE SANTIAGO a/k/a/ "CHOLO"
SHAUMYK SANTIAGO
NATASHA FIGUEROA
ENRIQUE MEDINA a/k/a/ "RICKY ROSE"
ALEXIS MORALES a/k/a/ "A"
ELIEZER MORALES
JOSHUA BAUER a/k/a/ "WHITE BOY"
MARILIN DELEON a/k/a/ "BEBA"
VANESLY LOPEZ
LATEEF BUDD a/k/a/ "LT"
MARCUS JOHNSON
TOMMY BRUNSON, JR.
*Defendants*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between in or about 2016 and the present in the Western District of New York, and elsewhere, **JANCARLOS GONZALEZ-RIVERA a/k/a/ "LOS"; JONATHAN CRUZ-VEGA a/k/a/ "TEGO" ; EARNEST BAKER a/k/a/ "SLAY" AMANTE SANTIAGO a/k/a/ "CHOLO"; SHAUMYK SANTIAGO; NATASHA FIGUEROA; ENRIQUE MEDINA a/k/a/ "RICKY ROSE"; ALEXIS MORALES a/k/a/ "A"; ELIEZER MORALES; JOSHUA BAUER a/k/a/ "WHITE BOY" MARILIN DELEON a/k/a/ "BEBA"; VANESLY LOPEZ; LATEEF BUDD a/k/a/ "LT"; MARCUS JOHNSON and TOMMY BRUNSON, JR.** conspired to possess with intent to distribute and to distribute 400 grams or more of fentanyl, one kilogram or more of heroin and five kilograms or more of cocaine and did conspire with others to do same, all in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A) .

This Criminal Complaint is based on these facts:

☒  Continued on the attached Affidavit.

*Complainant's signature*

SABATINO G. SMITH, Special Agent
Drug Enforcement Administration

Application submitted electronically by email in .pdf format
Oath administered, and contents and signature attested to me
and before me as true and accurate by telephone pursuant to
Fed.R.Crim.P. 4.1 and 41(d)(3), this 28ᵗʰ day of April, 2020.

*Printed name and title*

*Judge's signature*

MARK W. PEDERSEN
United Magistrate Judge, WDNY

*Printed name and title*

City and State:   Rochester, New York

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK_____

UNITED STATES OF AMERICA                                    **20-MJ-611**

        v.

JANCARLOS GONZALEZ-RIVERA a/k/a/ "LOS"
JONATHAN CRUZ-VEGA a/k/a/ "TEGO"
EARNEST BAKER a/k/a/ "SLAY"
AMANTE SANTIAGO a/k/a/ "CHOLO"
SHAUMYK SANTIAGO
NATASHA FIGUEROA
ENRIQUE MEDINA a/k/a/ "RICKY ROSE"
ALEXIS MORALES a/k/a/ "A"
ELIEZER MORALES
JOSHUA BAUER a/k/a/ "WHITE BOY"
MARILIN DELEON a/k/a/ "BEBA"
VANESLY LOPEZ
LATEEF BUDD a/k/a/ "LT"
MARCUS JOHNSON
TOMMY BRUNSON, JR.

              Defendants
_____

IN THE MATTER OF THE SEARCH OF

THE PREMISES AT:                                          **20-MJ-612**

4 FLORACK STREET, ROCHESTER, NEW YORK (**Premises 1**);

35 NORTHAVEN TERRACE, ROCHESTER, NEW YORK (**Premises 2**);

769 LAKE SHORE BOULEVARD, ROCHESTER, NEW YORK (**Premises 3**);

234 SANDALWOOD DRIVE, ROCHESTER, NEW YORK (**Premises 4**);

75 ANGELUS DRIVE, ROCHESTER, NEW YORK (**Premises 5**);

10 STRATHMORE CIRCLE-APARTMENT D, ROCHESTER, NEW YORK (**Premises 6**);

195 CAMPBELL PARK (Rear Apartment), ROCHESTER, NEW YORK (**Premises 7**);

128 CLIFFORD AVENUE, ROCHESTER, NEW YORK (**Premises 8**);

16 VILLAGE WAY, ROCHESTER, NEW YORK (**Premises 9**);

700 STILL MOON CRESCENT, APARTMENT 12, ROCHESTER, NEW YORK (**Premises 10**);

143 WINDMILL TRAIL, ROCHESTER, NEW YORK (**Premises 11;**

28 BLAYDON LOOP, WEST HENRIETTA, NEW YORK (**Premises 12**);

20 HEIDELBERG STREET, ROCHESTER, NEW YORK (**Premises 13**);

182 AVENUE D, APARTMENT 203 (**Premises 14**);

33 LOCUST STREET, ROCHESTER, NEW YORK (**Premises 15**);

14 GALUSHA STREET, ROCHESTER, NEW YORK (**Premises 16**);

83 SPRINGFIELD AVENUE, ROCHESTER, NEW YORK (**Premises 17**);

37 AVENUE D, ROCHESTER, NEW YORK (**Premises 18**);

330 ROSEWOOD TERRACE, ROCHESTER, NEW YORK (**Premises 19**);

79 BRANCH STREET, ROCHESTER, NEW YORK (**Premises 20**);

300 SHADY RUN LANE, APARTMENT 210, PENFIELD, NEW YORK (**Premises 21**)

161 FISHERMAN'S COVE, ROCHESTER, NEW YORK (**Premises 22**); and

45 SOUTHVIEW TERRACE, ROCHESTER, NEW YORK (**Premises 23**)

THE VEHICLES:

2016 CADILLAC ESCALADE, COLOR BLACK, BEARING NEW YORK STATE LICENSE PLATE GXN-4213, VEHICLE IDENTIFICATION NUMBER

1GYS4JK4GR441655 (**Vehicle 1**);

2017 MERCEDES BENZ, COLOR RED, BEARING NEW YORK STATE LICENSE PLATE HJA-5076, VEHICLE IDENTIFICATION NUMBER 4JGED6EB0HA058750 (**Vehicle 2**);

2008 MERCEDES BENZ C30, COLOR BLUE, BEARING NEW YORK STATE LICENSE PLATE HZB-3678, VEHICLE IDENTIFICATION NUMBER WDDGF81X88F156776 (**Vehicle 3**);

2015 LEXUS SUV, COLOR DARK GRAY, BEARING NEW YORK STATE LICENSE PLATE HRA-7431, VEHICLE IDENTIFICATION NUMBER JTJBM7FXXF5112405 (**Vehicle 4**);

2014 RAM 1500, COLOR BLACK, BEARING NEW YORK STATE LICENSE PLATE JNC-2568, VEHICLE IDENTIFICATION NUMBER 1C6RR7VT7ES420947 (**Vehicle 5**);

2009 AUDI A4, COLOR WHITE, BEARING NEW YORK STATE LICENSE PLATE HRA-4865, VEHICLE IDENTIFICATION NUMBER WAULF68K39N066852 (**Vehicle 6**);

2009 ACURA TSX, COLOR WHITE, BEARING NEW YORK STATE LICENSE PLATE JDT-4149, VEHICLE IDENTIFICATION NUMBER JH4CU26699C009119 (**Vehicle 7**);

2018 LEXUS L57, COLOR WHITE, BEARING NEW YORK STATE LICENSE PLATE JDY-6775, VEHICLE IDENTIFICATION NUMBER JTJHY7AX6J4261429 (**Vehicle 9**);

2017 HONDA ACCORD, COLOR BLACK, BEARING NEW YORK STATE LICENSE PLATE JGE-9382, VEHICLE IDENTIFICATION NUMBER 1HGCR2F50HA061230 (**Vehicle 10**) ;

2012 NISSAN MAXIMA, COLOR BURGANDY, BEARING NEW YORK STATE LICENSE PLATE JRE-8629, VEHICLE IDENTIFICATION NUMBER IN4AA5AP5CC869793 (**Vehicle 11**);

2004 CHEVROLET TAHOE, COLOR WHITE, BEARING NEW YORK STATE LICENSE PLATE JRE-7904, VEHICLE IDENTIFICATION NUMBER 1GNEK13Z84R283837 (**Vehicle 13**);

_____

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS
## AND SEARCH WARRANTS

**SABATINO SMITH, being duly sworn, deposes and states:**

1.      I am a Special Agent with the Drug Enforcement Administration.  As such, I
am a "federal law enforcement officer" within the meaning of Federal Rules of Criminal
Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws
and duly authorized by the Attorney General to request search warrants and to make arrests
for, offenses enumerated in Title 21, United States Code, Section 801, et seq.

2.      This Affidavit is in support of a criminal complaint charging JANCARLOS
GONZALEZ-RIVERA a/k/a "Los," JONATHAN CRUZ-VEGA a/k/a "Tego,"
EARNEST BAKER a/k/a "Slay," AMANTE SANTIAGO a/k/a "Cholo," SHAUMYK
SANTIAGO, NATASHA FIGUEROA, ENRIQUE MEDINA a/k/a "Ricky Rose",
ALEXIS MORALES a/k/a "A", ELIEZER MORALES, JOSHUA BAUER a/k/a
"White Boy", MARILIN DELEON a/k/a/ "Beba", VANESLY LOPEZ, LATEEF
BUDD a/k/a "LT", MARCUS JOHNSON and TOMMY BRUNSON, JR., with
conspiracy to possess with intent to distribute and to distribute 400 grams or more of
fentanyl, one kilogram of heroin and 5 kilograms or more of cocaine in violation of 21
U.S.C. §§ 846 and 841(a)(1)(A).

3.      This affidavit also supports an application for search warrants for twenty-
three locations and thirteen automobiles likely to contain evidence and fruits and

–4–

instrumentalities and records of the drug trafficking and other criminal activity of the named

defendants, as more fully set forth below.

## TRAINING AND EXPERIENCE AND INVOLVEMENT
## IN THIS INVESTIGATION

4.      I have been a Special Agent with the DEA since September 2009.  Prior to

becoming a Special Agent with the DEA, I was employed as a Special Agent and counter

sniper with the United States Secret Service for eight years.  In May of 2000, I received a

Bachelor's of Science degree in Political Science from the State University of New York at

Brockport.

5.      During my employment with the Drug Enforcement Administration, I

completed 20 weeks of training at the DEA Office of Training, located in Quantico,

Virginia, prior to being assigned to the Rochester Resident Office.  My training included

classroom preparation in drug trafficking networks, drug identification, as well as practical

application of surveillance, drug investigation, and arrest procedures.  During my tenure

with the DEA, I have participated in numerous investigations relating to armed individuals

that were involved in the distribution of controlled substances, including heroin, cocaine,

cocaine base and other substances.  I have also participated in numerous interviews and

debriefings of individuals involved in armed drug trafficking.  I am familiar with the habits,

methods, routines, practices and procedures commonly employed by persons engaged in the

armed trafficking of illegal drugs.  Additionally, I am familiar with the methods of use,

effects, distribution, appearance, as well as the methods of manufacture of controlled

substances.  I have been the affiant on multiple federal and state search warrants, arrest

warrants and other applications.  During my time at the Rochester Resident Office, I have

participated in numerous long-term narcotics investigations that utilized the court-

authorized interception of wire communications that have resulted in the arrest of drug

distributors, and the seizures of quantities of controlled substances and firearms.

      6.     I have been one of the lead agents in this investigation since its inception.  As

a result of my personal participation in this investigation, analysis of documents and records

obtained by DEA agents, Rochester Police Department (RPD) Investigators, Greece Police

Department (GPD) Investigators, agents of the Alcohol, Tobacco, and Firearms (ATF), and

other law enforcement officers, information provided by confidential informants, the basis

of whose knowledge and reliability will be described below, interception of wire and

electronic communications pursuant to court authorization intercepts as detailed below,

information learned through analysis of pen registers and cell-site location, subpoenaed tolls

and other records, and information gathered from court authorized GPS tracking devices on

multiple vehicles and on physical surveillance of GONZALEZ-RIVERA and his associates,

I am familiar with all aspects of this investigation.  Since this affidavit is being submitted for

limited purposes, I have not included each and every fact known to me concerning this

investigation.  Rather, I have set forth only the facts that I believe are necessary to establish

the required foundation for the requested search warrants and those facts that establish

probable cause to believe that the above-named defendants committed the above-mentioned

offense.

## BACKGROUND OF INVESTIGATION

7.      Since 2016, DEA, RPD, New York State Police (NYSP), GPD and the ATF (the investigative team) have been investigating the narcotics trafficking of JanCarlos GONZALEZ-RIVERA who is responsible for the distribution of cocaine, heroin and fentanyl in Rochester, New York.  This investigation has produced compelling and reliable evidence that GONZALEZ-RIVERA is the head of a large and long standing cocaine, heroin and fentanyl distribution organization based in Rochester, New York.  The investigation has revealed that GONZALEZ-RIVERA uses numerous workers, including but not limited to MARILIN DELEON a/k/a "Beba", NATASHA FIGUEROA, AMANTE SANTIAGO a/k/a "Cholo", and SHAUMYK SANTIAGO, to transport, store, repackage for distribution, and distribute the cocaine and fentanyl to customers and then collect payment for the drug transactions.  Surveillance, confidential source information, and controlled purchases have shown that JONATHAN CRUZ-VEGA a/k/a "Tego", and EARNEST BAKER a/k/a "Slay," are close associates of GONZALEZ-RIVERA and distribute cocaine and fentanyl for the organization.  Additionally, agents have identified through surveillance, confidential source information, and controlled purchases that GONZALEZ-RIVERA's customers include MARCUS JOHNSON, VANESLY LOPEZ, TOMMY BRUNSON and ENRIQUE MEDINA.  Based on intercepted phone calls, surveillance, confidential source information, and controlled purchases agents have identified that MEDINA utilizes ALEXIS MORALES, ELIEZER

–7–

MORALES, and JOSHUA BAUER to store and distribute fentanyl, heroin[1] and cocaine on his behalf.  Furthermore, this investigation has also revealed that LATEEF BUDD is a close associate of GONZALEZ-RIVERA who supplies drugs to the organization and also purchases drugs from the organization.

8.      As more fully described below, this investigation has entailed controlled and undercover purchases of narcotics from defendants, wiretaps of numerous phones used by or connected to defendants and extensive surveillance using stationary cameras, GPS trackers, Cell Site locators and visual roving surveillance by the agents and officers involved in this investigation.

**DEFENDANTS**

**JANCARLOS GONZALEZ-RIVERA**

9.      **JanCarlos GONZALEZ-RIVERA** aka "Los", DOB xx/xx/85, has a principal residence at 75 Angelus Drive, Rochester, New York **(Premises 5).**  GONZALEZ-RIVERA has the following criminal history:

> **On November 22, 2006**, GONZALEZ-RIVERA pled guilty to Attempted Criminal Possession of a Controlled Substance in the Third Degree, a felony, and sentenced to three years in prison.

> **On December 20, 2002**, GONZALEZ-RIVERA pled guilty to Criminal Possession of a Controlled Substance in the Third Degree, a felony, and sentenced to two to six years in prison.

---

[1] Based on my training and experience, I know that in the Rochester area, heroin and fentanyl are often treated interchangeably by drug traffickers and drug users.  For example, heroin/fentanyl users do not commonly distinguish between the two when ordering their drugs.  They will ask for "two bundles" "boy" etc, and they will principally care about the potency of the drug and its effect on them, rather than whether it is heroin, fentanyl and/or a combination of both.

**On November 29, 2004**, GONZALEZ-RIVERA pled guilty to Menacing in the Second Degree, a Misdemeanor, and sentenced to fifty-three days in jail.

**On July 25, 2002**, GONZALEZ-RIVERA pled guilty to Criminal Possession of a Controlled Substance in the Seventh Degree, a misdemeanor, and sentenced to six months in jail.

## JONATHAN CRUZ-VEGA

10.     **Jonathan CRUZ-Vega a/k/a "Tego"** DOB XX/XX/1991 resides at 195 Campbell Park, Rochester, New York **(Premises 7)** and utilizes 10 Strathmore Circle, Apartment D, Rochester, New York **(Premises 6)** and 16 Village Way, Rochester, New York **(Premises 9)** as stash locations for narcotics.  CRUZ-VEGA has the following criminal history;

On September 24, 2013, CRUZ-VEGA was convicted upon a plea of guilty to Attempted Criminal Possession of a Weapon in the Second Degree: Loaded Firearm, a felony, and two counts of Criminal Possession of a Weapon in the Second Degree, felonies, and sentenced to thirty months imprisonment with 30 months post release supervision.

On November 16, 2010, CRUZ-VEGA was convicted upon a plea of guilty of Attempted Criminal Possession of a Controlled Substance in the Seventh Degree, a misdemeanor, and sentenced to 45 days concurrent.

On July 7, 2011, CRUZ-VEGA was convicted upon a plea of guilty to Criminal Mischief in the Fourth Degree, a misdemeanor, and sentenced to one year imprisonment.

On January 21, 2020, CRUZ-VEGA was arrested by New York State Police for Criminal Possession of a Loaded Weapon in the Second Degree and Criminal Possession of a Weapon Third Degree for previous conviction, pursuant to a car chase in the city of Rochester.  Those charges remain pending.

## EARNEST BAKER

11.     **Earnest BAKER a/k/a "Slay"** XX/XX/1985 resides at 20 Heidelberg Street, Rochester, New York **(Premises 13)** and utilizes 33 Locust Street, Rochester, New York **(Premises 15)** as a stash location for narcotics.  BAKER has the following criminal history and is currently on federal and state probation;

On January 20, 2013, BAKER was convicted upon a plea of guilty of Conspiracy to Possess with Intent to Distribute a Controlled Substance and sentenced to 93 months in prison and is currently on federal supervised release.

On December 2, 2011, BAKER was convicted upon a plea of guilty of Criminal Possession of a Loaded Firearm in the Second Degree, a felony, and sentenced to seven years in prison.  He is currently on state parole on this charge.

On April 20, 2004, BAKER was convicted upon a plea of guilty to Assault in the Second Degree: Intent to Cause Physical Injury with a Weapon, a felony, and sentenced to two years in prison.

On April 23, 2010, BAKER was convicted upon a plea of guilty to Criminal Possession of a Controlled Substance in the Seventh Degree, a misdemeanor, and sentenced to 52 days imprisonment.

On November 12, 2003, BAKER was convicted upon a plea of guilty to Criminal Possession of Stolen Property in the Fifth Degree, a misdemeanor, and sentenced to six months imprisonment.

On November 7, 2002, BAKER was convicted upon a plea of guilty to Criminal Possession of a Controlled Substance in the Seventh Degree, a misdemeanor, and sentenced to 30 days imprisonment.

## AMANTE SANTIAGO

12.     **Amante SANTIAGO a/k/a "Cholo"** XX/XX/1994, resides at 700 Still Moon Crescent, Apartment 12, Rochester, New York **(Premises 10).**  Amante SANTIAGO has the following criminal history;

On May 17, 2013, SANTIAGO was convicted upon a plea of guilty to Criminal Possession of Marijuana in the Fourth Degree, a misdemeanor, and sentenced to 45 days in prison.

## SHAUMYK SANTIAGO

13.     **Shaumyk SANTIAGO** XX/XX/1992 (hereinafter referred to as "SHAUMYK**"**) resides at 4 Florack Street, Rochester, New York **(Premises 1)**, which is the principal site where GONZALEZ-RIVERA sells and processes narcotics.  SHAUMYK has no narcotics criminal history.

## NATASHA FIGUEROA

14.     **Natasha FIGUEROA** XX/XX/1993 (hereinafter referred to as "FIGUEROA**"**) resides at 35 Northaven Terrace, Rochester, New York **(Premises 2).** FIGUEROA has no known criminal history.

## ENRIQUE MEDINA

15.     **Enrique MEDINA a/k/a "Rick Rose"** XX/XX/1991 (hereinafter referred to as "MEDINA**"**) resides at 143 Windmill Trail, Rochester, New York **(Premises 11)**. MEDINA has the following criminal history;

On October 12, 2011, MEDINA was convicted upon a plea of guilty to Conspiracy in the Second Degree, a felony, and sentenced to 5 years' probation.

**ALEXIS MORALES**

16.     **Alexis MORALES a/k/a "A"** XX/XX/1991 resides at 37 Avenue D,

Rochester, New York **(Premises 18)**.  ALEXI MORALES has the following criminal history;

On May 22, 2019, MORALES was convicted upon a plea of guilty in Monroe County, New York for Criminal Possession of a Controlled Substance in the 7th Degree, a Class A misdemeanor.  MORALES was sentenced to 11 months in prison.

**ELIEZER MORALES**

17.     **Eliezer MORALES** XX/XX/1987 resides at 83 Springfield Avenue,

Rochester, New York **(Premises 17)**.    ELIEZER is the brother of ALEXIS and cousin of

MEDINA and BAUER.  ELIEZER has the following criminal history;

On April 1, 2015, Eliezer MORALES was convicted upon a plea of guilty in Monroe County, New York for Criminal Possession of a Controlled Substance in the 3rd Degree, a Class B felony.  Eliezer MORALES was sentenced to 5 years community service.  On June 5, 2018, MORALES was resentenced for violation of probation to this above stated charge and sentenced to one year in prison.

**JOSHUA BAUER**

18.     **Joshua BAUER** DOB XX/XX/1994 (hereinafter referred to as "BAUER")

resides at 330 Rosewood Terrace, Rochester, New York **(Premises 19)**.  This investigation

has revealed that BAUER is the brother of MEDINA.  BAUER has the following known

narcotics criminal history;

On August 27, 2015, BAUER was convicted upon a plea of guilty for Criminal Possession of Marijuana in the fourth degree (Class A Misdemeanor) and sentenced to three years of probation.

## MARILIN DELEON a/k/a "Beba"

19.    **Marilin DELEON** a/k/a "Beba" XX/XX/1986 resides at 769 Lakeshore

Drive, Rochester, New York **(Premises 3).**  DELEON has no known criminal history,


## VANESLY LOPEZ

20.    **Vanesly LOPEZ** XX/XX/1976 resides at 14 Galusha Street, Rochester, New

York **(Premises 16)**.  LOPEZ has an October 1999 misdemeanor conviction for Assault in the

3d Degree, with intent to cause physical injury, for which she was sentenced to 84 days in jail

and three years probation.

## LATEEF BUDD

21.    **Lateef BUDD a/k/a "LT"** XX/XX/1991 resides at 28 Blaydon Loop, West

Henrietta, New York **(Premises 12)** and at the Ellison Heights Apartments, 300 Shady Run

Lane, Building, Apartment 210, in Penfield **(Premises 21)**.  BUDD has the following

criminal history;


On November 16, 2016, BUDD was convicted upon a plea of guilty to
Criminal Possession of a Controlled Substance in the Fifth Degree, a Felony,
and sentenced to one year imprisonment.

On October 7 2010, BUDD was convicted upon a plea of guilty to
Criminal Possession of a Controlled Substance in the Seventh Degree, a
Misdemeanor, and sentenced to three years of probation.

**MARCUS JOHNSON**

22.    **Marcus JOHNSON** XX/XX/1989, resides at 182 Avenue D, Apartment 203,

Rochester, New York (**Premises 14**).  JOHNSON has the following criminal history and is

currently on New York State Parole;

On March 28, 2017, JOHNSON was convicted upon a plea of guilty to Criminal Possession of a Controlled Substance in the Third Degree, a Felony, and sentenced to five years of imprisonment.  He is currently on parole.

On October 10, 2014, JOHNSON was convicted upon a plea of guilty to Criminal Possession of a Controlled Substance in the Fifth Degree, a Felony, and sentenced to nine months of imprisonment.

On January 31, 2012, JOHNSON was convicted upon a plea of guilty to Rico Racketeering-Narcotics and sentenced to 31 months imprisonment.

**TOMMY BRUNSON, JR.**

23.    **Tommy BRUNSON, JR.  JOHNSON** XX/XX/1989, resides at 228 West

Pleasant Avenue, Syracuse, New York.  BRUNSON has the following **criminal** history:

**On July 2, 2013**, BRUNSON pled guilty to Criminal Possession of a Weapon in the Second Degree: Loaded Firearm, a felony, and was sentenced to five years in prison.

**On March 15, 2011**, BRUNSON pled guilty to Criminal Possession of a Controlled Substance in the Third Degree, a felony, and was sentenced to two years in prison.

## PROBABLE CAUSE

## CONFIDENTIAL SOURCE INFORMATION

24.     The investigative team has used several reliable confidential sources to advance the investigation.  These sources have provided intelligence and/or have conducted controlled purchase and have held controlled and monitored telephone calls and meetings with the targets of this investigation.

## Confidential Source Five (CS-5)

25.     Confidential Source 5 (CS-5) is personally known to the DEA and RPD. CS-5 has cooperated with law enforcement for several months.  CS-5's cooperation began pursuant to a plea agreement with the Government in exchange for consideration at sentencing.  Since commencing his/her cooperation, CS-5 has provided agents information relative to narcotics trafficking which has been substantially corroborated through independent investigation, consensual recordings of face-to-face conversations, and information received independently and separately from other law enforcement agencies. As more fully set described below, CS-5 has made several controlled purchases of drugs in this investigation.  The identity of CS-5 is being withheld from this affidavit to protect CS-5 from retaliation and because CS-5 is an active cooperating source.  CS-5 indicated that the information CS-5 provided was based upon either personal observations or personal conversations either directly with the individuals involved or persons CS-5 knows to be closely associated with the individuals.

26.     CS-5 stated that, in 2019, prior to CS-5 cooperating with the government, he/she had been inside the residence at 4 Florack **(Premises 1)** and observed a gallon sized bag of heroin and multiple firearms.  CS-5 stated that GONZALEZ-RIVERA, "Cholo" (Amante SANTIAGO), and Jonathan CRUZ-VEGA a/k/a "Tego" were at **Premises 1** at this time.  CS-5 further stated that **Premises 1** is the stash location for GONZALEZ-RIVERA and that Cholo lived at the residence at that time.  According to CS-5, at present Cholo no longer resides at Premises 1 and his brother Shaumyk currently lives at Premises 1, and GONZALEZ-RIVERA and his associates continue to use this location to traffic and store narcotics.

27.     CS-5 also stated that GONZALEZ-RIVERA sells a large amount of heroin and cocaine and that GONZALEZ-RIVERA's partner is "Tego" (CRUZ-VEGA).  CS-5 stated, based on personal observations and/or conversations with member of the organization, that CRUZ-VEGA stores and processes heroin at his girlfriend Rebecca's residence located at 16 Village Way, Rochester, New York (**Premises 9**).  CS-5 also stated that CRUZ-VEGA has another girlfriend who lives at the Strathmore Circle Apartments[2] and that CRUZ-VEGA also stores narcotics at that location.  CS-5 also stated that CRUZ-VEGA also stores drug proceeds at his mother's house located at 128 Clifford Avenue, Rochester, New York (**Premises 8**).

28.     CS-5 stated that Amante SANTIAGO ("Cholo") distributes heroin for GONZALEZ-RIVERA.

---

[2] The investigation has since revealed that this location is at 10 Strathmore Circle, Apartment D, Rochester **(Premises 6).**

29. CS-5 further stated that GONZALEZ-RIVERA is utilizing a black male with the alias "Slay"[3] to serve as protection for the organization and to distribute narcotics for the organization.

30. CS-5 also stated, based on conversations with associates of GONZALEZ-RIVERA, that a black male with an alias of "LT" and a first name Lateef, sells large amounts of cocaine and supplies cocaine to GONZALEZ-RIVERA and his associates.[4]

**<u>Confidential Source Four (CS-4)</u>**

31. Confidential Source 4 (CS-4) is personally known to the DEA and RPD. CS-4 has cooperated with law enforcement for over one year. CS-4's cooperation with the Government is in exchange for monetary compensation. Since commencing his/her cooperation, CS-4 has provided agents reliable information relative to narcotics trafficking which has been corroborated through independent investigation, consensual recordings of face-to-face controlled purchases of narcotics by CS-4, and information received independently and separately from other law enforcement agencies. CS-4 indicated that the information CS-4 provided was based upon either personal observations or personal conversations either directly with the individuals involved or persons CS-4 knows to be closely associated with the individuals. The identity of CS-4 is being withheld from this affidavit to protect CS-4 from retaliation and because CS-4 is an active cooperating source.

32. In 2020, Confidential Source Four (CS-4) informed investigators in this case

---

[3] This investigation has identified "Slay" as Earnest BAKER.

[4] As set forth below, the investigation has identified "LT" as Lateef BUDD.

that a black male named BAKER a/k/a "SLAY," was selling large amounts of heroin/fentanyl in the Rochester area.  CS-4 advised that he/she has known BAKER personally for over two years.  Law enforcement confirmed via visual surveillance during the course of this investigation that the individual who CS-4 knows as BAKER a/k/a SLAY is in fact defendant Earnest BAKER.

33.     CS-4 stated that he/she believed BAKER was receiving large amounts of heroin from a male Hispanic named Carlos LNU a/k/a "LOS."  Additionally, during this investigation, BAKER himself told CS-4 that BAKER had large amounts of cocaine and heroin for sale.  In addition, CS-4 told agents that BAKER and LOS are close to a black male with the alias "LT".  CS-4 further told agents that LT's first name is Lateef.  CS-4 told agents that "LT" is a large-scale cocaine trafficker in the Rochester, New York area.  As more fully discussed below, CS-4 made controlled purchases of fentanyl and cocaine from BAKER during this investigation.

34.     CS-4 stated that BAKER is a very violent individual and has told CS-4 that he enjoys fighting people and has bragged about shooting people in the past.

**Confidential Source Three (CS-3)**

35.     Confidential Source Three (CS-3) is personally known to the DEA.  CS-3 is cooperating pursuant to an agreement with prosecutors in exchange for consideration at sentencing.  CS-3 has been providing information to law enforcement for over 9 months.  CS-3 has provided agents reliable information relative to narcotics trafficking that has been corroborated through independent investigation, consensual recordings of face-to-face

–18–

conversations, controlled purchases of narcotics, and information received independently and separately from other law enforcement agencies. CS-3 indicated that the information CS-3 provided was based upon either personal observations or personal conversations either directly with the individuals involved or persons CS-3 knows to be closely associated with the individuals.    CS-3 has also conducted several controlled purchases of drugs from targets in this investigation.  The identity of CS-3 is being withheld from this affidavit to protect CS-3 from retaliation and because CS-3 is an active cooperating source.  CS-3 indicated that the information CS-3 provided was based upon either personal observations or personal conversations either directly with the individuals involved or persons CS-3 knows to be closely associated with the individuals.

36.    CS-3 stated that "Los" heads a large drug trafficking organization.  Agents have since identified "Los" as JanCarlos GONZALEZ-RIVERA. CS-3 stated that Los is the biggest heroin dealer in the Rochester NY region. CS-3 stated that a few years ago, Los robbed his supplier of two kilos of fentanyl.  CS-3 further stated that Enrique MEDINA is supplied by Los.

37.    In 2020, CS-3 stated that MEDINA pays Alexis MORALES $400 a day to distribute cocaine and heroin for MEDINA and that MEDINA's brother Joshua BAUER also sells narcotics for MEDINA.   CS-3 further stated that MEDNIA generally does not physically touch narcotics that he purchases from GONZALEZ-RIVERA, he only negotiates the transactions and that Alexis MORALES and BAUER handle the distribution of the drugs.

## Confidential Source Six (CS-6)

38.    Confidential Source Six (CS-6) is personally known to the DEA and FBI.  CS-6 is cooperating pursuant to an agreement with prosecutors in exchange for consideration at sentencing.  CS-6 has been providing information to law enforcement for several years.  CS-6 has provided agents reliable information relative to narcotics trafficking that has been corroborated through independent investigation, consensual recordings of face-to-face conversations, controlled purchases of narcotics, and information received independently and separately from other law enforcement agencies. CS-6 has conducted multiple controlled purchases of narcotics and firearms for the FBI in a separate investigation.  CS-6 indicated that the information CS-6 provided was based upon either personal observations or personal conversations either directly with the individuals involved or persons CS-6 knows to be closely associated with the individuals.    The identity of CS-6 is being withheld from this affidavit to protect CS-6 from retaliation and because CS-6 is an active cooperating source.

39.    CS-6 stated that he/she has known Vanesly LOPEZ for over ten years and during this time LOPEZ has always been involved in selling large amounts of cocaine.  CS-6 stated that he/she has seen LOPEZ in possession of large amounts of cocaine on numerous occasions in the past.  CS-6 further stated that he/she believes that LOPEZ is currently being supplied cocaine by a Hispanic male with the alias "Los" and is believed to

have the first name of Carlos.  CS-6 further described Los as a heavy set male with braided

hair.[5]

40.     CS-6 stated that LOPEZ lives at 14 Galusha Street in the upstairs apartment

and no one lives in the downstairs of the residence, but LOPEZ has access to the entire

residence.  CS-6 stated that LOPEZ's mother owns the residence at 14 Galusha Street

(**Premises 16**) but rarely visits the location other than to perform maintenance on it.  Most

recently, during the week of April 9, 2020, CS-6 observed a vehicle arrive at 14 Galusha

Street (**Premises 16**), park in the driveway, and an unknown individual entered the

residence.  CS-6 then observed the downstairs living room light turn on and CS-6 did not

see any presence of LOPEZ's mother at the residence, only LOPEZ's vehicle (**Vehicle 6**)

parked in the driveway (indicating that LOPEZ was using the downstairs apartment at the

time).

**Confidential Source 7 (CS-7)**

41.     Confidential Source 7 (CS-7) is cooperating pursuant to a plea agreement with

prosecutors in exchange for consideration at sentencing.   In a proffer before his/her guilty

plea, CS-7 has stated to investigators that prior to CS-7's arrest in 2018, he/she supplied bulk

quantities of cocaine to "Bud Latiff" or "LT".   CS-7 added that Latiff was from the west

side of Rochester and had a prior drug conspiracy charge.  CS-7 explained that Latiff would

---

[5] This matches the description of GONZALEZ-RIVERA.

then supply "Fat Carlos" or "Los, who CS-7 described as a heavy set Hispanic with longer

hair.[6]  Agents showed CS-7 a picture of GONZALEZ-RIVERA and CS-7 confirmed that

that was "Los".  CS-7 stated that he/she met GONZALEZ-RIVERA face to face a few

times but did not trust him so CS-7 would not deal with Los directly.


### Proffer of Federal Defendant 3

42.     In February of 2020, Federal Defendant 3 was arrested by the DEA Rochester

RO and Federal Defendant 3 agreed to speak with the government and later proffered with

the government.  Prior to proffering, this defendant signed the standard proffer agreement

with the United States Attorney's Office agreeing to be truthful.  During the proffer session,

Federal Defendant 3 provided information about the drug trafficking activities of

GONZALEZ-RIVERA and a Hispanic male with the alias "Cholo" (known to agents as

Amante SANTIAGO).

43.     Federal Defendant 3 stated that his/her drug supplier was a heavy set

Hispanic male with long hair named "Los."  Federal Defendant 3 stated that he/she never

dealt directly with "Los" and would only meet with "Los'" "people".  Federal Defendant 3

stated "Cholo" was one of the people from who would directly supply Federal Defendant 3.

Federal Defendant 3 stated he/she would see Cholo with "Los" at a Rochester area bar on a

regular basis, more specifically the "Barrel of Dolls strip club

44.     Federal Defendant 3 stated that for all of 2019 and up until his/her arrest date

---

[6] This is consistent with the actual appearance of GONZALEZ-RIVERA.

in early 2020, he/she purchased approximately 30-40 bundles of heroin that was mainly grey in color at least three to four times a week from "Cholo" and another individual.

45.     Federal Defendant 3 further stated he/she would get half the amount of the described narcotics on consignment and pay for the other half when supplied by "Cholo" and the other associate.  Federal Defendant 3 stated that most of the transactions would take place at night and "Cholo" would routinely show up in different rental cars during the purchases.

## INVESTIGATION AND TAKEDOWN OF ANGEL OCASIO DRUG TRAFFICKING ORGANIZATION AND GONZALEZ-RIVERA'S DEALINGS WITH THAT ORGANIZATION

46.     In April of 2016, during a federal narcotics investigation, agents seized approximately 11.5 kilograms of cocaine, 117 grams of crack cocaine, 95 grams of heroin, $413,469.00 in US currency and five firearms pursuant to search warrants executed at the residence of Angel OCASIO and other members of his drug trafficking organization. Several individuals were arrested for violations of Title 21, U.S.C., § 846 (conspiracy to distribute 5 kilograms or more of cocaine and 280 grams or more of crack cocaine).

47.     A cooperating defendant arrested during this investigation told the government, during a proffer meeting, that the defendant would supply JanCarlos GONZALEZ-RIVERA aka Los with cocaine.  The defendant stated that he/she would supply GONZALEZ-RIVERA with half a kilogram of cocaine approximately every couple of days and that GONZALEZ-RIVERA would, in turn, supply the defendant with heroin. The defendant further stated that GONZALEZ-RIVERA would occasionally supply the

defendant with cocaine if the defendant was unable to obtain cocaine from his regular cocaine sources.

48.     The cooperating defendant also stated that GONZALEZ-RIVERA's brother was killed on St Paul Street in Rochester.  The cooperating defendant's reliability was confirmed via his cooperation which led to the conviction of two codefendants.

### Homicide of Gonzalez-Rivera's Brother and the Arrest of Marcus Johnson

49.     On January 27th, 2016, at approximately 3:45 p.m., members of the Rochester Police Department responded to 1063 St Paul Street for the report of a person shot. Upon arrival, officers located a male lying on the ground, with multiple gunshot wounds, near the northeast corner of the back parking lot to the apartment building. A white 2015 Ford Expedition rental vehicle was located near the victim with the front driver window shot out. The victim, later identified as Carlos E. Rivera-Cabezudo, was taken to Strong Memorial Hospital and was pronounced dead there. The victim was determined to be the half-brother of GONZALEZ-RIVERA.[7]

50.     The landlord of 1063 St. Paul identified the victim's half-brother, GONZALEZ-RIVERA as being the renter of apartment #15, stating "he never really moved in".  A search warrant was executed at GONZALEZ-RIVERA's apartment 15 at 1063 St. Paul on January 27, the same day as the murder.  Police recovered from inside the apartment approximately 11 ounce of crack cocaine, scales, beakers, cellular phones,

---

[7] The white Ford Expedition rental was determined to be rented by Krystal GONZALEZ, who is a girlfriend of GONZALEZ-RIVERA and has children with him.  Krystal GONZALEZ also paid for a hotel room where the victim stayed while in Rochester.

approximately $2339.00 in cash and identification for Marcus JOHNSON.  Fingerprints

were also recovered on several plates with cocaine residue matching Marcus JOHNSON

DOB XX/XX/1989.

51.     On February 10, 2016, RPD Tactical Unit officers arrested Marcus

JOHNSON, and he was charged with Criminal Possession of a Controlled Substance in the

First Degree in connection with the drugs seized at the apartment at 1063 St. Paul.

JOHNSON ultimately pled guilty in connection with the charges to Felony Criminal

Possession of a Controlled Substance in the Third Degree and was sentenced to five years of

imprisonment.  He is currently on New York State parole.


### Texts Messages etween Gonzalez-Rivera and Angel Ocasio at the Time of the Murder and Subsequent Search of Apartment #15

52.     During the investigation of Angel Ocasio, police seized several cell phones

from Angel Ocasio's residence.  Subsequent analysis of these phones revealed significant

communication between Ocasio and GONZALEZ-RIVERA, as detailed below.


### January 27, 2016 at 5:48 p.m. Day of Murder of Gonzalez-Rivera's Brother

53.     On January 27, 2016, starting at approximately 5:48 p.m., OCASIO and

GONZALEZ-RIVERA had an exchange of text messages. The exchange is as follows:

**Angel Ocasio (AO):** Tell ur other boy that got that with u 5o pay attn. till th3y leave. (5:35

p.m.)

**Jan Carlos Gonzalez-Rivera (JGR):** Ok (5:40 p.m.)

**AO:** U talked to ur mom she on her way. Yo my brother inlaw live on Harris. the word is that u the one that got shot. (5:48 p.m.)

**JGR:** I heard they trying to get in the apartment upstairs that shit so dirty wow (8:23 p.m.)

**AO:** They can't though for what. (8:24 p.m.)

**AO:** I just tried calling u. Who told them about the apartment (8:26 p.m.)

**AO:** Where ur mom at (8:30 p.m.)

**JGR:** I don't know (8:38 p.m.)

**JGR:** Hear wit me (8:38 p.m.)

**JGR:** Marlenis mom house (8:41 p.m.)

**JGR:** They in the apartment it's fucking over (8:44 p.m.)

**AO:** Is it in ur name (8:45 p.m.)

**JGR:** Carlos Rivera (8:45 p.m.)

**AO:** That's not ur name (8:46 p.m.)

**JGR:** That's not my whole name (8:46 p.m.)

**AO:** Ok do u have any mail o4 document with ur real name (8:47 p.m.)

**AO:** Is the landlord cool (8:48 p.m.)

**AO:** But u told my brother i5 was clean, txt me where u at. Talk in person. Erase All those numbers. Put ur iphone in plane mode and turn it off. what number is this (8:53 p.m.)

**JGR:** He cool (8:54 p.m.)

**JGR:** The truck was clean (8:57 p.m.)

**JGR:** U know that upstairs is headquarter (8:58 p.m.)

54.     Based on my training and experience, the substance of this and other intercepted communications, and my involvement in the investigation, I believe that when OCASIO texted, "Tell ur other boy that got that with u 5o pay attn. till th3y leave," OCASIO was telling GONZALEZ-RIVERA to have his boy that was at the scene of the homicide to pay attention until after the police leave the scene. I believe that when OCASIO texted, "U talked to ur mom she on her way. Yo my brother inlaw live on Harris. the word is that u the one that got shot," OCASIO was telling GONZALEZ-RIVERA that the rumors on the street was that it was GONZALEZ-RIVERA who had been killed on St Paul Street (instead of his half-brother).  I believe that when GONZALEZ-RIVERA texted, "I heard they trying to get in the apartment upstairs that shit so dirty wow," GONZALEZ-RIVERA was telling OCASIO  that the police were trying to get into his apartment where GONZALEZ-RIVERA keeps his narcotics stash. I believe that when OCASIO texted, "I just tried calling u. Who told them about the apartment," OCASIO was asking GONZALEZ-RIVERA how the police knew about the apartment that GONZALEZ-RIVERA was using as a stash spot.

55.     I further believe that when GONZALEZ-RIVERA texted, "They in the apartment it's fucking over," GONZALEZ-RIVERA was telling OCASIO  that the police were in the apartment where GONZALEZ-RIVERA keeps his narcotics stash and that GONZALEZ-RIVERA's drug dealing operation was going to end as a result.

56.     I further believe that when OCASIO texted, "Is it in ur name," OCASIO was asking it the apartment was in GONZALEZ-RIVERA's name.  When GONZALEZ-RIVERA responded "Carlos Rivera" and OCASIO texted, "That's not ur name,"

–27–

GONZALEZ-RIVERA correctly noted "That's not my whole name."

57.    I further believe that when OCASIO texted, "txt me where u at. Talk in person. Erase All those numbers. Put ur iphone in plane mode and turn it off. what number is this," OCASIO was telling GONZALEZ-RIVERA to not talk on the phone anymore and to erase all his numbers in the phone and to put his phone in plane mode and turn the phone off so the police cannot track his phone.

58.    I believe that when GONZALEZ-RIVERA texted, "The truck was clean," and "U know that upstairs is headquarter," GONZALEZ-RIVERA was telling OCASIO that there was no narcotics in the truck but that the apartment located at 1063 St Paul Street-Apartment #15 was GONZALEZ-RIVERA's stash location.

### Intercepted Calls and Texts between Angel Ocasio and Gonzalez-Rivera on Ocasio telephone instrument (585) 524-8457

59.    On March 7, 2016, the Honorable Charles J. Siragusa, United States District Court Judge, WDNY issued an order (16-MR-6036) authorizing the interception of electronic and wire communications on Angel Ocasio's cell phone (585) 524-8457.  Some of the communications between Ocasio and GONZALEZ-RIVERA are set forth below.

### March 25, 2016 at 8:06 p.m.

60.    On March 25, 2016, at approximately 8:06 p.m., OCASIO received an incoming call from GONZALEZ-RIVERA who was at the time using cell phone # (716) 436-0450.  The following is a transcript of that call:

**Angel Ocasio (AO):**  Hello?
**Jan Carlos Gonzalez-Rivera (JGR):** Yo, Pa, What's up?

**AO:** Chilling.
**JGR:** Yo, you can't help me out?  You brother... your brother said, he, he over [PH] though...
**AO:** Ya, the fuckin Holy Week fucked everything up.
**JGR:** Oh!  So, you can't... you only got even a little bit?
**AO:** Nah.
**JGR:** [Smacks lips] Not even a small one?
**AO:** I swear to God, Pa.  Nothing, bro.
**JGR:** [Smacks lips] Damn!  Alright.
**AO:** No lie, no lie.
**JGR:** Alright, then.
**AO:** I asked [PH] him about that, so he told me it's possible, he thinks [U/I] so I'm waiting.
**JGR:** Alright.
**AO:** That's it.  I'll let my brother know.
**JGR:**  Alright.
**AO:** Aright.
[End of Call]


61.     Based on my training and experience, the substance of this and other
intercepted communications, I believe that when GONZALEZ-RIVERA stated, "Yo, you
can't help me out?  You brother... your brother said, he, he over [PH] though,"
GONZALEZ-RIVERA was asking OCASIO if OCASIO could get him some cocaine.
OCASCIO responsde that "Ya, the fuckin Holy Week fucked everything up" meant that his
supply had been interrupted because of it being Easter week.  I further believe that when
GONZALEZ-RIVERA stated, "Oh!  So, you can't... you only got even a little bit," and
"Not even a small one," GONZALEZ-RIVERA was asking OCASIO if could get a smaller
quantity of cocaine then what he normally gets from OCASIO and OCASIO responded, I
swear to God, Pa.  Nothing, bro."


**March 30, 2016 at 6:38 p.m.**


–29–

62.     On March 30, 2016, starting at approximately 6:38 p.m., OCASIO and GONZALEZ-RIVERA had another exchange of texts on their respective cell phones:

**Jan Carlos Gonzalez-Rivera (JGR):** Whats up pai u said today tell me something good (6:38 p.m.)

**Angel Ocasio (AO):** Nthg (6:38 p.m.)

**JGR:** Come on pai i know you lol (6:44 p.m.)

**AO:** Dnt have to lie to u . (6:45 p.m.)

**AO:** U c my bro dnt got (6:45 p.m.)

**JGR:** Ok (6:48 p.m.)

63.     Based on my training and experience and the substance of this and other intercepted communications, I believe that when GONZALEZ-RIVERA texted, "Whats up pai u said today tell me something good," GONZALEZ-RIVERA was asking OCASIO if OCASIO had any cocaine for GONZALEZ-RIVERA. I further believe that when OCASIO responded, "Nthg" abd "U c my bro dnt got," OCASIO was telling GONZALEZ-RIVERA that neither OCASIO's nor his brother had any cocaine to supply to GONZALEZ-RIVERA.

**April 2, 2016 at 3:25 p.m.**

64.     On April 2, 2016, starting at approximately 3:25 p.m., OCASIO and GONZALEZ-RIVERA had another exchange of text messages on their respective cell phones. The exchange is as follows:

**Jan Carlos Gonzalez-Rivera (JGR):** Damn nigga let me get something please stop playen (3:25 p.m.)

**Angel Ocasio (AO):** Pa I swear on my kids I don't got man . Next week (3:27 p.m.)

**JGR:** Ok (3:45 p.m.)

65.     Based on my training and experience, the substance of this and other intercepted communications, I believe that when GONZALEZ-RIVERA texted, "Damn nigga let me get something please stop playen," GONZALEZ-RIVERA was begging OCASIO to give him some cocaine and OCASIO responded that he swear on his kids that he doesn't have any cocaine to give GONZALEZ-RIVERA and that he should be resupplied next week when he texted, "Pa I swear on my kids I don't got man . Next week."

**April 6, 2016 at 9:44 a.m.**

66.     On April 6, 2016, starting at approximately 9:44 a.m., OCASIO and GONZALEZ-RIVERA had the following exchange of text messages:

**Angel Ocasio (AO):** U opened the car (9:44 a.m.)

**AO:** Yo (9:58 a.m.)

**Jan Carlos Gonzalez-Rivera (JGR):** I just opened it (9:59 a.m.)

**AO:** Did shattered look crazy. Ur too (10:00 a.m.)

**JGR:** Its mad soft all shatyered im going to the stove now wit it (10:01 a.m.)

**AO:** K let me know (10:02 a.m.)

**JGR:** Ok (10:03 a.m.)

**JGR:** This shit aint rite (11:02 a.m.)

**AO:** It's not that's crazy tell them where u at. (11:09 a.m.)

**AO:** They trying play us call them asap. (11:10 a.m.)

−31−

**JGR:** I just did they asken me can i do anything wit it (11:11 a.m.)

**AO:** They knew then. I can't unless Ya put it all in the pot. Dam my boy was taking it all.. I need 5 right now 4 my peeps. Now can't even trust them. I was going tell you we can go down there and get at least 2 or 4. For my boy. (11:18 a.m.)[8]

**JGR:** Yo it comes back 27 from a small one the thing is q it dont get hard it takes mad long too get hard (12:56 p.m.)

**AO:** It's no good it git something . Where u at (12:57 p.m.)

67.     Based on my training and experience and the substance of this and other intercepted communications, I believe that when OCASIO texted, "U opened the car," OCASIO was asking GONZALEZ-RIVERA if he opened the kilogram of cocaine and GONZALEZ-RIVERA texted, "I just opened it." I believe that when OCASIO texted, "Did shattered look crazy. Ur too," OCASIO was telling GONZALEZ-RIVERA that his kilogram of cocaine appeared to be of poor quality and asked GONZALEZ-RIVERA how the quality of the kilogram of cocaine that GONZALEZ-RIVERA had was.  GONZALEZ-RIVERA responded it didn't look good either because it was very soft and GONZALEZ-RIVERA was going to cook it into crack and see how pure it was when GONZALEZ-RIVERA texted, "Its mad soft all shatyered im going to the stove now wit it."

68.     When GONZALEZ-RIVERA texted, "This shit aint rite," I believe that he was reporting that the cocaine was of bad quality.  "They trying play us call them asap,"

---

[8] The text messages that are in italics were downloaded from Angel Ocasio's telephone instrument (585) 524-8457

OCASIO was telling GONZALEZ-RIVERA to call the source and GONZALEZ-RIVERA responded that he did call the source and the source asked if GONZALEZ-RIVERA could still sell the cocaine ("I just did they asken me can i do anything wit it.")

69.    I believe that when OCASIO texted, "They knew then. I can't unless Ya put it all in the pot. Dam my boy was taking it all. I need 5 right now 4 my peeps. Now can't even trust them. I was going tell you we can go down there and get at least 2 or 4. For my boy," OCASIO was informing GONZALEZ-RIVERA that the source knew it was of bad quality and OCASIO stated that his boy (customer) needed five kilograms of cocaine right now.

70.    I believe that when GONZALEZ-RIVERA texted, "Yo it comes back 27 from a small one the thing is q it dont get hard it takes mad long too get hard," GONZALEZ-RIVERA was telling OCASIO that he tried to cook "31" grams of the cocaine the powder cocaine and it only produced 27 grams of crack and would not get hard. OCASIO then told GONZALEZ-RIVERA that the cocaine must be cut with something to dilute it when OCASIO texted, "It's no good it git something . Where u at."


**April 12, 2016 at 1:50 p.m.**

71.    On April 12, 2016, starting at approximately 1:50 p.m., OCASIO and GONZALEZ-RIVERA had the following exchange of texts:

**Jan Carlos Gonzalez-Rivera (JGR):** What u got for me come on dont lie (1:50 p.m.)

**Angel Ocasio (AO):** Wouldn't do that shit crazy (1:52 p.m.)

**AO:** Yo need 1 of urs (2:22 p.m.)

–33–

**JGR:** Wya (2:26 p.m.)

**AO:** G oing down coney towards Norton. (2:27 p.m.)

**JGR:** Give 10 and we go to the same spot from last time (2:29 p.m.)

72.    Based on my training and experience and the substance of this and other intercepted communications, I believe that when GONZALEZ-RIVERA texted, "What u got for me come on dont lie," GONZALEZ-RIVERA was asking OCASIO if OCASIO had any cocaine for GONZALEZ-RIVERA.  I further believe that when OCASIO texted, "Yo need 1 of urs," OCASIO was informing GONZALEZ-RIVERA that OCASIO needed one quantity of heroin from GONZALEZ-RIVERA.  GONZALEZ-RIVERA then directed OCASIO to meet him "in the same spot" they had met at earlier in 10 minutes.  Ocasio was at this time supplying GONZALEZ-RIVERA with cocaine and GONZALEZ-RIVERA was, in turn, supplying Ocasio with heroin.

**April 16, 2016 at 8:29 p.m.**

73.    On April 16, 2016, the two men had the following exchange of texts:

**Angel Ocasio (AO):** Yo u got new ? (8:29 p.m.)

**Jan Carlos Gonzalez-Rivera (JGR):** Yeah its new killing people i swear (8:36 p.m.)

**AO:** Txt in 20 min meet same place as last 2 (8:43 p.m.)

74.    Based on my training and experience and the substance of this and other intercepted communications, I believe that when OCASIO texted, "Yo u got new," OCASIO was asking GONZALEZ-RIVERA if GONZALEZ-RIVERA had a new supply

of heroin for OCASIO and GONZALEZ-RIVERA responded that he did have a new supply of heroin and that it was of very high quality because this new supply of heroin was "killing people i swear." I further believe that when OCASIO texted, "Txt in 20 min meet same place as last 2," OCASIO wanted to meet GONZALEZ-RIVERA in twenty minutes at the same spot that they met at the last two times.

**April 19, 2016**

**9:44 a.m.**

75.    On April 19, 2016, at approximately 9:44 a.m., OCASIO called GONZALEZ-RIVERA.  The following is a transcript of that call:

**Jan Carlos Gonzalez-Rivera (JGR):** I'm on my way, I'll be there in three (3)... four (4) minutes.

**Angel Ocasio (AO):**  [Background noise]  Yo!  What part you at? [PH]

**JGR:** I'm on St. Paul now.

**AO:** Huh?

**JGR:** I'm on St. Paul now.

**AO:** Aright.  Meet me at the store right there, uhm... by... br... uh Dewey.

**JGR:** Which one?

**AO:** [U/I] anyway I'm going to Family Dollar.  I gotta go to Family Dollar.

**JGR:**  Okay, okay, okay.

 [End of Call]

−35−

**10:05 a.m.**

76.     On April 19, 2016, at approximately 10:05 a.m., OCASIO placed an outgoing

call on telephone instrument (585) 524-8457 to telephone instrument (716) 436-0450, utilized

by GONZALEZ-RIVERA.  The following is a transcript of that call:

**Jan Carlos Gonzalez-Rivera (JGR):** Yeah.

**Angel Ocasio (AO):** Yo hold on.  Give me a second, hold on.   [Pause]  [Background noise]
Yo!

**JGR:** Yo!

**AO:** You know what's crazy?

**JGR:** What?

**AO:** They're from the same people I buy... I buy that car from; last time.

**JGR:** Mm... Nah!

**AO:** It's the    same, it's the same uhm... You know what I mean?

**JGR:** It's the s... it's some black people, some black people?

**AO:** No, no, no!   I'm sayin' it's the same thing, it's the same, um, [Brief pause] It's the same
as... It's the same um... bird.  The emblem?

                                        [Voices overlap]

**JGR:** Uh, yeah, yeah.

**AO:** Uh, you know the emblem?

**JGR:** Oh, yeah?

**AO:** Yeah!  I swear to god.  No lying.

**JGR:** Oh!

**AO:** With the bird.

**JGR:** Oh, for real?

**AO:** I swear to god.   [Chuckles]  No lie.

**JGR:** Oh shit!  You're faster than me.  I didn't even get to do it yet.

**AO:** And they got a number on it and everything.

–36–

**JGR:** Oh!

**AO:** It's that... it [U/I] the way I do.

**JGR:** Ah well, it's official then, right?

**AO:** Yeah, it's official.

**JGR:** Oh, okay then.

**AO:** Okay.

**JGR:** Aright.

[End of Call]

77.     Based on my training and experience and the substance of this and other intercepted communications and my involvement in this investigation, I believe that when OCASIO stated, "They're from the same people I buy... I buy that car from; last time," and "It's the same, it's the same uhm... You know what I mean," OCASIO was telling GONZALEZ-RIVERA that the kilogram of cocaine that GONZALEZ-RIVERA just supplied to OCASIO must have come from the same source from whom OCASIO had obtained cocaine a previous transaction.  I further believe that when OCASIO stated, "No, no, no!  I'm sayin' it's the same thing, it's the same, um, [Brief pause] It's the same as... It's the same um... bird.  The emblem," "Uh, you know the emblem," and "With the bird" OCASIO recognized that the kilogram of cocaine came from the same source because it has an emblem of a bird[9] on the kilogram of cocaine.

78.     I further believe that when GONZALEZ-RIVERA stated, "Oh shit!  You're faster than me.  I didn't even get to do it yet," GONZALEZ-RIVERA was telling OCASIO that GONZALEZ-RIVERA had not yet unwrapped his kilogram of cocaine.  I further

---

[9] During the Ocasio investigation agents seized kilograms of cocaine which bore an emblem of a bird.

believe that when GONZALEZ-RIVERA asked OCASIO, "Ah well, it's official then, right?" GONZALEZ-RIVERA was OCASIO if the cocaine was of good quality and OCASIO responded that it was ("Yeah, it's official.")

## CONTROLLED PURCHASES OF DRUGS
## CONDUCTED IN THIS INVESTIGATION

79.    During the course of this investigation, several confidential sources made controlled purchases of drugs from several of the defendants.

## CONTROLLED PURCHASES FROM CRUZ-VEGA

### January 2020 Controlled Purchase from Jonathan CRUZ-VEGA

80.    In the middle of January 2020, members of the investigative team met with CS-5 in order to conduct a controlled purchase of heroin/fentanyl[10] from CRUZ-VEGA. CS-5 had previously made contact with CRUZ-VEGA at the direction of the investigative team and obtained a contact number for CRUZ-VEGA.  In the presence of the investigative team, CS-5 contacted the number provided by CRUZ-VEGA and spoke with CRUZ-VEGA, at which time a meet location in the City of Rochester was agreed upon.  Members of the investigative team searched CS-5 and his/her vehicle with a negative result for weapons or contraband, provided CS-5 with recording devices and official advanced funds (OAF), and CS-5 drove to the agreed location to meet with CRUZ-VEGA.[11]

---

[10]  See footnote 1 above.

[11] This process of searching the CS and his/her vehicle before the CS headed out to meet with the target was

81.     Shortly after CS-5's arrival at the meet location, a member of the investigative team observed via electronic monitoring CRUZ-VEGA's rental vehicle depart the vicinity of his residence at 195 Campbell Park, Rochester, New York (**Premises 7**).  Approximately seven minutes later, a member of the investigative team observed CRUZ-VEGA's rental vehicle arrive in the vicinity of the meet location and CRUZ-VEGA met with CS-5.

82.     Following that meeting, members of the investigative team maintained visual contact on CS-5 as he/she traveled to a secondary meet location in the area of 16 Village Way, as directed by CRUZ-VEGA.

83.     Surveillance was also maintained on CRUZ-VEGA as he drove his rental vehicle to the vicinity of **Building 10, Strathmore Circle**.[12]  Approximately four minutes later, a member of the investigative team observed someone walk to CRUZ-VEGA's rental vehicle coming from the direction of **Building 10, Strathmore Circle.**  The rental vehicle then departed **Strathmore Circle** and traveled directly to the secondary meet location where CS-5 was waiting.  As observed by members of the investigative team, CS-5 then met with CRUZ-VEGA, at which time CRUZ-VEGA handed CS-5 a clear plastic baggie containing a grey powdery substance appearing to be heroin/fentanyl and, in exchange, CS-5 paid CRUZ-VEGA the OAF[13].

_____

followed in every controlled purchase discussed in this affidavit.  Similarly, after the completion of the controlled purcahses, the same procedure was followed whereby the CS drove directly to meet with the agents and turned over the narcotics and recording devices and the CS and his/her vehicle was again searched and the CS was debriefed by the agents on the particulars of the transaction.

[12] As noted below, one of CRUZ-VEGA's girlfriends resides in Apartment D, in Building 10 Strathmore Circle (**Premises 6**)

[13] The quantity of narcotics exchanged and the amount of OAF paid for the narcotics are being withheld from this and other controlled purchases described below in order to protect the identity of confidential sources utilized in this investigation.

84.     After the transaction was complete, CS-5 departed the secondary meet location and traveled directly back to a predetermined location where CS-5 turned over the bag of suspected drugs and the recording devices to members of the investigative team.  CS-5 and his/her vehicle were again searched with negative results for weapons or contraband.

85.     CS-5 was then debriefed on the narcotics transaction, and CS-5 confirmed that CRUZ-VEGA handed CS-5 the narcotics.  CS-5 stated that Amante SANTIAGO ("Cholo") was also present during the transaction.

86.     CS-5 further advised that when CRUZ-VEGA arrived, CRUZ-VEGA first entered the residence at 16 Village Way (**Premises 9**) remaining inside for a brief period and then came directly to CS-5 and handed him/her the narcotics.  Approximately a half hour after the controlled purchase, electronic monitoring observed CRUZ-VEGA's rental vehicle return to the vicinity of CRUZ-VEGA's residence at 195 Campbell Park (**Premises 7**).  The grey powdery substance which CRUZ-VEGA sold to CS-5 was sent to the Drug Enforcement Administration Northeast Laboratory for analysis and tested positive for the presence of fentanyl.

87.     CS-5 was later shown a photograph of a Hispanic Female and CS-5 immediately identified this female as "Savanna."  CS-5 stated that Savanna is a close friend of CRUZ-VEGA's girlfriend "LeLe" FNU LNU who lives at the Strathmore Circle Apartments.  The photograph of the Hispanic female who agents showed CS-5 was of Sahvana Lopez, the registered RG&E customer for 10 Strathmore Circle, Apartment "D" (**Premises 6**).

88.     Based on my training and experience, it is a common tactic for narcotics

traffickers to use other persons with multiple degrees of separation to place utilities in their name to avoid detection from law enforcement.   In light of the CS-5's identification of Sahvana Lopez in whose name utilities are registered at apartment D at 10 Strathmore Circle, I believe that Savanna allows her name to be used by LeLe and CRUZ-VEGA for utilities at their apartment D, I further believe that CRUZ-VEGA obtained at least a portion of the fentanyl he sold to CS-5 from Apartment D.

### February 2020 Controlled Purchase from CRUZ-VEGA

89.     In the first half of February 2020, CS-5 made another controlled purchase of heroin/fentanyl from CRUZ-VEGA.  CS-5 had previously made contact with CRUZ-VEGA at the direction of controlling agents via electronic communication and a meet location in the City of Rochester was agreed upon.  Shortly after CS-5 arrived at the meet location, a member of the investigative team observed CRUZ-VEGA's rental vehicle arrive at the meet location.  CS-5 then met with CRUZ-VEGA, at which time CRUZ-VEGA handed CS-5 a clear plastic baggie containing a grey powdery substance appearing to be heroin/fentanyl and, in exchange, CS-5 paid CRUZ-VEGA the Official Advanced Funds. After the transaction was complete, CS-5 departed the meet location and traveled directly back to a predetermined location where CS-5 provided members of the investigative team with the plastic baggie and the recording devices.[14]

90.     CS-5 was debriefed on the narcotics transaction, and confirmed that he/she

---

[14] Agents were unable to maintain surveillance on CRUZ-VEGA's rental vehicle following the controlled purchase.

purchased the drugs from CRUZ-VEGA.  The grey powdery substance was subsequently sent to the Drug Enforcement Administration Northeast Laboratory and tested positive for Fentanyl.

## February 2020 Controlled Purchase from CRUZ-VEGA

91.     In the middle of February 2020, CS-5 made another controlled purchase of heroin/fentanyl from CRUZ-VEGA.  CS-5 had previously made contact with CRUZ-VEGA at the direction of controlling agents and a meet location in the City of Rochester was agreed upon.  CS-5 drove to the meet location in anticipation of the controlled purchase.

92.     Approximately 15 minutes prior, members of the investigative team observed a rental vehicle which was known to be rented by CRUZ-VEGA parked in the vicinity of 10 Strathmore Circle, Apartment D, Rochester, New York (**Premises 6**).  This rental vehicle had earlier been observed by a member of the investigative team parked unattended at Cruz Vega's residence at 195 Campbell Park, Rochester, New York (**Premises 7**) at approximately 9:37 a.m. on this same day.

93.     Approximately a minute after CS-5 arrived at the meet location, a member of the investigative team observed a male exit 10 Strathmore Circle and depart in CRUZ-VEGA's rental vehicle.  CRUZ-VEGA's vehicle then traveled directly to the meet location, at which time CS-5 met with CRUZ-VEGA.  (CS-5 was wearing a concealed recording device and the investigative team could hear CRUZ-VEGA's voice during the transaction.) CRUZ-VEGA handed CS-5 a clear plastic baggie containing a grey powdery substance

appearing to be heroin/fentanyl and, in exchange, CS-5 paid CRUZ-VEGA the OAF.

94.     After the transaction was complete, CS-5 turned over the purchased drugs to members of the investigative team and confirmed that CRUZ-VEGA sold him/her the drugs. The grey powdery substance was subsequently sent to the Drug Enforcement Administration Northeast Laboratory for analysis where it tested positive for Fentanyl.

95.     Surveillance was maintained on CRUZ-VEGA's rental vehicle and it was observed departing the meet location and returning to the Building 10, Strathmore Circle **(Premises 6)**.

### March 2020 Controlled Purchase from CRUZ-VEGA

96.     In the beginning of March 2020, CS-5 made another controlled purchase of heroin/fentanyl from CRUZ-VEGA.  In the presence of members of the investigative team, CS-5 again made contact with CRUZ-VEGA via electronic communication and a meet location in the City of Rochester was agreed upon.  CS-5 drove to the meet location in anticipation of the controlled purchase.

97.     Approximately 10 minutes later, a member of the investigative team observed a CRUZ-VEGA arrive at the meet location in a rental vehicle, CS-5 then met with CRUZ-VEGA at the meet location, at which time CRUZ-VEGA handed CS-5 a clear plastic baggie containing a tan powdery substance appearing to be heroin/fentanyl and, in exchange, CS-5 paid CRUZ-VEGA the OAF.  After the transaction was complete, CS-5 departed the meet location and traveled directly to meet with members of the investigative team and turned over the drugs to them. CS-5 was then debriefed on the narcotics transaction, at which time

CS-5 confirmed that CRUZ-VEGA sold him/her the drugs.

98.     The tan powdery substance was subsequently sent to the Drug Enforcement Administration Northeast Laboratory where it tested positive for fentanyl.


### April 2020 Controlled Purchase from CRUZ-VEGA

99.     In the beginning of April 2020, CS-5 made another controlled purchase of heroin/fentanyl from CRUZ-VEGA.  CS-5 travelled to the location previously agreed to with CRUZ-VEGA.

100.     Approximately 10 minutes before CS-5 arrived at the meet location, a member of the investigative team observed a rental vehicle previously determined to be utilized by CRUZ-VEGA parked unattended in front of 10 Strathmore Circle, where **Premises 6** is located.  Approximately 10 minutes later, a member of the investigative team observed two individuals get into the rental vehicle and depart the vicinity of **Premises 6**. Surveillance was maintained on the rental vehicle as it traveled to the meet location, at which time a member of the investigative team observed CRUZ-VEGA meet with CS-5. CRUZ-VEGA handed CS-5 a clear plastic baggie containing a grey powdery substance appearing to be heroin/fentanyl and, in exchange, CS-5 paid CRUZ-VEGA the OAF.

101.     After the transaction was complete, CS-5 departed the meet location and traveled directly back to a predetermined location where CS-5 provided members of the investigative team with the plastic baggie and the recording device, and confirmed that CRUZ-VEGA sold CS-5 the drugs.  A member of the investigative team conducted a field test of the grey powdery substance, with the positive result for the presence of fentanyl.  The

grey powdery substance was subsequently sent to the Drug Enforcement Administration

Northeast Laboratory for analysis with the results pending.

.

## CONTROLLED PURCHASES FROM EARNEST BAKER

### February 2020 Controlled Purchase from Earnest BAKER

102.    At the end of February 2020, members of the investigative team met with CS-

4 in order to conduct a controlled purchase of heroin/fentanyl from BAKER.  In the

presence of members of the investigative team, CS-4 again made contact with BAKER via a

telephone utilized by BAKER and a meet location in the City of Rochester was agreed

upon.

103.    CS-4 travelled to the agreed location in anticipation of the controlled

purchase.  Approximately 17 minutes after CS-4's arrival at the meet location, a member of

the investigative team observed Earnest BAKER's black Ram 1500 pickup truck, New York

Registration number JNC-2568 (**Vehicle 5**) approaching the meet location, with BAKER

driving.

104.    CS-4 and BAKER then met to discuss the narcotics transaction, at which time

BAKER contacted a third party and directed CS-4 to a secondary meet location in the City

of Rochester to complete the narcotics transaction.  CS-4 and BAKER both departed the

meet location in their respective vehicles and CS-4 was followed by controlling agents to the

secondary meet location.

105.    Approximately 8 minutes later, a member of the investigative team observed a

white Chevy Tahoe, New York Registration number JLW-6641 **(Vehicle 13)**[15] approach CS-4.  CS-4 then met with the third party at the secondary meet location, at which time the third party handed CS-4 a clear plastic baggie containing a grey powdery substance appearing to be heroin/fentanyl and, in exchange, CS-4 paid the third party the OAF.

106.    After the transaction was complete, CS-4 departed the secondary meet location and traveled directly back to a predetermined location where CS-4 provided members of the investigative team with the plastic baggie and the recording device.  CS-4 was then debriefed on the narcotics transaction, at which time CS-4 confirmed the transaction and described the third party to controlling agents.  The grey powdery substance was subsequently sent to the Drug Enforcement Administration Northeast Laboratory where it tested positive for fentanyl.

107.    Surveillance was maintained on the third party as he traveled to a business in the City of Rochester for approximately 4 minutes before traveling directly to BAKER's residence at 20 Heidelberg Street, Rochester, New York (**Premises 13**).   Approximately a half hour later, **Vehicle 13** departed **Premises 13** and made two short stops at a convenience store and a gas station before continuing to 33 Locust Street, Rochester, New York (**Premises 15**).

### March 2020 Controlled Purchase from BAKER

108.    In the middle of March 2020, CS-4 made another controlled purchase from

---

[15] At the time of this February controlled purchase, **Vehicle 13** had tag # JLW-6641.  Subsequently, the registration was changed to the name of Philip FLOWERS with an address of 33 Locust Street, Rochester, NY, with the new tag # JRE-7904.

Earnest BAKER.  Members of the investigative team utilized a combination of physical surveillance, electronic surveillance, and GPS monitoring to conduct surveillance on multiple members of the drug trafficking organization.

109.    Earlier that afternoon, at approximately 5:25, electronic surveillance[16] near Natasha FIGUEROA's residence at 35 Northaven Terrace in Rochester (**Premises 2**) showed FIGUEROA exiting her residence and getting into her black Mercedes-Benz, New York Registration number HZB-3678 (**Vehicle 3**) and drive away.  A GPS tracker installed on FIGUEROA's Mercedes (**Vehicle 3**) showed that FIGUEROA drove to Earnest BAKER's residence at 20 Heidelberg Street, Rochester, New York (**Premises 13**) and at approximately 5:34 p.m., a member of the investigative team observed FIGUEROA's **Vehicle 3** parked in the street near **Premises 13**.  At approximately 5:38 p.m., FIGUEROA returned to **Vehicle 3** from the direction of **Premises 13** and departed the area.  Surveillance was maintained on **Vehicle 3** and showed that FIGUEROA returned to **Premises 2** at approximately 5:53 p.m. after stopping briefly at a convenience store.

110.    Later in the evening on that same day, CS-4 made contact with BAKER and a meet location in the City of Rochester was agreed upon.  CS-4 drove to the meet location in anticipation of the controlled purchase.

111.    Approximately 20 minutes later, BAKER arrived at the agreed meet location. CS-4 then met with BAKER at the meet location, at which time BAKER handed CS-4 a transparent plastic containing a white powdery substance appearing to be cocaine and, in

---

[16] A stationary camera was set up near FIGUEROA's house at 35 Northaven Terrace (Premises 2) which permitted the investigative team to maintain constant visual surveillance of the outside of the residence.

exchange, CS-4 paid BAKER the Official Advanced Funds.  After the transaction was complete, CS-4 departed the meet location and traveled directly back to a predetermined location where CS-4 turned over the purchased white powdery substance to members of the investigative team.  CS-4 confirmed that BAKER handed CS-4 the suspected cocaine.  The suspected cocaine was sent to the Northeast Laboratory for analysis with the results pending.

112.    Surveillance was maintained on BAKER's vehicle and a member of the investigative team observed BAKER's vehicle travel directly from the meet location back to BAKER's residence at 20 Heidelberg **(Premises 13)**, parking behind the residence in an alley.  At approximately 9:14 p.m. on the same day, a member of the investigative team observed FIGUEROA's **Vehicle 3** and BAKER's vehicle parked unattended at BAKER's residence (**Premises 13**).

## PURCHASES FROM ALEXIS MORALES AND JOSHUA BAUER

### Police stop of drug customer after purchasing heroin from Alexis MORALES

113.    On November 5, 2018, Alexis MORALES was involved in a traffic stop while operating a white Chevrolet Tahoe with New York registration GUU-7114.  This Tahoe was registered to Maria Deleon, DOB: XX-XX-1965.  Just prior to this traffic stop, officers observed a female enter the white Tahoe and then exit the Tahoe after approximately one minute.  A police stop was conducted on the female's vehicle and she admitted to officers that she possessed heroin.  The female told police officers that she had obtained the heroin from MORALES.

114.    As more fully set forth below, agents have subsequently observed Alexis MORALES operating the same white Chevrolet Tahoe with New York registration GUU-7114 **(Vehicle 8)** while engaging in apparent drug trafficking activity.  The Tahoe is still registered to Maria Deleon as stated above.

**Undercover Purchases of heroin/fentanyl from Alexis MORALES and Joshua BAUER**

115.    During the course of this investigation and as explained in further detail in this affidavit, agents identified Alexis MORALES and BAUER as drug dealers who sell narcotics for Enrique MEDINA.  Additionally, agents have confirmed that ELIEZER MORALES stored the narcotics for MEDINA at 83 Springfield Avenue, Rochester **(Premises 17)**.  Pursuant to intercepted communications on cellular phones utilized by Alexis MORALES, ELIEZER, and BAUER, agents were aware that BAUER and MORALES were visiting ELIEZER's residence **(Premises 17)** for the purpose of obtaining narcotics to sell to waiting customers.  When agents identified MEDINA, MORALES, and BAUER in this investigation, agents learned that the Rochester Police Department had conducted multiple controlled purchases from both MORALES and BAUER.

116.    Beginning in early December 2019, the Rochester Police Department began conducting controlled purchase of fentanyl and cocaine from Alexis MORALES and BAUER.  Investigators were introduced to an unwitting third party (UW) who had access to narcotics traffickers who were selling heroin and cocaine.  The investigators were able to accompany the UW and secretly purchase user amounts of heroin/fentanyl and cocaine from the UW's dealers (later determined to be Alexis MORALES and BAUER).

117.    On December 10, 2019, investigators met the UW in the city of Rochester for the purpose of purchasing heroin/fentanyl from the UW's supplier named Alex.[17]  The undercover investigator (UC) gave the UW $50 and the UC requested heroin.  The UC and other investigators observed the UW enter a white Tahoe with New York registration GUU-7114 **(Vehicle 8)**[18.]  The UW then exited **Vehicle 8** in less than one minute and handed the investigator five red glassine envelopes that later field tested positive for fentanyl.  Investigators had previously viewed Alexis MORALES' photo and were able to positively identify Alexis MORALES as the drug dealer utilizing the Tahoe that day.

118.    On January 20, 2020, investigators again met the UW in the city of Rochester for the purpose of purchasing heroin and cocaine from the UW's supplier.  The UC handed the UW $200 to purchase cocaine and heroin.  Investigators observed Alexis MORALES arrive to the meet location in **Vehicle 8** and UW entered MORALES' vehicle.  A short time later, the UW exited **Vehicle 8** and entered UC's vehicle and handed the UC cocaine and a grey powdery substance.  The suspected cocaine field tested positive for cocaine and the suspected heroin field tested positive for fentanyl.  Surveillance followed Alexis MORALES after this transaction and he was observed a short time later at the same location selling to other customers.

---

[17] The UW identified Alex's phone number as (585) 410-7336.  As more fully set forth below, that number is subscribed to Alexis MORALES, and a federal wiretap was conducted on that number (Target Telephone 14) and other phone numbers in this investigation.

[18]  This is the same white Tahoe that Alexis MORALES was driving on November 5, 2018 when he sold heroin to the female, as detailed in paragraph 113 above.

119.    On February 12, 2020, investigators met the UW in the city of Rochester for the purpose of purchasing heroin and cocaine from the UW's supplier.  The UC and UW met and the UC handed the UW $200 to purchase cocaine and heroin.  Investigators observed Alexis MORALES again arrive at the meet location in **Vehicle 8** and parked next to the UC.  UW entered MORALES's vehicle and a short time later exited and entered the UC's vehicle.  The UW handed the UC the suspected cocaine and suspected heroin.  The suspected cocaine field tested positive for cocaine and the suspected heroin field tested positive for fentanyl.  MORALES was later observed at the same location selling to other customers.

120.    On February 13, 2020, investigators received information that MORALES resided at 37 Avenue D, Rochester, New York (**Premises 18**).  Investigators observed Alexis MORALES' 2003 Chevrolet Tahoe (**Vehicle 8**)  parked at **Premises 18** on multiple occasions over the next few weeks at various times of the day.

121.    On February 27, 2020, investigators again met the UW for the purpose of purchasing heroin/fentanyl and cocaine from the Alexis MORALES.  The UC and UW met and the UC handed the UW $170 to purchase cocaine and heroin.  This time, investigators observed a white Acura with New York registration JDT-4149 arrive at the meet location.  Agents have since identified this vehicle as Joshua BAUER's Acura (**Vehicle 7**).

122.    The UW entered **Vehicle 7** and a few minutes later exited and entered the UC's vehicle.  The UW handed the UC the suspected heroin and stated the drug supplier did not have any cocaine.  The suspected heroin was field tested, which resulted in the

positive presence of fentanyl.  Surveillance was unable to follow the Acura but the UC later viewed a photograph of Joshua BAUER and positively identified BAUER as the drug dealer utilizing the white Acura when the UW bought the fentanyl that day.

123.    On March 12, 2020, investigators again met the UW in the city of Rochester for the purpose of purchasing heroin and cocaine from the UW's supplier.  The UC and UW met and the UC handed the UW $340 to purchase cocaine and heroin.  Investigators observed Alexis MORALES arrive at the meet location in **Vehicle 8** and the UW entered **Vehicle 8**.  UW entered MORALES' vehicle and a short time later exited and handed the UC a tied up plastic bag, which contained suspected cocaine and suspected heroin.  The suspected cocaine field tested positive for cocaine and the suspected heroin field tested positive for fentanyl.


## SURVEILLANCE OPERATIONS IN THIS INVESTIGATION


124.    As more fully described below, this investigation has involved extensive surveillance of the defendants and their respective residences and vehicles.  Stationary cameras were set up near the 4 Florack (Premises 1), 35 Northaven (Premises 2) and 20 Heidelberg (Premises 13) which allowed the investigative team to maintain constant visual surveillance of the exterior of those locations.  GPS trackers were installed on numerous vehicles used by the defendants which allowed the investigative team to identify the location and movement of the vehicles.  Cell Site location authorization was also obtained on the phones used by GONZALEZ-RIVERA, Alexis MORALES and Joshua BAUER.  Finally,

federal wiretaps were conducted on the cell phones of Joshua BAUER (585-743-9486,

Target Telephone 11), Eliezer MORALES (585-504-5596, Target Telephone 12) and Alexis

MORALES (585-410-7336), Target Telephone 14).

## SURVEILLANCE ON DECEMBER 10, 2019

### Gonzalez-Rivera supplies Medina and Bauer

125.    On December 10, 2019, at approximately 7:45 p.m., GONZALEZ-RIVERA

was sitting inside a white Chevy Tahoe, Illinois Registration number BK-34251, parked in

the driveway of 4 Florack Street, Rochester, New York (**Premises 1**).  GONZALEZ-

RIVERA remained inside the vehicle for approximately 25 minutes (during which time he

met with CRUZ-VEGA) and then went inside **Premises 1** at 8:09 pm.

126.    At approximately 8:30 p.m., a grey Ford Expedition, New York Registration

number JHJ-1461, arrived at **Premises 1**.  This vehicle was determined to be a Hertz rental

vehicle rented by Enrique MEDINA.  MEDINA exited the driver's side and Joshua

BAUER exited the passenger side of MEDINA's Ford rental and entered **Premises 1**.  A

few minutes later, at approximately 8:35 p.m., MEDINA and BAUER exit **Premises 1** and

depart in MEDINA's Ford rental.  Shortly afterwards, a member of the investigative team

observed MEDINA's rental arrive at a business lot at the intersection of North Goodman

Street and Norton Street.

127.    Based on my training and experience and the investigation to date, I believe

that MEDINA and BAUER traveled to **Premises 1** in order to obtain a quantity of narcotics from GONZALEZ-RIVERA before traveling to the business lot to conduct a narcotics transaction with an unknown third party.

128.     At approximately 9:11 p.m., MEDINA's Ford rental returned to) 4 Florack (**Premises 1** and MEDINA and BAUER again went inside **Premises 1** at approximately 9:15 p.m.  At approximately 9:24 p.m., BAUER exited **Premises 1** and entered MEDINA's Ford rental.  At approximately 9:36 p.m., MEDINA exited **Premises 1** and got into the driver's side of the Ford rental, at which time MEDINA and BAUER departed in the Ford rental.

129.     Members of the investigative team followed MEDINA's Ford rental to Windmill Trail, Rochester, NY, where it was observed idling at the end of the driveway of MEDINA's residence at 143 Windmill Trail, Rochester, New York (**Premises 11**).  Approximately ten minutes later, a member of the investigative team observed only a fresh set of tire tracks in the driveway leading from where MEDINA's Ford rental had been observed idling to the garage of the residence at **Premises 11**, indicating that MEDINA had parked the Ford rental in his garage.

130.     Based on my training and experience and the investigation to date, I believe that after returning to Premises 1 from the business lot, MEDINA and BAUER again met with GONZALEZ-RIVERA in order to obtain an additional quantity of narcotics which they took back to MEDINA's residence at 143 Windmill Trail (**Premises 11**).  I further

believe that the period during which MEDINA had his Ford rental idling in front of his house was a counter surveillance technique used to attempt to identify possible law enforcement in the area.  MEDINA has engaged in similar conduct on several occasions during this investigation.

## SURVEILLANCE ON DECEMBER 17, 2019

131.    On December 17, 2019, at approximately 6:08 p.m., GONZALEZ-RIVERA was observed pulling into the driveway of Natasha FIGUEROA's residence at 35 Northaven Terrace, Rochester, New York (**Premises 2**) driving a white 2019 GMC Yukon XL, Utah Registration number F34-3MT.  This vehicle was determined to be a rental vehicle rented and utilized by GONZALEZ-RIVERA.

132.    At approximately 6:09 p.m., a female appearing to be FIGUEROA (wearing a winter jacket with a hood) exited **Premises 2** carrying what appeared to be a supermarket shopping bag and approached the driver's side of GONZALEZ-RIVERA's white GMC Yukon and passed the bag to GONZALEZ-RIVERA.  The female then returned to **Premises 2** as GONZALEZ-RIVERA's Yukon rental departed.

133.    One minute later, at approximately 6:10 p.m., GONZALEZ-RIVERA's white Yukon rental pulled into the driveway of 4 Florack Street, Rochester, New York (**Premises 1**)[19].  GONZALEZ-RIVERA exited the Yukon and entered **Premises 1** along

---

[19] FIGUEROA's residence at 35 Northaven Terrace (Premises 2) is approximately two blocks from the house at 4 Florack (Premises 1).

with an unknown male from a dark SUV which had previously parked in the driveway. Based on my training and experience and the investigation to date, I believe that when GONZALEZ-RIVERA traveled to **Premises 2** and retrieved a bag, he obtained a quantity of narcotics stashed at **Premises 2** which GONZALEZ-RIVERA then transported them to **Premises 1**.

### Medina, Alexis Morales and Bauer are supplied by Gonzalez-Rivera

134.     Approximately five minutes later, at approximately 6:15 p.m., MEDINA's above-described gray Ford Expedition rental pulled into the driveway of **Premises 1**. MEDINA exited the Expedition and went inside **Premises 1**.

135.     At approximately 6:35 p.m., MEDINA exited **Premises 1** followed shortly by GONZALEZ-RIVERA, and the two conversed in the driveway.  At approximately 6:42 p.m., Alexis MORALES' white 2003 Chevrolet Tahoe, New York Registration GUU-7114 (**Vehicle 8**), pulled into the driveway of **Premises 1**.  MEDINA then approached the driver's side window of **Vehicle 8**.  At approximately 6:46 p.m., MEDINA entered his Ford Expedition rental and departed **Premises 1**.  **Vehicle 8** then repositioned itself in the driveway of **Premises 1** and a male believed to be Joshua BAUER based on physical characteristics exited the passenger side and went inside **Premises 1**.  Less than two minutes later, at approximately 6:48 p.m., the male believed to be BAUER exited **Premises 1** and opened the passenger door of GONZALEZ-RIVERA's white GMC Yukon rental before returning to **Premises 1** carrying an unknown object.  At approximately 6:49 p.m., the male

believed to be BAUER exited **Premises 1** and got into the passenger seat of **Vehicle 8**, at which time **Vehicle 8** departed **Premises 1**.

136.    Based on my training and experience and the investigation to date, I believe that MEDINA traveled to Premises 1 in order to arrange the purchase of drugs from GONZALEZ-RIVERA.  After MEDINA departed, BAUER and Alexis MORALES came to 4 Florack to actually pick up and transport the drugs.  This is consistent with confidential source information as well as the substance of intercepted communications, which indicate that BAUER and Alexis MORALES distribute narcotics on behalf of MEDINA.

## Vanesly Lopez is supplied by GONZALEZ-RIVERA

137.    At approximately 6:18 p.m. (approximately eight minutes after GONZALEZ-RIVERA arrived), Vanesly LOPEZ' white 2009 Audi A4, New York Registration HRA-4865 (**Vehicle 6**), pulled into the driveway of **Premises 1**.  Vanesly LOPEZ exited **Vehicle 6** and entered **Premises 1**.  A few minutes later, at approximately 6:22 p.m., LOPEZ exited **Premises 1** and departed in **Vehicle 6**.  Based on my training and experience and the investigation to date, the short nature of LOPEZ' visit to **Premises 1** immediately following GONZALEZ-RIVERA's return to **Premises 1** with the bag from **Premises 2**, indicates that LOPEZ went to Premises 1 to be supplied and was supplied with a quantity of narcotics by GONZALEZ-RIVERA.

138.    At approximately 8:19 p.m., Vanesly LOPEZ returned to 4 Florack (Premises 1) in her Audi  (**Vehicle 6**) and went inside  **Premises 1**.  LOPEZ exited the residence a few

minutes later and at approximately 8:23 p.m. and she left in her Audi (Vehicle 6).  The investigative team followed LOPEZ and observed her and **Vehicle 6** stop at two locations (believed to be the work and residence locations of drug customers) and then to LOPEZ' residence at 14 Galusha Street (**Premises 16**), where she arrived at approximately 9:22 pm.

139.    Based on my training and experience and the investigation to date, and LOPEZ' return to **Premises 1** where she remained for only three minutes and her subsequent short stops to different locations immediately following her visit to **Premises 1**, I believe that LOPEZ obtained additional drugs from Premises 1 and immediately distributed at least a portion of those drugs to her drug customers.  LOPEZ then returned home to 14 Galusha Street **(Premises 16)** with the proceeds of her drug sales and any leftover narcotics.

## SURVEILLANCE ON DECEMBER 19, 2019

### Narcotics transported to Premises 1
### where they are supplied to Cruz-Vega

140.    On December 19, 2019, at approximately 2:00 p.m., GONZALEZ-RIVERA arrived at 4 Florack Street, Rochester (**Premises 1**) in a rented white GMC Yukon XL, Utah Registration number F34-3MT, and pulled into the driveway.  He remained seated in the Yukon for a while.

141.    At approximately 2:14 p.m., CRUZ-VEGA arrived at Premises 1 in a rented black Cadillac SUV, New York Registration number JNR-7267.  This vehicle was determined to be registered to EAN Holdings, LLC, and rented by CRUZ-VEGA.  CRUZ-

VEGA then exited the Cadillac rental and got into the passenger side of the white GMC Yukon rental, with GONZALEZ-RIVERA still in the driver's seat.

142.    At the same time, at approximately 2:14 p.m., a grey Lexus SUV, New York Registration number HRA-7431 (**Vehicle 4**) pulled into the driveway of 35 Northaven Terrace, Rochester, New York (**Premises 2**).   The investigation has revealed that Vehicle 4 is driven by Marilin DELEON, aka "Beba", FIGUEROA's sister and one of GONZALEZ-RIVERA's girlfriends.  No one other than DELEON has been observed driving Vehicle 4 during the investigation.

143.    Natasha FIGUEROA exited the passenger side of **Vehicle 4** and entered **Premises 2**.  At approximately 2:16 p.m., **Vehicle 4** departed **Premises 2**.

144.    At approximately 2:17 p.m., **Vehicle 4** pulled into the driveway of **Premises 1**.  GONZALEZ-RIVERA and CRUZ-VEGA then exited the white GMC Yukon rental, at which time GONZALEZ-RIVERA approached the driver's side window of **Vehicle 4** and obtained a plastic shopping bag with something inside from the female driver who appeared to be Marilin DELEON.  CRUZ-VEGA approached the passenger's side of **Vehicle 4**.  After GONZALEZ-RIVERA obtained the shopping bag, both he and CRUZ-VEGA entered **Premises 1,** and **Vehicle 4** departed **Premises 1** at approximately 2:18 p.m.

145.    Based on my training and experience and the investigation to date, I believe that Marilin DELEON traveled in **Vehicle 4** to **Premises 1** in order to supply GONZALEZ-RIVERA and CRUZ-VEGA with the requested narcotics.

–59–

146.    At approximately 2:27 p.m., CRUZ-VEGA exited **Premises 1** and returned to CRUZ-VEGA's black Cadillac rental.  CRUZ-VEGA was pinching his arm to his body and appeared to be concealing a bag similar to the one GONZALEZ-RIVERA was observed obtaining from the driver of **Vehicle 4**.  CRUZ-VEGA then departed **Premises 1** at approximately 2:28 p.m.  At approximately 2:32 p.m., a member of the investigative team observed CRUZ-VEGA's black Cadillac rental arrive in the vicinity of his suspected stash location at 10 Strathmore Circle, Rochester, New York (**Premises 6**).  Based on my training and experience and the investigation to date, I believe that CRUZ-VEGA transported a quantity of narcotics to his stash location at **Premises 6**, which narcotics CRUZ-VEGA obtained at **Premises 1** after the narcotics were dropped off by the driver of Vehicle 4.

### SURVEILLANCE ON DECEMBER 23, 2019

### Gonzalez-Rivera supplies Amante Santiago and Unidentified Male at Premises 1

147.    On December 23, 2019, at approximately 7:35 p.m., GONZALEZ-RIVERA arrived at 4 Florack Street (**Premises 1**) in a white GMC Yukon rental.  GONZALEZ-RIVERA remained sitting in the white GMC Yukon rental.

148.    At approximately 7:47 p.m., a white BMW sedan, New York Registration number JMS-5982, arrived at **Premises 1**.  This vehicle was determined to be a rental vehicle registered to EAN Holdings, LLC, and utilized by Amante SANTIAGO aka "Cholo."  A male believed to be Amante SANTIAGO exited the driver's side of the white BMW rental and got into the passenger side of GONZALEZ-RIVERA's white Yukon rental.  An unknown male, hereafter UM1, got out of the passenger side of Amante's BMW

and approached the driver's side window of the white Yukon rental.  UM1 then appeared to count out U.S. Currency and then handed the currency to GONZALEZ-RIVERA.

149.    At approximately 7:57 p.m., the male believed to be Amante SANTIAGO exited GONZALEZ-RIVERA's white GMC Yukon rental and went to the passenger side of the white BMW rental.  A short time later, he walked back to Gonzalez-RIVERA'S GMC Yukon holding an unknown object.  The male believed to be SANTIAGO then returned to the white BMW rental and got in the drivers' seat and departed **Premises 1** at approximately 8:07 p.m. with UM1, who had since returned to the passenger seat of the BMW.

150.    Based on my training and experience and the investigation to date, I believe that during the foregoing activity Amante SANTIAGO and UM1 traveled to Premises 1 in order to conduct a narcotics transaction with GONZALEZ-RIVERA.  Furthermore, I believe that UM1 was counting out money in order to pay GONZALEZ-RIVERA for narcotics that GONZALEZ-RIVERA provided to SANTIAGO prior to SANTIAGO returning to the white BMW rental.

151.    A member of the investigative team followed the white BMW to the vicinity of a corner store in the vicinity of North Street and Roycroft Street at approximately 8:09 p.m., where visual contact was temporarily lost.  At approximately 8:11 p.m., a member of the investigative team again observed the white BMW rental as it traveled southbound on North Street.  Mobile surveillance was continued as the white BMW rental traveled to a gas station before traveling to Still Moon Crescent and parking in front of Amante SANTIAGO's residence at Still Moon Crescent, Apartment 12, Rochester, New York

(**Premises 10**) at approximately 8:39 p.m.  A member of the investigative team observed the name "Whitney" on the mailbox for **Premises 10**.

152.    The investigation to date has determined that Ashley WHITNEY is the girlfriend of Amante SANTIAGO.  The next morning, on December 24, 2019, at approximately 9:02 a.m., a member of the investigative team observed the white BMW rental parked unattended in the parking lot of **Premises 10,** indicating that Amante SANTIAGO had spent the night at **Premises 10.**

## SURVEILLANCE ON JANUARY 3, 2020

### Alexis Morales brings a large quantity of cash to Gonzalez-Rivera

153.    On January 3, 2020, at approximately 9:54 p.m., GONZALEZ-RIVERA arrived at 4 Florack Street, Rochester, New York (**Premises 1**) in a silver Chevy Tahoe.  At approximately 9:58 p.m., **Vehicle 8** (Alexis MORALES' car) pulled into the driveway of **Premises 1**.  GONZALEZ-RIVERA moved the silver Chevy Tahoe next to the driver's side window of **Vehicle 8**.  At approximately 9:59 p.m., **Vehicle 8** departed **Premises 1** and the driver appeared to be Alexis MORALES.  GONZALEZ-RIVERA continued to sit in the silver Chevy Tahoe and count approximately seven large stacks of U.S. Currency from a plastic bag.  At approximately 10:05 p.m., GONZALEZ-RIVERA departed **Premises 1** in the silver Chevy Tahoe.

154.    Based on my training and experience and the investigation to date, I believe that Alexis MORALES traveled to **Premises 1** in order to pay GONZALEZ-RIVERA a quantity of money owed to GONZALEZ-RIVERA for narcotics.  The short amount of time

that GONZALEZ-RIVERA remained at Premises 1 (approximately 10 minutes) indicates that he went to the location specifically to meet with Alexis to receive the cash.

## SURVEILLANCE ON JANUARY 19, 2020

### Gonzales-Rivera obtains drugs from Figueroa and brings them to 4 Florack for processing

155.    On January 19, 2020, at approximately 4:03 p.m., GONZALEZ-RIVERA arrived at Natasha FIGUEROA's residence at 35 Northaven Terrace, Rochester, New York (**Premises 2**) in a rented black GMC Yukon.  At approximately 4:09 p.m., Natasha FIGUEROA exited **Premises 2** holding a black bag, approached the driver's side of the black Yukon and handed the bag to GONZALEZ-RIVERA.  FIGUEROA then went back inside **Premises 2** and GONZALEZ-RIVERA departed in the black GMC Yukon rental.

156.    At approximately 4:11 p.m., GONZALEZ-RIVERA arrived at 4 Florack Street, (**Premises 1**) in the black Yukon.  GONZALEZ-RIVERA exited the Yukon carrying the black bag along with a grey bag and what appeared to be a box with a photo of a blender on it, and used keys to enter **Premises 1**.

157.    Based on my training and experience and the investigation to date, I believe that GONZALEZ-RIVERA traveled to **Premises 2** to retrieve a quantity of narcotics stashed at that location before traveling to **Premises 1**.  Additionally, I believe that the additional items GONZALEZ-RIVERA was observed also carrying into **Premises 1** were indicative of GONZALEZ-RIVERA utilizing **Premises 1** to dilute and package narcotics into distributable amounts.

158.    At approximately 4:20 p.m., Philip FLOWERS' white Chevrolet Tahoe with New York States tag number JRE-7904 (**Vehicle 13**)**,** pulled into the driveway of **Premises 1**.  A male believed to be Philip FLOWERS exited **Vehicle 13** with a grey plastic bag and went inside **Premises 1**.  Based on my training and experience and the investigation to date, I believe that the male believed to be FLOWERS arrived at **Premises 1** in order to assist GONZALEZ-RIVERA process narcotics into distributable amounts.

159.    At approximately 5:29 p.m., Earnest BAKER arrived at **Premises 1** in his black Ram 1500, New York Registration number JNC-2568 (**Vehicle 5**) and entered **Premises 1** with food bags and beverage cups.  BAKER remained at the residence for approximately 1 hour, leaving at 6:31 p.m.

160.    At approximately 5:53 p.m., CRUZ-VEGA arrived at Premises 1 driving a grey Chevy SUV, New York Registration number JLD-3450.  CRUZ-VEGA entered the residence, where he remained for approximately 34 minutes before departing at 6:29 pm.

161.    At approximately 9:10 p.m., Shaumyk SANTIAGO arrived at 4 Florack in a white Chevy Colorado and went inside the residence.  At approximately 9:13 p.m., GONZALEZ-RIVERA, the male believed to be FLOWERS, and Shaumyk SANTIAGO all exited **Premises 1** and got into their respective vehicles.  GONZALEZ-RIVERA and the male believed to be FLOWERS departed **Premises 1** while Shaumyk SANTIAGO repositioned the white Chevy Colorado in the driveway and went back inside **Premises 1**.

162.    Based on my training and experience, the foregoing activity indicates that GONZALEZ-RIVERA obtained narcotics from FIGUEROA and brought them to 4 Florack (**Premises 1**) to cut and bag them for redistribution.  The fact that he brought with

him what appeared to be a blender/mixer, commonly used to mix narcotics and cut, further supports this conclusion. The arrival of the male believed to be Flowers' with his own bag at the residence less than ten minutes after GONZALEZ-RIVERA arrived indicates that he came to the location to assist GONZALEZ-RIVERA process the drugs. FLOWERS remained at the residence until GONZALEZ-RIVERA left for the night at 9:13 pm, leaving Shaumyk SANTIAGO, who lives at Premises 1, as the sole remaining occupant.

### SURVEILLANCE ON January 22, 2020

### Figueroa brings drugs to Gonzalez-Rivera at 4 Florack and Gonzalez-Rivera supplies drugs to Medina and Bauer

163.    On January 22, 2020, at approximately 6:01 p.m., FIGUEROA departed 35 Northaven (**Premises 2**) carrying a bag and got into her Mercedes **(Vehicle 3)**  She arrived at 4 Florack one minute later. GONZALEZ-RIVERA then exited Premises 1 and walked to the passenger side of Vehicle 3. Moments later GONZALEZ-RIVERA walked back inside Premises 1, carrying a bag.

164.    At approximately 6:21 p.m., Enrique MEDINA arrived in a rental vehicle and went inside Premises 1. At approximately 6:25 p.m., Joshua BAUER got out of MEDINA's rental vehicle and also went inside Premises 1. One minute later, BAUER exited Premises 1, walked to MEDINA's rental. BAUER then walked away from MEDINA's rental carrying a bag and got into another vehicle (a four door sedan) and departed the area.

165.    At approximately 6:43 p.m., GONZALEZ-RIVERA, MEDINA, and two other males exited PREMISES 1.  MEDINA entered his rental, and GONZALEZ-RIVERA and the two other males entered GONZALEZ-RIVERA's vehicle and both vehicles departed the area.

166.    Based on my training and experience and the investigation to date, I believe that FIGUEROA traveled to Premises 1 and gave GONZALEZ-RIVERA a bag with drugs requested by GONZALEZ-RIVERA.   I further believe that MEDINA and BAUER went to Premises 1 to obtain narcotics from GONZALEZ-RIVERA.  BAUER took possession of the narcotics and left with them in the four door sedan.   This is consistent with information from CS-5 that MEDINA meets with GONZALEZ-RIVERA to negotiate cocaine and heroin purchases and does not usually transport the drugs.  Furthermore, the investigation to date has indicated that BAUER and Alexis MORALES are responsible for the distribution aspect of their narcotics trafficking and ELIEZER MORALES is responsible for maintaining the stash location.

167.    This is further corroborated by the interception of telephone communications between BAUER on TARGET TELEPHONE 11 and ELIEZER MORALES on TARGET TELEPHONE 12.  Approximately three minutes after BAUER left 4 Florack Street, BAUER sent a text message to ELIEZER at TARGET TELEPHONE 12 that read, "I got ur daughter".  BAUER then called ELIEZER at 6:30 p.m., and in sum and substance stated that BAUER would come to ELIEZER's house later that night.  Based on my training and experience and these intercepted communications, I believe that BAUER received a

quantity of cocaine ("daughter") from Premises 1 and told ELEIZER that he would bring the cocaine to MEDINA's stash location at ELIEZER's residence (**Premises 17**) later that night.

## SURVEILLANCE ON JANUARY 31, 2020

### Marilin DeLeon delivers drugs to Gonzalez-Rivera

168.    On January 31, 2020, at approximately 4:48 p.m., GONZALEZ-RIVERA arrived at 4 Florack Street, Rochester, New York (**Premises 1**) in a rented white GMC. GONZALEZ-RIVERA entered the residence carrying two large plastic bags.  At approximately 5:00 p.m., Marilin DELEON's grey Lexus SUV, New York Registration number HRA-7431 (**Vehicle 4**) pulled into the driveway of **Premises 1.**  GONZALEZ-RIVERA exited **Premises 1** and approached the passenger side of **Vehicle 4** for approximately two seconds before returning to **Premises 1** with his right hand concealed from view.  **Vehicle 4** then immediately backed out of the driveway and drove away.

169.    Based on my training and experience and the investigation to date, I believe that Vehicle 4 traveled to Premises 1 in order to supply GONZALEZ-RIVERA with a quantity of narcotics.  I further believe that Marilin DELEON was driving Vehicle 4 at the time given that she is the only person who has been observed driving Vehicle 4 during this months' long investigation.

–67–

## SURVEILLANCE ON FEBRUARY 5, 2020

### Figueroa delivers drugs to Gonzalez-Rivera at 4 Florack, and Gonzalez-Rivera supplies some of the drugs to Marcus Johnson

170.    At approximately 4:07 p.m., GONZALEZ-RIVERA arrived at **Premises 1** in a black Cadillac Escalade, New York Registration number GXN-4213 (**Vehicle 1**).  The black Escalade is registered to Krystal Gonzalez, one of GONZALEZ-RIVERA's girlfriends.  Gonzales-Rivera remained in the driveway.  At approximately 4:18 p.m., a rented grey Ford sedan, Pennsylvania Registration number LBA-5510 arrived at **Premises 1**.  Marcus JOHNSON exited the grey Ford rental and got into the passenger side of GONZALEZ-RIVERA'S black Escalade (**Vehicle 1).**

171.    At approximately 4:34 p.m., Natasha FIGUEROA departed 35 Northaven Terrace, Rochester, New York (**Premises 2**) in her black Mercedes Benz C30 (**Vehicle 3**) and drove to 4 Florack (Premises 1), arriving there about a minute later.

172.    GONZALEZ-RIVERA then approached the passenger side of FIGUEROA's Mercedes (**Vehicle 3)** and returned to the black Escalade (**Vehicle 1)** carrying a black plastic bag.  **Vehicle 3** then departed.

173.    At approximately 4:37 p.m., Marcus JOHNSON walked around **Vehicle 1** to the driver's side and stood next to GONZALEZ-RIVERA while he appeared to be manipulating the contents of the bag just received from FIGUEROA.  JOHNSON then walked to his grey Ford sedan rental and got inside.  GONZALEZ-RIVERA then entered **Premises 1** with the black bag, which appeared to hold less contents inside, and he was

retying the bag (indicating that he had opened it and removed a portion from it) and remained inside for less than a minute.   GONZALEZ-RIVERA then exited **Premises 1** and at approximately 4:38 p.m. GONZALEZ-RIVERA and JOHNSON departed **Premises 1** in their respective vehicles.

174.    Based on my training and experience and the investigation to date, I believe that FIGUEROA traveled to **Premises 1** and provided GONZALEZ-RIVERA a quantity of narcotics that had been stored at **Premises 2**.  Additionally, I believe that GONZALEZ-RIVERA then provided JOHNSON with a portion of the narcotics before JOHNSON departed in his rental vehicle.

## SURVEILLANCE ON FEBRUARY 7, 2020

### Budd and Gonzalez-Rivera engage in a drug transaction

175.    On February 7, 2020, at approximately 3:28 p.m., Lateef BUDD arrived at 4 Florack Street (**Premises 1**) in the white Lexus L57, New York Registration JDY-6775 (**Vehicle 9**).  GONZALEZ-RIVERA arrived at the same time in a rented maroon GMC Yukon, New York Registration number HYZ-5336.  BUDD exited **Vehicle 9** and entered the passenger side of GONZALEZ-RIVERA's rented maroon Yukon rental, and the two men drove away from Premises 1 in the Yukon.

176.    At approximately 7:57 p.m., GONZALEZ-RIVERA and BUDD returned to **Premises 1** in the maroon Yukon rental.  Both men went inside **Premises 1**, with

–69–

GONZALEZ-RIVERA carrying a bag.  At approximately 8:29 p.m., BUDD exited **Premises 1** and got into **Vehicle 9** and drove away.

177.    Based on my training and experience and the investigation to date, I believe that BUDD and GONZALEZ-RIVERA met in order to conduct a drug transaction.

178.    At approximately 9:04 p.m., a member of the investigative team observed BUDD exiting **Vehicle 9** in the driveway of one of BUDD's residences at 28 Blaydon Loop, West Henrietta, New York (**Premises 12**) and walking towards the garage.  A black sedan was also observed in the driveway.

## SURVEILLANCE ON FEBRUARY 8, 2020

### Budd obtains drugs from Gonzalez-Rivera

179.    The next morning, on February 8, 2020, at approximately 10:58 a.m., a member of the investigative team observed Lateef BUDD's white Lexus L57 (**Vehicle 9**) and the black Honda Accord, New York Registration number JGE-9382 (**Vehicle 10**) parked in the driveway of 28 Blaydon Loop, West Henrietta, New York (**Premises 12**).

180.    At approximately 3:39 p.m., BUDD arrived at **Premises 1** in his white Lexus (**Vehicle 9**) and walked into **Premises 1**.  At approximately 3:41 p.m., GONZALEZ-RIVERA exited **Premises 1** and get into his rented maroon GMC Yukon which was parked in the driveway of **Premises 1**.  BUDD then went into the backseat of the GONZALEZ-RIVERA's rented maroon GMC Yukon and retrieved a yellow bag and then walked back to

his white Lexus (**Vehicle 9**).  BUDD then departed **Premises 1** in **Vehicle 9** and

GONZALEZ-RIVERA departed in the maroon GMC Yukon rental.

181.    Based on my training and experience and the investigation to date, I believe

that BUDD traveled to **Premises 1** in order to obtain narcotics, which were concealed in the

yellow bag which BUDD took from GONZALEZ-RIVERA's rented Yukon.


## SURVEILLANCE ON FEBRUARY 10, 2020

### Gonzalez-Rivera picks up drugs from Figueroa, brings them back to Florack and supplies Vanesly Lopez

182.    On February 10, 2020, at approximately 5:02 p.m., GONZALEZ-RIVERA

arrived at 4 Florack Street, Rochester, New York (**Premises 1**) in the rented maroon GMC

Yukon.  He then immediately drove back out of the driveway at Premises 1 and drove to

Natasha FIGUEROA's house at 35 Northaven Terrace (**Premises 2**).

183.    At approximately 5:04 p.m., FIGUEROA exited **Premises 2** and walked to

the driver's side of GONZALEZ-RIVERA's rented Yukon.  FIGUEROA then handed

GONZALEZ-RIVERA a small white bag and GONZALEZ-RIVERA departed **Premises 2**

and drove back to **Premises 1**.  Based on my training and experience and the investigation

to date, I believe that GONZALEZ-RIVERA traveled to **Premises 2** in order to obtain a

quantity of narcotics that was stashed at **Premises 2** by FIGUEROA before returning to

**Premises 1** in anticipation of supplying customers with the narcotics.

184.    At approximately 5:11 p.m., GONZALEZ-RIVERA could be seen parked in

the driveway of 4 Florack Street (**Premises 1**) sitting in the maroon Yukon rental, and he was unwrapping the white bag he had just gotten from FIGUEROA.  The unwrapping revealed a white object inside.  GONZALEZ-RIVERA then placed the white object out of view towards the center console of the Yukon.

185.     A few minutes later, at approximately 5:17 p.m., Vanesly LOPEZ entered the passenger side of GONZALEZ-RIVERA's maroon Yukon and began talking with GONZALEZ-RIVERA.  At approximately 5:32 p.m., LOPEZ exited GONZALEZ-RIVERA's Yukon and returned to her white Audi A4, New York Registration number HRA-4865 (**Vehicle 6**).  Both the Audi and the Yukon then departed **Premises 1**.

186.     At approximately 6:04 p.m., a member of the investigative team observed **Vehicle 6** parked unattended in the driveway of LOPEZ' residence at 14 Galusha Street, Rochester, New York (**Premises 16**).

187.     Based on my training and experience and the investigation to date, I believe that LOPEZ traveled to **Premises 1** and met with GONZALEZ-RIVERA in order to obtain a quantity of narcotics that GONZALEZ-RIVERA had just obtained from FIGUEROA.

**SURVEILLANCE ON FEBRUARY 15, 2020**

**Shaumyk Santiago obtains drugs from 4 Florack left there by Gonzalez-Rivera**

188.     On February 15, 2020, at approximately 2:45 p.m., GONZALES-RIVERA arrived at Natasha FIGUEROA's residence at 35 Northaven Terrace, Rochester, New York (**Premises 2**) in a rented white BMW X7.  At approximately 2:50 p.m., FIGUEROA came to the driver's side of GONZALEZ-RIVERA's white BMW rental and handed

GONZALEZ-RIVERA a black plastic bag.  GONZALEZ-RIVERA then departed **Premises 2**.

189.    At approximately 3:39 p.m., GONZALEZ-RIVERA arrived at 4 Florack Street, (**Premises 1**) in the rented white BMW.  GONZALEZ-RIVERA and an unidentified passenger, hereafter UI1, exited the white BMW and walked towards the street out of view before entering **Premises 1**.  At approximately 3:52 p.m., GONZALEZ-RIVERA and UI1 exited **Premises 1** and departed in GONZALEZ-RIVERA's white BMW rental.

190.    Based on my training and experience and the investigation to date, I believe that GONZALEZ-RIVERA traveled to **Premises 2** in order to obtain a quantity of narcotics stashed at the location by FIGUEROA before traveling to **Premises 1**.

191.    At approximately 5:24 p.m., a silver Volkswagen sedan arrived at **Premises 1** and Shaumyk SANTIAGO exited the passenger side.  Shaumyk SANTIAGO approached the milk door next to the entry door of **Premises 1** and appeared to get something from inside the compartment.  He then got back into the passenger side of the silver Volkswagen sedan, and the Volkswagen sedan then departed **Premises 1**.

192.    Based on my training and experience and the investigation to date, I believe that GONZALEZ-RIVERA placed a quantity of narcotics in the milk door compartment from inside the residence for Shaumyk SANTIAGO to retrieve it.  This is consistent with similar activity observed at that location where individuals have been observed putting items inside the milk door compartment and/or removing items from the compartment.

## SURVEILLANCE ON FEBRUARY 17, 2020

### Gonzalez Rivera turns over suitcases of cash and/or narcotics to Figueroa to transport

193.    At approximately 4:35 p.m., FIGUEROA exited 35 Northaven Terrace (**Premises 2**) and departed in her black Mercedes Benz (**Vehicle 3**).  At the time, GONZALEZ-RIVERA was at 4 Florack siting inside Earnest BAKER's black Ram Pickup (**Vehicle 5**), which was parked in the driveway of Premises 1.

194.    At approximately 4:43 p.m., FIGUEROA and **Vehicle 3** arrived at **Premises 1**.  GONZALEZ-RIVERA exited **Vehicle 5** and approached the driver's side window of **Vehicle 3** and proceeded to hand FIGUEROA a stack of U.S. Currency.  GONZALEZ-RIVERA then returned to **Vehicle 5**, obtained two suitcases, walked back to **Vehicle 3**, and placed them in the passenger side of **Vehicle 3**.  FIGUEROA then departed **Premises 1** in **Vehicle 3** and GONZALEZ-RIVERA departed in **Vehicle 5**.

195.    At approximately 5:02 p.m., FIGUEROA returned to her house (**Premises 2**) in **Vehicle 3** and went inside without the suitcases.

196.    Based on my training and experience and the investigation to date, I believe that GONZALEZ-RIVERA utilized **Vehicle 5** to transport the two suitcases containing drug proceeds and/or narcotics from an unknown location and then turned over the suitcases to FIGUEROA in **Vehicle 3** in order for her to transport them to a stash location or an additional co-conspirator.

## SURVEILLANCE ON FEBRUARY 19, 2020

### Gonzalez-Rivera supplies drugs to a male believed to be Phillip Flowers

197.    On February 19, 2020, at approximately 4:04 p.m., FIGUEROA exited 35 Northaven Terrace (**Premises 2**) and departed in her black Mercedes Benz (**Vehicle 3**). At approximately 4:05 p.m., **Vehicle 3** pull into the driveway of 4 Florack (**Premises 1**). FIGUEROA exited **Vehicle 3** and walked to the milk door next to the entrance of **Premises 1**, appearing to place an object inside before departing in **Vehicle 3**. Based on my training and experience and the investigation to date, I believe that FIGUEROA was directed by GONZALEZ-RIVERA to bring a quantity of narcotics for GONZALEZ-RIVERA and to place it in the milk door of **Premises 1**.

198.    At approximately 5:18 pm, GONZALEZ-RIVERA arrived at 4 Florack in Earnest BAKER's Ram pickup truck (**Vehicle 5**). GONZALEZ-RIVERA walked to the milk door holding a stack of cash in one hand and appeared to get what was inside the milk compartment. He then entered the residence with a key.

199.    At 5:38, EARNEST BAKER arrived at 4 Florack driving GONZALEZ-RIVERA's white BMW rental. BAKER then walked to his RAM pickup and placed a brown bag in the backseat, and then entered the residence.

200.    At approximately 6:28 p.m., a white Chevy Tahoe, New York Registration JRE-7904 (**Vehicle 13**)[20] arrived at **Premises 1**. The male believed to be Philip FLOWERS

---

[20] **Vehicle 13** is registered to Philip FLOWERS, xx/xx/1978. It is the same car used by the male believed to

–75–

then entered **Premises 1**.  At approximately 6:39 p.m., the white Chevy Tahoe **(Vehicle 13)** departed Premises 1.[21]  Ten minutes later, GONZALEZ-RIVERA and BAKER exited **Premises 1**.  BAKER got into the driver's side of his Ram pickup truck **(Vehicle 5)**, while GONZALEZ-RIVERA retrieved a bag from the passenger side of Ram pickup **(Vehicle 5)** and went back into **Premises 1**.  BAKER then departed in **Vehicle 5**.

201.    Based on my training and experience and the investigation to date, I believe that the in the foregoing activity, the male believed to FLOWERS obtained drugs from 4 Florack and drove them away in his white Tahoe (Vehicle 13).  BAKER's arrival and presence at 4 Florack while Flowers was there is consistent with other surveillance in this case and CS information indicating that BAKER uses FLOWERS to transport drugs for him.

### Gonzalez-Rivera supplies drugs to Marcus Johnson

202.    At about the same time as BAKER left, at approximately 6:38 p.m., Marcus JOHNSON entered **Premises 1** after arriving in a rented black Ford Fusion, Minnesota Registration number CWN-381, and parking in the street.

203.    At approximately 7:21 p.m., Natasha FIGUEROA'S Mercedes **(Vehicle 3)** arrived at **Premises 1**.  GONZALEZ-RIVERA then exited **Premises 1**, approached **Vehicle**

---

be FLOWERS on January 19, as described in paragraph 158 above.

[21] Surveillance did not observe the male believed to be Flowers get back into the white Chevy Tahoe (Vehicle 13) because the camera being used was focused at the time on identifying the individual who pulled up in the Ford Fusion (Marcus JOHNSON).

**3** briefly and went back inside **Premises 1**.[22]  Two minutes later, at approximately 7:23 p.m., GONZALEZ-RIVERA and JOHNSON exited **Premises 1** and get into the GONZALEZ-RIVERA'S white BMW rental and departed **Premises 1**.

204.    At approximately 8:32 p.m., the white BMW rental returned to **Premises 1**. JOHNSON then exited the passenger side and entered **Premises 1** by unlocking the door. He came back out less than a minute later, reached briefly into the GONZALEZ-RIVERA's BMW and then returned to his black Fusion rental.  GONZALEZ-RIVERA and JOHNSON the departed in their respective vehicles.

205.    Based on my training and experience and the investigation to date, I believe that FIGUEROA came to Florack and dropped off drugs for GONZALEZ-RIVERA, which he in turn, supplied to JOHNSON**.**

## SURVEILLANCE ON FEBRUARY 24, 2020

### Baker and Lopez at 4 Florack

206.    On February 24, 2020, at approximately 4:41 p.m., GONZALEZ-RIVERA arrived at 4 Florack (**Premises 1**) in his white BMW rental.  GONZALEZ-RIVERA

---

[22] FIGUEROA and **Vehicle 3** departed and drove back to FIGUEROA's house **(Premises 2)**.

remained in the vehicle.

207.    At approximately 4:45 p.m., BAKER arrived at **Premises 1** in the black Cadillac Escalade, New York Registration number GXN-4213 (**Vehicle 1**).  The Escalade is registered to Krystal Gonzalez, one of Gonzalez-Rivera's girlfriends and Gonzalez-Rivera has been observed driving the vehicle on numerous occasions.   BAKER approached Gonzalez-Rivera and obtained keys from him.  BAKER then briefly entered **Premises 1**. When he exited he was holding an item appearing to be a stove pot, which he placed into the Escalade (**Vehicle 1)**, and then drove away in the Escalade.

208.    At the same time, at approximately 4:49 p.m., Vanesly LOPEZ arrived at **Premises 1** in her white Audi A4, New York Registration number HRA-4865 (**Vehicle 6**) and parked in the street.  At approximately 4:50 p.m., LOPEZ sat in the front passenger seat of GONZALEZ-RIVERA's white BMW rental and the two remained in the vehicle.  At approximately 5:29 p.m., LOPEZ exited the passenger side of the BMW rental and used keys to enter **Premises 1** as GONZALEZ-RIVERA departed **Premises 1** in the white BMW rental.

209.    At approximately 5:48 p.m., GONZALEZ-RIVERA returned to **Premises 1** and entered **Premises 1**.  At approximately 5:54 p.m., LOPEZ exited **Premises 1** with an object in her left hand, followed by GONZALEZ-RIVERA.  LOPEZ then departed **Premises 1** in her AUDI (**Vehicle 6)** while GONZALEZ-RIVERA departed in the BMW rental.

210.    Based on my training and experience and the investigation to date, I believe

–78–

that this surveillance shows that BAKER and LOPEZ are trusted associates of

GONZALEZ-RIVERA as evidenced by both BAKER and LOPEZ entering Premises 1

while GONZALEZ-RIVERA stayed outside and by LOPEZ staying at Premises 1 when

GONZALEZ-RIVERA was not there.


### SURVEILLANCE ON MARCH 6, 2020

### Figueroa and DeLeon deliver drugs to Gonzalez-Rivera
### which he in turn supplies to Tommy Brunson

211.    On March 6, 2020, at approximately 6:40 p.m., GONZALEZ-RIVERA

arrived at 4 Florack Street (**Premises 1**) in the black Cadillac Escalade, New York

Registration number GXN-4213 (**Vehicle 1**) registered to Krystal Gonzalez, and remained

in the vehicle.


212.    At approximately 6:48 p.m., a female believed to be Marilin DELEON

(Natasha FIGUEROA's sister and one of GONZALEZ-RIVERA's girlfriends) arrived at 35

Northaven Terrace (**Premises 2**) in her grey Lexus SUV (**Vehicle 4**).  At approximately 6:51

p.m., a female believed to be FIGUEROA exited **Premises 2** and entered the passenger side

of **Vehicle 4**.  **Vehicle 4** then departed **Premises 2** and arrived at 4 Florack a minute later.

GONZALEZ-RIVERA exited **Vehicle 1** and approached **Vehicle 4** holding two bags which

he appeared to hand through the passenger side window of **Vehicle 4**.  Gonzalez-Rivera

also appeared to receive something from Vehicle 4. **Vehicle 4** then departed at

approximately 6:54 p.m. as GONZALEZ-RIVERA entered **Premises 1**

213.    Three minutes later, at approximately 6:57 p.m., GONZALEZ-RIVERA exited **Premises 1** and departed in the black Escalade (**Vehicle 1**).  At approximately 7:00 p.m., a member of the investigative team observed **Vehicle 1** arrive in the vicinity of the North Goodman Street and Norton Street intersection and meet with a white 2017 Chrysler 300, New York Registration number JJM-1309 (**Vehicle 12**).  This vehicle was determined to be registered to Tommy BRUNSON Jr. d/o/b: xx/xx/90 of 228 West Pleasant Avenue, Syracuse, New York.  Tommy BRUNSON is a known drug trafficker in the Syracuse, New York area.  The meet was brief and consistent with a narcotics transaction.  Following the meet, **Vehicle 1** returned to **Premises 1** at approximately 7:06 p.m.

214.    Based on my training and experience, and later meetings with BRUNSON as described below, I believe that the foregoing shows that FIGUEROA and DELEON delivered drugs to Gonzalez-Rivera, which Gonzalez-Rivera in turn supplied to Tommy BRUNSON a short while later.

### SURVEILLANCE ON MARCH 13, 2020

### Gonzalez-Rivera supplies drugs to Marilin DeLeon

215.    At approximately 3:15 p.m., Marilin DELEON's grey Lexus SUV (**Vehicle 4**) pulled into the driveway of **Premises 1**.  GONZALEZ-RIVERA then exited **Premises 1** carrying a small white object appearing to be a small bag of narcotics in his left hand and

approached the passenger side of **Vehicle 4**.  GONZALEZ-RIVERA was observed passing the object through the front passenger window before opening the rear passenger door and retrieving a white bag from the back seat.  GONZALEZ-RIVERA then returned to **Premises 1** and **Vehicle 4** departed.

216.    Based on my training and experience and the investigation to date, I believe that GONZALEZ-RIVERA engaged in a drug transaction with Marilin DELEON in **Vehicle 4**, handing DELEON with a quantity of narcotics and obtaining something from DELEON at the same time.

### Figueroa brings drugs to Gonzalez-Rivera at Florack

217.    At approximately 3:22 p.m., FIGUEROA exited **Premises 2** with a black plastic bag and depart in **Vehicle 3**.  At approximately 3:23 p.m., **Vehicle 3** pulled into the driveway of **Premises 1**.  GONZALEZ-RIVERA then exited **Premises 1** and approached the passenger side of **Vehicle 3**, where he retrieved the black plastic bag.  GONZALEZ-RIVERA then went back inside **Premises 1** with the black plastic bag.  **Vehicle 3** departed.

218.    At approximately 3:28 p.m., **Vehicle 3** arrived at **Premises 2** and FIGUEROA entered **Premises 2**.  At approximately 3:30 p.m., FIGUEROA came back out and got into **Vehicle 3** carrying a Wegman's reusable shopping bag and departed.  At approximately 3:31 p.m., **Vehicle 3** arrived at **Premises 1**.  GONZALEZ-RIVERA then exited **Premises 1** and approached **Vehicle 3**, retrieving the Wegman's shopping bag, before returning to **Premises 1** and **Vehicle 3** departing.

219.    Based on my training and experience and the investigation to date, I believe that FIGUEROA made multiple trips to **Premises 1** in order to deliver to GONZALEZ-RIVERA with various narcotics that were being stashed at **Premises 2**.

## SURVEILLANCE ON MARCH 18, 2020

### Marilin DeLeon drops off drugs to Gonzalez-Rivera at 4 Florack

220.    On March 18, 2020, at approximately 4:29 p.m., GONZALEZ-RIVERA'S grey Chevy Suburban rental pulled into the driveway of 4 Florack (**Premises 1**).  Eight minutes later, at approximately 4:37 p.m., Marilin DELEON's grey Lexus SUV (**Vehicle 4**) pulled into the driveway of **Premises 1** and parked next to the grey Chevy Suburban.  The driver of **Vehicle 4** then handed a bag into the driver's side window of the grey Chevy Suburban rental before **Vehicle 4** departed **Premises 1**.  Shortly thereafter, at approximately 4:42 p.m., GONZALEZ-RIVERA's grey Chevy Suburban rental departed **Premises 1**.

221.    Based on my training and experience and the investigation to date, I believe that Marilin DELEON in **Vehicle 4** traveled to **Premises 1** to deliver a quantity of drugs to GONZALEZ-RIVERA, and that GONZALEZ-RIVERA then shortly thereafter left to supply customers.[23]

---

[23] Although at the time of the exchange neither driver of the two vehicles were visible, as noted below, the rented Chevy Suburban was GONZALEZ-RIVERA's rental and he was observed driving it later that day. With respect to Vehicle 4, this is the car of Marilin DELEON who has repeatedly been observed using the car

## Medina drops off money to Gonzalez-Rivera

222.    At approximately 8:07 p.m., GONZALEZ-RIVERA arrived at Premises 1 in his grey Chevy Suburban.  Some seven minutes later, at approximately 8:14 p.m., Enrique MEDINA pulled into the driveway of 4 Florack in his rented black GMC Yukon, New York Registration number JLD-7594.  MEDINA then got out of his Yukon and sat in the passenger seat of the grey Chevy Suburban rental with GONZALEZ-RIVERA still in the driver's seat.  At approximately 8:16 p.m., GONZALEZ-RIVERA began counting a large sum of money while sitting in the driver's seat of the grey Chevy Suburban rental, while MEDINA sat next to him in the front passenger seat.  At approximately 8:17 p.m., GONZALEZ-RIVERA and MEDINA exited the grey Chevy Suburban rental and departed **Premises 1** in MEDINA's black GMC Yukon rental.  At approximately 8:25 p.m., the black GMC Yukon rental returned to **Premises 1**, at which time GONZALEZ-RIVERA and MEDINA entered the residence.

223.    At approximately 8:34 p.m., MEDINA exited **Premises 1** with a plastic bag and departed in the black GMC Yukon rental.  At approximately 9:01 p.m., a member of the investigative team observed MEDINA's black GMC Yukon rental circle the block of Windmill Trail.  Prior to circling the block, a member of the investigative team observed that there were no lights on at 143 Windmill Trail, Rochester, New York (**Premises 11**).

224.    At approximately 9:04 p.m., a member of the investigative team completed a

---

during the investigation.

drive-by of **Premises 11** and observed that lights inside the residence were on.  There were

no vehicles in the driveway, indicating that MEDINA parked the black GMC Yukon rental

in the garage of **Premises 11**, as observed during previous surveillance operations.

225.    Based on my training and experience and the investigation to date, I believe

that MEDINA departed **Premises 1** after having negotiated a drug transaction with

GONZALEZ-RIVERA which was later consummated by BAUER, as described below.

MEDINA then drove home to **Premises 11** and engaged in counter surveillance in order to

determine if he was being surveilled by law enforcement before parking his car in the garage

### DeLeon delivers more drugs to Florack,
### which Gonzalez-Rivera supplies to Joshua Bauer

226.    At approximately 9:33 p.m., DELEON's Lexus (**Vehicle 4**) returned to

**Premises 1**.  GONZALEZ-RIVERA exited **Premises 1** and walked to the passenger

window of **Vehicle 4** for approximately 3 seconds before going back inside **Premises 1**.

**Vehicle 4** then departed.

227.    At approximately 9:54 p.m., Joshua BAUER's white Acura TSX, New York

Registration number JDT-4149 (**Vehicle 7**) parked in the vicinity of **Premises 1** and a male

believed to be BAUER entered **Premises 1**.  At approximately 10:02 p.m., the male believed

to be BAUER exited **Premises 1** with a bag, walked to the street and got into the rear seat of

a dark colored Chevy sedan.

228.    At approximately 10:28 p.m., GONZALEZ-RIVERA exited the house and

got into his grey Chevy Suburban rental.  At approximately 10:31 p.m., the male believed to

be BAUER returned to **Premises 1** and approached the driver's side window of the
GONZALEZ-RIVERA's Chevy Suburban rental before getting into the passenger side of
the rental at approximately 10:37 p.m.  At approximately 10:40 p.m., the male believed to
be BAUER exited the grey Chevy Suburban rental and got into BAUER's Acura (**Vehicle
7**).  Both GONZALEZ-RIVERA and the male believed to be BAUER then departed in their
respective vehicles.

229.    Based on my training and experience and the investigation to date, I believe
that Marilin DELEON delivered more drugs to GONZALEZ-RIVERA at 4 Florack, and
that shortly thereafter, BAUER came to Florack to obtain a quantity of drugs, as previously
negotiated by MEDINA.  BAUER then sold those drugs and returned to Florack to pay
GONZALEZ-RIVERA and/or to obtain additional drugs for future resale.

## SURVEILLANCE ON MARCH 23, 2020

### Cruz Vega obtains drugs from Gonzalez Rivera at Florack, goes to Strathmore to stash and rebag them and then supplies a drug customer

230.    On March 23, 2020, at approximately 3:26 p.m., GONZALEZ-RIVERA
arrived at 4 Florack (**Premises 1**) in a rented maroon Chevy Suburban.  Three minutes later,
at approximately 3:29 p.m., CRUZ-VEGA arrived at **Premises 1** in a rented black Nissan
Pathfinder.  GONZALEZ-RIVERA and CRUZ-VEGA then entered **Premises 1**.  At
approximately 3:50 p.m., GONZALEZ-RIVERA and CRUZ-VEGA exited **Premises 1** and
left in their respective vehicles.

231.    Four minutes later, at 3:54 p.m., a member of the investigative team observed CRUZ-VEGA's black Nissan Pathfinder in the vicinity of 10 Strathmore Circle, Apartment D, (**Premises 6**)**,** and CRUZ-VEGA entered the building.  At approximately 4:02 p.m., a member of the investigative team observed CRUZ-VEGA exit 10 Strathmore Circle and returned to the black Nissan Pathfinder rental.  At approximately 4:04 p.m., a member of the investigative team observed the black Nissan Pathfinder rental pull into a business lot at the intersection of North Goodman Street and Norton Street, where CRUZ-VEGA was observed meeting with an occupant of a silver Honda Odyssey.  At approximately 4:08 p.m., both vehicles departed the business lot.

232.    Based on my training and experience and the investigation to date, I believe that CRUZ-VEGA met with GONZALEZ-RIVERA at **Premises 1** in order to obtain a quantity of narcotics before traveling to his stash location at **Premises 6** to stash and possibly rebag some of the drugs.  I further believe that CRUZ-VEGA then traveled to the business lot in order to complete a narcotics transaction with the operator of the silver Honda Odyssey, as the meet was short and consistent with a narcotics transaction.


### SURVEILLANCE ON MARCH 24, 2020

### Gonzalez-Rivera goes to 79 Branch Street (Premises 20) to obtain drugs and returns to Florack to supply multiple drug customers

233.    At approximately 5:17 p.m., a 2008 gray Dodge Caravan, New York Registration number HJA-5332 pulled into the driveway of **Premises 1**.  A Hispanic male wearing a blue and black Nike jacket exited the driver door of the Caravan and went inside

**Premises 1** after being let in.

234.    At approximately 5:25 p.m., GONZALEZ-RIVERA exited **Premises 1** and got into his maroon Suburban rental and left.  GONZALEZ-RIVERA drove to 79 Branch Street, Rochester (**Premises 20)**, arriving there at approximately 5:26 p.m.[24], remained there for approximately two minutes and then drove back to Florack **(Premises 1**) arriving there at approximately 5:29 p.m..  GONZALEZ-RIVERA exited the vehicle and entered **Premises 1**.

235.    At approximately 5:48 p.m., the Hispanic male exited **Premises 1** and got into the Caravan and drove away.  Surveillance officers followed the Caravan and observed the driver engage in conduct consistent with a drug deal (the driver got into the passenger seat of another vehicle for a brief period and then get out and the other vehicle drove away).

236.    Based on my training and experience, the driver of the Caravan came to Florack to obtain drugs.  GONZALEZ-RIVERA then went to 79 Branch Street (Premises 20) where he remained for less than two minutes, to obtain drugs which he brought back to Florack. GONZALEZ-RIVERA then supplied the drugs to the driver of the Caravan, who later drove to meet and supply his own drug customer.

### Baker and the male believed to be Flowers come to Florack to be supplied

237.    At approximately 6:19 p.m., FLOWERS' white Chevy Tahoe (**Vehicle 13)** pull into the driveway of **Premises 1**.  As noted above, Vehicle 13 is registered in the name

---

[24] 79 Branch Street is three blocks away from 4 Florack.  It is the residence of the mother of Natasha FIGUEROA and Marilin DELEON.

of Philip FLOWERS at 33 Locust Street, Rochester, NY.  A male believed to be Philip

FLOWERS got out of the white Tahoe and went to the door of Premises 1 carrying a bag,

and GONZALEZ-RIVERA opened the door and let him in.

238.    At approximately 6:33 p.m., BAKER arrive in **Vehicle 5** and went inside the

residence.

239.    At approximately 7:30 p.m., the male believed to be FLOWERS exited

**Premises 1** carrying a yellow plastic bag and a smaller grey bag (both different from the bag

he carried into the house earlier).  He then placed the two bags in the passenger seat of the

white Tahoe and then drove away in the Tahoe.  At approximately 7:44 p.m., a member of

the surveillance team observed the FLOWERS' white Tahoe pull into the driveway of

FLOWERS' residence at 33 Locust (**Premises 15)** and the male believed to be FLOWERS

walked inside **Premises 15** while carrying the previously observed yellow bag.


### Medina comes to Florack to be supplied

240.    At approximately 7:21 p.m., MEDINA arrived at Florack in a rented 2020

black GMC Suburban and went inside.  At approximately 7:34 p.m., MEDINA exited

**Premises 1** and got into his black GMC rental.

241.    A minute later GONZALEZ-RIVERA and BAKER exited **Premises 1** and

GONZALEZ-RIVERA walked to MEDINA's GMC rental and spoke to MEDINA.  At

approximately 7:39 p.m., MEDINA departed in his black GMC Rental and GONZALEZ-

RIVERA departed in his red Suburban rental.  (BAKER had departed two minutes earlier at

7:37 p.m. in **Vehicle 5**.)

242.    Based on my training and experience, and the investigation to date, I believe that the various people that met with GONZALEZ-RIVERA did so to obtain and/or order narcotics.  I believe that GONZALEZ-RIVERA obtained the narcotics at 79 Branch Street (**Premises 20**).  I believe that the yellow bag that the male believed to be FLOWERS carried out of **Premises 1** and put into **Vehicle 13** was a large quantity of narcotics, which were driven to FLOWERS' residence at Premises 15 and stored there.  BAKER's presence at Florack at the time that the male believed to be FLOWERS obtained drugs is consistent with prior surveillance indicating that BAKER arranges drug transactions with Gonzales-Rivera and then has FLOWERS physically move the drugs.  Finally, I believe that MEDINA was there to also negotiate a drug transaction with GONZALEZ-RIVERA.

## SURVEILLANCE ON MARCH 26, 2020

### Gonzalez-Rivera obtains drugs from Figueroa and then supplies multiple customers and later goes to 79 Branch Street to drop off proceeds

243.    On March 26, 2020 at approximately 5:35 p.m., MEDINA arrived at Premises 1 in his black Yukon rental.  GONZALEZ-RIVERA and CRUZ-VEGA were already at Premises 1 when MEDINA arrived.  At approximately 5:58 p.m., BAUER arrived in his white Acura TSX (**Vehicle 7**).  At approximately 6:02 p.m., GONZALEZ-RIVERA left in his red Chevy rental.

244.    After stopping at a house on Wolfert Terrace for a few minutes, and returning to Premises 1 and immediately leaving, Gonzalez drove the red Chevy rental to FIGUEROA's house at (Premises 2), arriving there at 6:13 p.m.  FIGUEROA walked to the driver door of the red Chevy rental and handed GONZALEZ-RIVERA a bag of what

appeared to be a white substance.  FIGUEROA then went back inside **Premises 2** and GONZALEZ-RIVERA left in his red Chevy rental.

245.    At approximately 6:17 p.m., a member of the surveillance team observed GONZALEZ-RIVERA's red Chevy rental back in front of the same house on Wolfert Terrace where he remained for one minute.

246.    At approximately 6:22 p.m., the red Chevy rental pulled into the driveway of **Premises 1** and GONZALEZ-RIVERA exited the vehicle, and went inside.  Based on my training and experience, and the investigation to date, I believe that when GONZALEZ-RIVERA first went to Wolfert Terrace, it was to ascertain how much narcotics the buyer at that location wanted.  I believe that when GONZALEZ-RIVERA obtained drugs from FIGUEROA at **Premises 2**, some of which he then delivered to the house on Wolfert Terrace.

247.    Two minutes after GONZALEZ-RIVERA arrived, at approximately 6:24 p.m., BAUER left **Premises 1** in **Vehicle 7**. At approximately 7:33 p.m., CRUZ-VEGA left in his Dodge Rental.  At approximately 7:41 p.m., GONZALEZ-RIVERA and MEDINA exited **Premises 1** and left in their respective vehicles.

248.    Three minutes later, at approximately 7:44 p.m., a member of the surveillance team observed GONZALEZ-RIVERA's red Chevy rental parked in front of 79 Branch Street (**Premises 20**).  At the same time, another member of the surveillance team observed the Dodge rental utilized by CRUZ-VEGA parked in front of 10 Strathmore Circle (**Premises 6**).

249.    Based on my training and experience, I believe that the foregoing activity

shows that MEDINA and BAUER came to Premises 1 to obtain drugs from GONZALEZ-RIVERA.  GONZALEZ-RIVERA then left Premises 1 and, after meeting briefly with another customer at Wolfert Terrace, stopped at FIGUEROA's house (Premises 2) to pick up drugs.  He then supplied his customer at Wolfert Terrace and then returned to Florack where he supplied drugs to BAUER (who left shortly thereafter) and to CRUZ-VEGA (who took the drugs back to 10 Strathmore Circle (**Premises 6**)).  I further believe that GONZALEZ-RIVERA later went to 79 Branch Street to drop off drug proceeds from the previously conducted drug deals.

## SURVEILLANCE ON MARCH 27, 2020

### Gonzalez-Rivera obtains drugs from female and supplies Medina/Bauer

250.    At approximately 6:37 p.m., BAUER arrived at **Premises 1** in his Acura TSX (**Vehicle 7**).  At approximately 6:49 p.m., MEDINA arrived at Premises 1 in his black Yukon rental.

251.    At approximately 6:51 p.m., a member of the surveillance team observes GONZALEZ-RIVERA in his red Chevy rental in the area of Shady Lane in Rochester, meeting with a female  who was driving a 2014 white Hyundai Sonata, registered to a Rebecca Junco at 16 Village Way, Rochester (**Premises 9**).  A member of the surveillance team observed the female hand GONZALEZ-RIVERA a box.  The female then left the area in the Hyundai Sonata and was observed arriving at 16 Village Way (**Premises 9**) shortly thereafter.  As noted above 16 Village Way is the residence of one of CRUZ-VEGA's girlfriends and is one of his stash locations.

252.    GONZALEZ-RIVERA then drove his red Chevy rental to **Premises 1**, pulling into the driveway there at approximately 6:55 p.m.  At approximately 7:06 p.m., MEDINA and BAUER left in MEDINA's black Yukon rental.  At approximately 7:20 p.m., MEDINA and BAUER returned to **Premises 1** in the black Yukon Rental.

253.    At approximately 8:14 p.m., BAUER and MEDINA exited Premises 1. MEDINA was holding something in his hand, and after the two men went back and forth between their respective cars, they left in their respective vehicles.


## Gonzalez-Rivera supplies Baker

254.    At approximately 7:11 p.m., BAKER arrived at **Premises 1** driving **Vehicle 5**. BAKER later entered GONZALEZ-RIVERA's red Chevy rental and sat in driver's seat.  At approximately 7:27 p.m., GONZALEZ-RIVERA handed something to BAKER while BAKER was sitting in the driver seat of the red Chevy rental.  BAKER and GONZALEZ-RIVERA then walked inside Premises 1.

255.    At approximately 7:47 p.m., BAKER exited **Premises 1** with an unknown square shaped object in his left hand.   BAKER get into **Vehicle 5** and left.  At approximately 7:57 p.m., BAKER entered the front door of his residence at 20 Heidelberg Street (**Premises 13**).


256.    Based upon my training and experience, and the investigation to date, I believe that when GONZALEZ-RIVERA met the female in the white Sonata, the box handed to GONZALEZ-RIVERA contained drugs.  I further believe that GONZALEZ-

RIVERA then brought the drugs to **Premises 1** to distribute it amongst his customers, including MEDINA/BAUER and BAKER.

## SURVEILLANCE ON MARCH 31, 2020

### Figueroa brings money and drugs to Florack and gives them to Lopez

257.    On March 31 at approximately 5:15 p.m., GONZALEZ-RIVERA and LOPEZ arrived at **Premises 1** in GONZALEZ-RIVERA's silver Chevy Tahoe rental.

258.    At approximately 5:21 p.m. FIGUEROA exited **Premises 2** carrying a gray bag and drove her Mercedes (**Vehicle 3)** to 4 Florack, arriving there at approximately 5:23 p.m.  LOPEZ then exited the silver Tahoe rental and walked to **Vehicle 3**.  FIGUEROA handed LOPEZ the same gray bag that FIGUEROA had with her when she walked out of **Premises 2** a few minutes before.  After LOPEZ received the bag, LOPEZ returned to the passenger seat of the silver Tahoe rental and she appeared to begin counting something. FIGUEROA left Premises 1 and returned to **Premises 2** and walked into the house empty handed.

259.    At approximately 5:28 p.m., FIGUEROA again exited **Premises 2** with a yellow bag that appeared to contain a square shaped object and get into **Vehicle 3** and drove to Premises 1 arriving there a minute later.  LOPEZ then again exited the silver Tahoe rental with the gray bag she had earlier received from FIGUEROA and approached FIGUEROA's car.  LOPEZ then handed FIGUEROA the gray bag, and in return, FIGUEROA handed LOPEZ the yellow bag.  After receiving the yellow bag, LOPEZ

walked back to the silver Tahoe rental and put the bag in the passenger seat area.

260.    FIGUEROA drove back to her residence (Premises 2) and walked inside holding the gray bag.

261.    Based on my training and experience, and the investigation to date, I believe that the first bag that FIGUEROA gave LOPEZ (the gray bag) contained money for narcotics.  This belief is further corroborated by the observation of LOPEZ counting something after receiving the gray bag.  When FIGUEROA returned with the yellow bag, I believe that LOPEZ returned the money in the gray bag to FIGUEROA who, in turn, gave LOPEZ the yellow bag which contained drugs.  I believe that the point of FIGUEROA bringing the gray bag first was for LOPEZ and GONZALEZ-RIVERA to check to make sure the right amount of money was being paid for the narcotics.

### Gonzalez Rivera picks up drugs at 79 Branch Street (Premises 20) and brings them back to Florack and supplies Marcus Johnson

262.    Shortly thereafter, at approximately 5:38 p.m., Marcus JOHNSON arrived in a gray Dodge Charger Rental, New York Registration number JNU-4426.  GONZALEZ-RIVERA and JOHNSON went inside **Premises 1**.  At approximately 5:57 p.m., JOHNSON exited **Premises 1** and motioned to LOPEZ to exit the silver Tahoe rental and enter **Premises 1**, which she did.

263.    At approximately 6:07 p.m., GONZALEZ-RIVERA exited **Premises 1**, got into the silver Tahoe rental, and left.  At approximately 6:08 p.m., a member of the surveillance team observed the silver Tahoe rental parked in front of 79 Branch Street

(**Premises 20**).  This is the residence of the mother of Natasha FIGUEROA and Marilin DELEON. At approximately 6:15 p.m., a member of the surveillance team observed the silver Tahoe rental leave **Premises 20** and arrive back at Florack a minute later. GONZALEZ-RIVERA then exited the vehicle and entered **Premises 1**.

264.    At 6:17 pm, one minute after GONZALEZ-RIVERA arrived at Florack, Marcus JOHNSON exited **Premises 1** and got into his gray Charger rental and left.

265.    At approximately 6:29 p.m., a member of the surveillance team observed JOHNSON's gray Charger Rental park in front of 9 Lime Street.  At approximately 6:36 p.m., a member of the surveillance team observed JOHNSON enter 9 Lime Street, which is a known drug distribution location for Marcus JOHNSON.  While surveilling this location, members of the surveillance team observed multiple vehicles stop for short periods of time, which based on my training and experience, is consistent with houses that are utilized to sell narcotics.  At approximately 7:20 p.m., a member of the surveillance team observed JOHNSON's gray Charger rental leave 9 Lime Street.

266.    Based on my training and experience, I believe that Marcus JOHNSON came to Florack to obtain drugs.  I further believe that GONZALEZ-RIVERA went to Branch Street (Premises 20) to pick up more drugs which he then drove back to Florack and supplied to JOHNSON, who left immediately thereafter and drove to 9 Lime Street to distribute the drugs to customers there.

### Gonzalez-Rivera supplies Tommy Brunson with narcotics

267.    At approximately 7:29 p.m., GONZALEZ-RIVERA's silver Tahoe rental and

a black 2020 Audi SUV, New York Registration number JRE-4979, pulled into the driveway of **Premises 1**. This vehicle was an Enterprise Rental Company car and was rented in the name of Tommy BRUNSON, Jr. of Syracuse, New York. A check of BRUNSON Jr.'s criminal history shows a conviction in 2011 for Criminal Sale of a Controlled Substance 3rd Degree, and a 2013 conviction for Criminal Possession of a Weapon in the 2nd Degree.

268.    BRUNSON got out of his 2020 Audi rental and went inside the residence with GONZALEZ-RIVERA. Less than a minute later, BRUNSON came out of the house with a gray bag in his front hoodie pocket and get into the Audi and left.

269.    Based on my training and experience, and the investigation to date, I believe that BRUNSON met with GONZALEZ-RIVERA at **Premises 1** and obtained an unknown quantity of narcotics from GONZALEZ-RIVERA.

### SURVEILLANCE ON APRIL 1, 2020

### Gonzalez-Rivera obtains drugs from Lateef Budd and from 79 Branch Street (Premises 20) and supplies those drugs to Medina and another known drug dealer

270.    At approximately 6:38 p.m., MEDINA and another known drug dealer (from whom controlled purchases of cocaine have been made in this investigation) arrived at **Premises 1** in MEDINA's black Yukon rental. At approximately 6:45 p.m., GONZALEZ-RIVERA pulled into the driveway of **Premises 1** in his silver Tahoe rental. GONZALEZ-RIVERA pulled his car next to MEDINA's car, and handed a clear plastic bag of what appeared to be a white substance to MEDINA. MEDINA then began counting a stack of

money inside his Yukon and at approximately 6:49 p.m., MEDINA handed GONZALEZ-RIVERA a stack of money.

271.    Based on my training and experience, and the investigation to date, I believe that the white substance given by GONZALEZ-RIVERA to MEDINA was an unknown quantity of narcotics, and then MEDINA paid GONZALEZ-RIVERA for the narcotics.

272.    At approximately 6:51 p.m., the three men entered Premises 1.

273.    At approximately 7:11 p.m., Lateef BUDD arrived at Florack in the black Honda Accord (**Vehicle 10**) and went inside.  Six minutes later, at approximately 7:17 p.m., BUDD exited **Premises 1**, went to his black Honda (**Vehicle 10**), reached into the car and appeared to then zipper a front pocket of his jacket.  BUDD then went back into **Premises 1**.  At approximately 7:37 p.m., BUDD exited **Premises 1**, got into **Vehicle 10,** and left.

274.    Based on my training and experience, I believe that BUDD came to Florack to conduct a drug transaction with GONZALEZ-RIVERA inside Premises 1.

275.    At approximately 7:53 p.m., GONZALEZ-RIVERA exited **Premises 1** and left in his silver Tahoe rental and drove to 79 Branch Street (**Premises 20**).  At approximately 7:57 p.m., a member of the surveillance team observed the silver Tahoe rental leave Branch Street (**Premises 20**), and GONZALEZ-RIVERA returned to Premises 1 a minute later at 7:58.   He exited the vehicle and went into his house carrying objects in both hands.

276.     Minutes later, at approximately 8:11 p.m., MEDINA and his companion exited **Premises 1** with a bag, got into MEDINA's black Yukon rental, and left.  The black Yukon was then observed driving to a smoke shop and from there to a known stash location

where MEDINA and his associates are known to process and store narcotics.

277.    Based on my training and experience, and the investigation to date, I believe that GONZALEZ-RIVERA went to **Premises 20** to obtain more drugs to supply to MEDINA and his companion.  I believe that MEDINA received an initial supply of either cocaine or heroin/fentanyl when he first met with GONZALEZ-RIVERA, but I further believe MEDINA and/or his companion also wanted the other type of narcotic, which GONZALEZ-RIVERA had to acquire from **Premises 20**.  This is why I believe that MEDINA and his companion went inside the residence initially and then left shortly after GONZALEZ-RIVERA returned from **Premises 20.**

278.    I further believe that MEDINA and his companion went to the smoke shop to acquire "cut" for the narcotics, in order to break it down into smaller quantities and they then went to the known stash location so that at least of portion of the narcotics could be processed there.

## SURVEILLANCE ON APRIL 2, 2020

### Gonzales Rivera meets with Cruz-Vega and Amante Santiago at Florack

279.    On April 2, 2020, at approximately 3:35 p.m., CRUZ-VEGA's white Explorer arrived at Premises 1.  Moments later a 2020 black Jaguar rented by Amante SANTIAGO arrived and parked at **Premises 1**.  GONZALEZ-RIVERA exited the passenger seat of the Jaguar and Amante SANTIAGO exited the driver door of the Jaguar. CRUZ-VEGA exited the white Explorer and the all three entered Premises 1.  At

approximately 3:53 p.m., GONZALEZ-RIVERA, SANTIAGO, and CRUZ-VEGA exited

Premises 1, entered their respective vehicles, and departed the area.

### Marilin DeLeon brings drugs to Gonzalez-Rivera
### Which he then supplies to a drug dealer

280.    At approximately 4:16 p.m., GONZALEZ-RIVERA parked at apartments

located at 720 North Clinton Avenue, Rochester, New York and he was observed talking

with an unknown male who was then observed conducting hand to hand transactions with

customers as GONZALEZ-RIVERA stayed in his vehicle.

281.    At approximately 4:15 p.m., DELEON arrived at 35 Northaven (**Premises 2**)

in her Lexus SUV (**Vehicle 4**).  DELEON entering the residence carrying a black plastic bag

and then one minute later she was observed exiting the residence carrying a grey plastic bag,

and then departing in the Vehicle 4.  DELEON then drove to the area near 720 North

Clinton Avenue where GONZALEZ-RIVERA was meeting with the other drug dealer,

arriving there at approximately 4:25 p.m... DELEON was then observed meeting with

GONZALEZ-RIVERA at the above mentioned apartments and she handed GONZALEZ-

RIVERA a brown paper bag containing an unknown object.  GONZALEZ-RIVERA then

handed DELEON what appeared to be a phone.  DELEON departed the area.

GONZALEZ-RIVERA walks toward the rear of his vehicle carrying the paper bag where

he appeared to meet with the drug dealer.  Two minutes later, GONZALEZ-RIVERA

walked back to his car empty handed and drove away.

282.     At approximately 5:03 p.m., GONZALEZ-RIVERA arrived back at the 720 North Clinton apartments and was observed handing the same unknown male what appeared to be several phones and cash.  Minutes later GONZALEZ-RIVERA departed the area.

283.     Based on my training and experience and the investigation to date, I believe that GONZALEZ-RIVERA traveled to the apartments (known to agents as a high drug trafficking area) to meet with a narcotics customer.  I further believe that GONZALEZ-RIVERA contacted DELEON to obtain the requested amount of narcotics that the unknown customer at the apartments ordered.  I believe that DELEON traveled to Premises 2 for the purpose of obtaining the drugs and then drove the drugs to give the drugs to GONZALEZ-RIVERA.  Additionally, I believe GONZALEZ-RIVERA sold the unknown male the drugs.  I further believe that GONZALEZ-RIVERA then returned to give the customer phones for the purpose of communicating with each other for future narcotics purchases.  Based on my training and experience, this is a common tactic that narcotics traffickers use to isolate customers to certain phones for communication purposes in order to avoid detection by law enforcement.

## SURVEILLANCE ON APRIL 3, 2020

### Figueroa brings drugs to Florack which are supplied to Lopez and Amante Santiago

284.     On April 3, 2020, at approximately 3:07 p.m., LOPEZ arrived at 4 Florack Street (**Premises 1**) in her white Audi A4 (**Vehicle 6**).  At approximately 3:22 p.m.,

GONZALEZ-RIVERA arrived at **Premises 1** in his rented silver Chevy Tahoe.  LOPEZ

then exited **Vehicle 6** carrying boxes that appeared to be security cameras.  LOPEZ and

GONZALEZ-RIVERA then appeared to converse with an unknown utility worker about

the placement of the exterior security cameras at Premises 1.[25]  LOPEZ handed the utility

worker the cameras and at approximately 3:27 p.m. LOPEZ entered **Premises 1** carrying a

red and black bag and a grey bag.  GONZALEZ-RIVERA entered the residence with her.

285.    At approximately 3:37 p.m., BAKER and an unknown male arrived at

**Premises 1** in BAKER's black Ram 1500 (**Vehicle 5**).  The two men then entered the

residence.

286.    At approximately 4:05 p.m., FIGUEROA exited 35 Northaven Terrace

(**Premises 2**) and drove in her Mercedes (**Vehicle 3**) to Florack arriving there at 4:07 p.m.

GONZALEZ-RIVERA exited **Premises 1**, approached the driver's side of the Mercedes

and retrieved a white object, placing it into his hoody pocket with his left hand before going

back inside **Premises 1**.  **Vehicle 3** then departed **Premises 1** and drove to 79 Branch Street,

Rochester, New York (**Premises 20**).  Based on my training and experience and the

investigation to date, I believe that FIGUEROA traveled to **Premises 1** in order to supply

GONZALEZ-RIVERA a quantity of narcotics.

287.    At approximately 4:11 p.m., a few minutes after FIGUEROA dropped off

drugs at Florack, Amante SANTIAGO arrived at **Premises 1** in his black Jaguar SUV and

---

[25] The security cameras were ultimately installed as confirmed by later surveillance.

went inside the residence.

288.     At approximately 4:12 p.m., LOPEZ departed **Premises 1** in **Vehicle 6** and drove to her residence at 14 Galusha **(Premises 16)** arriving there at approximately 4:20 p.m.  At approximately 4:34 p.m., LOPEZ returned to **Premises 1** in **Vehicle 6**.

289.     At approximately 4:44 p.m., Amante SANTIAGO departed **Premises 1** in the black Jaguar SUV rental.

290.     Based on my training and experience and the investigation to date, I believe that LOPEZ and SANTIAGO went to **Premises 1** in order to retrieve a quantity of narcotics from GONZALEZ-RIVERA.  Once the drugs were dropped off by FIGUEROA, GONZALEZ-RIVERA supplied LOPEZ and Amante SANTIAGO.  LOPEZ then returned to her residence at 14 Galusha to store the drugs there.

**Gonzalez-Rivera and Baker engage in counter surveillance**

291.     At approximately 4:45 p.m., GONZALEZ-RIVERA and BAKER departed **Premises 1** in the silver Chevy Tahoe rental.  At approximately 4:47 p.m., a member of the investigative team observed the silver Chevy Tahoe rental pull into a business lot at the intersection of Portland Avenue and Norton Street, before immediately departing. GONZALEZ-RIVERA then appeared to conduct multiple counter surveillance measures, to include filming surveillance vehicles, pulling over, and making multiple loops around city streets before returning to **Premises 1** at approximately 4:57 p.m.  At approximately 4:57

p.m., GONZALEZ-RIVERA and BAKER exited the silver Chevy Tahoe rental and

GONZALEZ-RIVERA hand BAKER a baggie containing a white substance.

292.    At approximately 5:01 p.m., GONZALEZ-RIVERA and BAKER again

departed **Premises 1** in the silver Chevy Tahoe rental.  At approximately 5:08 p.m.,

GONZALEZ-RIVERA and BAKER returned to **Premises 1** in the silver Chevy Tahoe

rental and went back inside the residence.

293.    Based on my training and experience and the investigation to date, I believe

that GONZALEZ-RIVERA and BAKER were attempting to conduct a narcotics

transaction in the vicinity of Portland Avenue and Norton Street with an unknown co-

conspirator when they apparently noticed surveillance officers in the area.  They then

conducted counter surveillance measures and returned to **Premises 1**, at which time

GONZALEZ-RIVERA handed BAKER the quantity of narcotics they planned on

distributing in order for BAKER to conceal it on his person.

### The male believed to be Flowers obtains drugs from 4 Florack and takes them back to 33 Locust Street

294.    At approximately 5:10 p.m., two minutes after GONZALEZ-RIVERA and

BAKER returned to Florack, the male believed to be FLOWERS arrived at Premises 1 in

the white Chevy Tahoe (Vehicle 13) and entered the residence.  He exited two minutes later,

at approximately 5:12 p.m., with a bulky object concealed in his hoody pocket and departed

in **Vehicle 13**.  BAKER left Premises 1 a short time later.

295.    At approximately 5:23 p.m., FLOWERS' **Vehicle 13** arrived at 33 Locust

−103−

Street, Rochester, New York (**Premises 15**) and the male believed to be FLOWERS walked up the front steps towards the residence.

296.     Based on my training and experience and the investigation to date, I believe that the male believed to be FLOWERS traveled to **Premises 1** in order to obtain a quantity of narcotics from GONZALEZ-RIVERA and/or BAKER, which he then concealed in his hoody pocket and took back to his residence at 33 Locust Street **(Premises 15)**.

### Marcus Johnson comes to Premises 1

297.     At approximately 6:06 p.m., Marcus JOHNSON arrived at **Premises 1** in his grey Dodge Charger rental.  At approximately 6:09 p.m., GONZALEZ-RIVERA and LOPEZ returned to **Premises 1** in the silver Chevy Tahoe rental and entered the residence along with JOHNSON, who was observed carrying an unknown object under his left arm. Marcus JOHNSON exited Premises 1 a few minutes later at 6:16 pm and drove away in this rented grey Charger.

### Lateef Budd drops off drugs at 4 Florack

298.     At approximately 6:15 p.m., Lateef BUDD arrived at **Premises 1** in his black Honda Accord, (**Vehicle 10**).  After greeting Marcus JOHNSON in the driveway, BUDD entered **Premises 1** while appearing to conceal a rectangular shaped object inside his coat under his left arm.  BUDD was inside for only a few minutes, exiting the residence at approximately 6:21 p.m., and departing in **Vehicle 10**.  On his way out, he was not holding anything under his jacket as when he entered the residence earlier.

–104–

**Medina picks up drugs at 4 Florack**

299.     At approximately 6:24 pm, three minutes after BUDD left, MEDINA arrived

at **Premises 1** in his black GMC Yukon rental.  At approximately 7:42 p.m., MEDINA

exited **Premises 1**, reached into the passenger side of MEDINA's Yukon rental briefly, then

returned to **Premises 1**.  At approximately 8:03 p.m., GONZALEZ-RIVERA, LOPEZ, and

MEDINA all departed **Premises 1** in their respective vehicles.

300.     Based on my training and experience and the investigation to date, I believe

that MEDINA traveled to **Premises 1** to obtain a quantity of narcotics from GONZALEZ-

RIVERA and then concealed the narcotics in his vehicle before departing the residence later

in the evening.  I believe that at least some of the drugs supplied to MEDINA were the

drugs that BUDD earlier delivered to the residence.

**SURVEILLANCE ON APRIL 11, 2020**

**Gonzalez-Rivera obtains drugs from 79 Branch Street (Premises 20)
and supplies a drug customer and Baker**

301.     On April 11, 2020, members of the investigative team utilized GPS

monitoring on a white GMC Yukon, New York Registration number JNV-5510, rented and

used by GONZALEZ-RIVERA.  At approximately 7:12 p.m., members of the investigative

team observed the GMC rental travel to the intersection of Norton Street and Schiller Street,

Rochester, New York, a location believed to be utilized by GONZALEZ-RIVERA and

other members of his organization as a place to socialize.

302.    At approximately 11:03 pm, the GMC rental departed the Norton and
Schiller location and drove to the vicinity of 79 Branch Street (**Premises 20**) arriving there a
few minutes later.  The GMC rental remained there for approximately seven minutes before
traveling directly to 4 Florack Street (**Premises 1**).

303.    At approximately 11:11 p.m., the GMC rental pulled into the driveway of
**Premises 1**, followed shortly afterwards by a dark colored sedan.  GONZALEZ-RIVERA
remained in the GMC rental while the unknown male operator of the dark colored sedan
got into the passenger side of the GMC.  After about a minute, the unknown male exited the
passenger side of the GMC rental and returned to the dark colored sedan.   Both vehicles
then departed **Premises 1.**

304.    The GPS tracker showed that GONZALEZ-RIVERA drove the GMC rental
directly to the vicinity of BAKER's residence at 20 Heidelberg Street, (**Premises 13**), where
it remained for only three minutes before returning directly to the vicinity of the Norton and
Schiller Street intersection.  The GPS tracker showed that the GMC rental remained
stationary at this location until 5:26 a.m. on April 12, 2020, when it left there and travelled
directly to GONZALEZ-RIVERA's residence at 75 Angelus Drive, Rochester, New York
(**Premises 5**).

305.    Based on my training and experience and the investigation to date, I believe
that GONZALEZ-RIVERA departed the social gathering location and traveled to 79
Branch Street (**Premises 20)** in order to obtain a quantity of narcotics that he then provided
to the operator of the dark colored sedan at **Premises 1**.  Furthermore, I believe that
GONZALEZ-RIVERA then traveled to BAKER's residence at **Premises 13** in order to

conduct an additional narcotics transaction with BAKER before returning to the social

gathering location where he remained for approximately six hours.

### SURVEILLANCE ON APRIL 15, 2020

#### Lateef Budd goes to Premises 1, then to another drug location,
#### then returns to one of his residences at Premises 21

306.    On April 15, 2020 GPS monitoring on Lateef BUDD's Honda Accord

(**Vehicle 10)** showed that BUDD was at **Premises 21** (Ellison Heights Apartments, Building

300, Apartment 210).  He had spent the night there.  The investigation has revealed that

BUDD rents this apartment and resides there at least part time with one of his girlfriends.

307.    The GPS tracker showed that BUDD left the area of Premises 21 at

approximately 4:32 p.m. and drove directly to the 4 Florack arriving there at 4:43 p.m...

BUDD then got out of his Honda and went inside Premises 1.  BUDD left approximately

15 minutes later, at 4:59 p.m., and drove his Honda (**Vehicle 10)** to the area of 45

Southview Terrace, Rochester, New York (**Premises 23**), where the car remained for

approximately 5 to 10 minutes.  BUDD then left 45 Southview Terrace and drove back to

**Premises 21** (Ellison Heights apartments, Building 300, in Penfield) arriving there at

approximately 5:36 p.m.

308.    At approximately 5:46 p.m., an unknown female exited the front door of

Building 300 and entered the driver door of BUDD's Accord.  The Accord then departed

and traveled to the Top's Supermarket on Penfield Road.  The unknown female then

entered the Supermarket.  At approximately 6:35 p.m., the unknown female was observed

exiting the Supermarket, entering the Accord, and traveling directly to the above apartment

building (Premises 21).

309.    At this time, a Monroe County Sheriff's Deputy spoke with the unknown female using the pretext of a suspicious vehicle in the area and the unknown female gave her name as Asia Davis, DOB: October 18, 1996.  The unknown female then stated that she just moved in and could not remember her apartment but stated it was either apartment 213 or 215.  During this time, Lateef BUDD and an unknown black male approached and asked if everything was ok.

310.    Agents subsequently searched the name and date of birth that the unknown female gave to the Deputy and found the identification to be false.  Additionally, subpoenaed records show that there is no apartment 215 in building 300.  Also, records indicate that apartment 213 has been rented since July of 2019.  Through subpoenaed records, agents obtained phone number 585-943-3025 as a contact phone number that BUDD gave Enterprise Rental Company on April 15, 2020.  This same phone number is listed as a contact number for apartment 210 of Building 300.  Furthermore, apartment rental records show that a contact number associated with apartment 210 is listed to Herman Parsons when entered in public records checks.  This is significant because Herman Parsons is the registered owner of the Honda Accord that BUDD and the unknown female operated on April 15, 2020.  During this investigation, agents have continually observed BUDD operate this Accord.

311.    Based on my training and experience, I believe BUDD went to **Premises 1** to conduct a narcotics transaction.  I believe that BUDD then went to **Premises 23**, and remained there for a brief period of time, because it is a location, as more fully described

below, where BUDD engages in drug trafficking.   I further believe that the unknown female

lied to the Deputy at Premises 21 in order to conceal the identity of BUDD's apartment 210,

which he utilizes to conceal narcotics and proceeds of narcotics.

**Figueroa brings drugs to Gonzalez-Rivera at 4 Florack
and Gonzalez-Rivera supplies the drugs to Tommy Brunson**

312.    On April 15, 2020, at approximately 6:58 p.m., GONZALEZ-RIVERA

arrived at 4 Florack in his rented silver Chevy Suburban.  Tommy BRUNSON's rented

2020 Audi (as described in paragraph 213 above) also drove into the driveway.  A male

believed to be BRUNSON got out of the passenger side of the black Audi rental and met

with GONZALEZ-RIVERA inside GONZALEZ-RIVERA's silver Suburban.  Minutes

later they then both entered Premises 1.

313.    At approximately 7:17 p.m., FIGUEROA drove from 35 Northaven to

Florack and GONZALEZ-RIVERA exited Premises 1 at approximately the same time.

Gonzales-Rivera then approached the driver's side of Figueroa's Mercedes and grabbed

something from her through the window.  At the same time, the male believed to be

BRUNSON exited **Premises 1** and Gonzalez Rivera then handed BRUNSON what

FIGUEROA had just handed to GONZALEZ-RIVERA.  BRUNSON then placed the item

in the passenger side of the Audi.  After a brief meeting at Gonzalez Rivera's Suburban, the

male believed to BRUNSON returned to the Audi, got into the passenger side and both the

Audi and GONZALEZ-RIVERA's Suburban left the area.

314.    Based on my training and experience and the investigation to date, I believe that GONZALEZ-RIVERA supplied BRUNSON with drugs which were brought to **Premises 1** by FIGUEROA.

## SURVEILLANCE ON APRIL 16, 2020

315.    On April 16, 2020, (the day after GONZALEZ-RIVERA supplied drugs to the male believed to be BRUNSON at Premises 1) members of the investigative team utilized a GPS tracking device installed on GONZALEZ-RIVERA's silver Chevy Suburban and observed the Chevy Suburban travel to Syracuse, New York.  At approximately 8:47 p.m., GONZALEZ-RIVERA departed Premises 1 in the silver Suburban rental, and the GPS tracker observed the rental travel directly to the vicinity of 228 West Pleasant Avenue, Syracuse, New York (**Premises 24**).  The investigation has revealed that this is the residence of Tommy BRUNSON, JR.  GONZALEZ-RIVERA arrived at the 228 West Pleasant address at approximately 10:14 p.m.  At approximately 10:36 p.m., GPS monitoring showed that the silver Suburban rental departed the vicinity of **Premises 24** and headed back to Rochester.

316.    Based on my training and experience and the investigation to date, I believe that GONZALEZ-RIVERA utilized the silver Suburban rental to travel to **Premises 24** in order to conduct a narcotics transaction with Tommy BRUNSON Jr.

## APRIL 15-17

−110−

### Lateef Budd's Rental Vehicle

317.    On April 15, 2020, at approximately 7:30 p.m., GPS monitoring on Lateef BUDD's black Honda Accord (**Vehicle 10)** indicated that the Accord was at the Rochester International Airport.  A member of the investigative team checked with rental companies and learned that BUDD had used his own name to rent a 2020 black Chevrolet sedan, New York Tag JNR-7609 from Enterprise Rental Company.

318.    A member of the investigative team then submitted a request through the New York State Police requesting any further LPR (License Plate Reader) hits on that vehicle.  BUDD'S rental vehicle was read by a LPR at the Rochester Airport Exit on April 15, 2020 at approximately 7:51 p.m.  BUDD's rental vehicle was then read by a LPR on the New York State Thruway at Site #17, Millgrove Road Bowmansville (near the Buffalo airport) heading westbound that same evening at midnight.

319.    On April 17, 2020, at approximately 9:40 p.m., the tag of BUDD's rental was again read by the same LPR on the New York State Thruway, Site #17, this time heading eastbound toward Rochester.  Agents set up surveillance at the New York State Thruway Exit 47 in Leroy and Exit 46 in Henrietta attempting to intercept BUDD upon his return into the Rochester region but were unable to spot the vehicle. At approximately 11:30 p.m. on April 17, a member of the surveillance team observed BUDD'S rental vehicle parked outside the Ellison Heights Apartments (**Premises 21).**

320.    Based on my training and experience, and the investigation to date, I believe that BUDD utilized a rental car to travel west out of town to acquire a large supply of cocaine from his source.  Based on my training and experience, and as has happened

repeatedly in this case, I have learned that drug traffickers will frequently utilize rental vehicles as a means to try to evade law enforcement. I believe that BUDD traveling out of town for a short period of time, especially when most businesses in the country are closed due to a current national viral pandemic (COVID-19), indicates that BUDD was not traveling for legitimate business, but was in fact traveling to acquire narcotics from one of his sources. I believe that BUDD utilizes luggage to hide the narcotics when travelling, which is why on the April 18, 2020 surveillance, agents observed BUDD bringing in a suitcase into **Premises 21**, as more fully discussed below.

## SURVEILLANCE ON APRIL 18-19, 2020

321.    On April 18, 2020 at approximately 12:23 p.m., a member of the surveillance team observed BUDD'S rented 2020 black Chevrolet sedan parked outside of **Premises 21** (Building 300, Ellison Heights Apartment).

322.    At approximately 2:45 p.m., a member of the surveillance team observed BUDD exit the apartment building and get into his rental vehicle. Just prior to this, members of the surveillance team observed a Maroon Nissan Maxima, New York Tag JRE-8629 (**Vehicle 11**), circling around the apartment complex parking lot. A Department of Motor Vehicles check indicated that this vehicle is registered to a Brittney F. FELDER of 161 Fisherman's Cove, Rochester, New York **(Premises 22)**.

323.    An Administrative Subpoena was sent to the apartment complex where 161 Fisherman Cove is located and the return indicated that **Premises 22** is actively being rented by Brittney FELDER. In 2016, a Field Interview Form (FIF) was written by the Rochester

Police Department wherein Brittney FELDER was identified as living with her boyfriend Jerrell J. INGRAM who stayed with her in the apartment in Greece and it was believed that INGRAM kept drugs at the apartment.  INGRAM was convicted in 2010 for Criminal Possession of a Controlled Substance in the 3rd Degree, and in 2013 for Attempted Criminal Possession of a Controlled Substance in the 3rd Degree.

324.     At approximately 2:45, BUDD got into his rental vehicle at the Ellison Park Apartments and drove out of the complex with **Vehicle 11** following directly behind.  At approximately 2:50 p.m., both vehicles stopped at a Marathon gas station near the Ellison Park Apartments and appeared to fill up on gas.  During this time, a member of the surveillance team observed the male driving **Vehicle 11.**  The member of the surveillance team observed that the driver looked like Jerrell INGRAM.

325.     Surveillance agents continued to follow both vehicles as they drove in tandem heading east on the New York State Thruway toward Syracuse with BUDD in the rental vehicle as the lead vehicle, and **Vehicle 11** as the trail vehicle.  At approximately 4:17 p.m., a member of the surveillance team observed both vehicles parked across from Tommy BRUNSON's residence at 228 West Pleasant Avenue in Syracuse (**Premises 24)**.  This was the same residence which GONZALEZ-RIVERA had visited two days before, as described in paragraph 315 above.

326.     At approximately 4:20 p.m., a member of the surveillance team observed two males get into **Vehicle 11**.[26] Members of the surveillance team then observed **Vehicle 11**

---

[26] The surveillance officers were unable to identify the two individuals because the nature of the neighborhood prevented close surveillance of the two vehicles.

circle around the neighborhoods (apparently engaging in counter surveillance activity) and return to the same spot approximately 2 minutes later and park.

327.    At approximately 5:27 p.m.[27], a member of the surveillance team observed BUDD get into the passenger seat of **Vehicle 11** carrying a yellow grocery bag.  **Vehicle 11** then left and drove around the neighborhood apparently again engaging in counter surveillance activity.  At approximately 5:30 p.m., a member of the surveillance team observed **Vehicle 11** return and stop next to BUDD's rental.  BUDD then exited **Vehicle 11** carrying the yellow grocery bag.  BUDD then walked to his rental vehicle, put the yellow grocery bag into the trunk of his rental vehicle, then got into the driver's seat and drove away following behind **Vehicle 11**.  Both then travelled in tandem onto the New York State Thruway westbound toward Rochester, New York, with **Vehicle 11** the lead car followed by BUDD's rental.

328.    At approximately 6:47 p.m., BUDD's rental vehicle arrived at the parking lot of the Ellison Heights Apartments and parked near **Premises 21**.  BUDD then walked into **Premises 21** carrying the same yellow grocery bag that he was observed putting into his rental vehicle in Syracuse.  At approximately 6:53 p.m., **Vehicle 11** pulled into the parking lot of **Premises 21** and circled the lot (appearing in engage in counter surveillance activity) before parking in front of **Premises 21**.  Approximately 4 minutes later, a member of the surveillance team observed BUDD approaching the driver door of **Vehicle 11** and then walking into **Premises 21** carrying a gray suitcase.

---

[27] Because of the countersurveillance activity by Vehicle 11, surveillance officers distanced themselves further from the two vehicles for some time.

329.    **Vehicle 11** then left the parking lot and, as observed by the surveillance team, engaged in multiple maneuvers consistent with counter-surveillance such as driving in circles and making last second lane changes and turns.  At approximately 7:24 p.m., a member of the surveillance team observed **Vehicle 11** parked in front of 45 Southview Terrace in Rochester (**Premises 23**).  Surveillance was discontinued at that time.

330.    On April 19, 2020 at approximately 10:17 a.m., a member of the surveillance team observed **Vehicle 11** parked in front of the Fisherman's Cove Apartments (**Premises 22)** where the registered owner of Vehicle 11 resides.

331.    Based on my training and experience, and the investigation to date, I believe both vehicles drove in tandem to Tommy BRUNSON's house in Syracuse and BUDD supplied drugs to BRUNSON.  I believe the drugs were transported in **Vehicle 11**, so that in the event that BUDD was stopped by the police, he would have no drugs in his vehicle.

332.    I believe that while both vehicles were at BRUNSON Jr.'s house, they drove **Vehicle 11** in circles around the neighborhood again to conduct counter-surveillance. When BUDD came out to **Vehicle 11** carrying the yellow grocery bag, I believe that the bag contained the monetary proceeds obtained by BUDD for selling the narcotics to BRUNSON Jr.

333.    I believe that when BUDD returned to his apartment at **Premises 21**, he transported the money in the yellow grocery bag into his apartment.  I believe that when BUDD got the suitcase from **Vehicle 11**, it was because the suitcase was utilized in **Vehicle 11** to hide the narcotics during the transport to Syracuse, New York.

−115−

334.    I believe that Vehicle 11 went to 45 Southview Terrace (**Premises 23)** because that location is connected to BUDD's drug trafficking as indicated by the fact that BUDD had gone to there on April 15 as set for the in paragraphs ¶¶ 306-307, 311 above.

335.    I believe that the Vehicle 11 was observed at **Premises 22** the following morning because this is where the male believed to be INGRAM (who drove Vehicle 11 to Syracuse in tandem with BUDD) lives with FELDER.

## COMMUNICATIONS INTERCEPTED VIA WIRETAPS

336.    United States District Court Judge Elizabeth A. Wolford authorized the interception of wire and electronic communications over the following Target Telephones:

By Orders dated December 31, 2019, February 7, 2020, and April 1, 2020, over Joshua BAUER's cell phone (585) 743-9486 (Target Telephone 11).

By Orders dated February 7, 2019, over another cell phone used by BAUER (585) 362-7102 (Target Telephone 13).

By Order dated February 7, 2020, over Eliezer MORALES' cell phone (585) 504-5596 (Target Telephone 12).

By Order dated April 1, 2020, over ALEXIS MORALES' cell phone (585) 410-7336 (Target Telephone 14).

The following sets forth some of the pertinent communications intercepted.

**Intercepted wire and electronic communications between Target Telephone 11 utilized by Joshua Bauer and Target Telephone 12 utilized by Eliezer Morales**

**January 5, 2020 at 6:21 p.m.**

337.    On January 5, 2020, at approximately 6:21 p.m., BAUER sent a text to

–116–

Eliezer MORALES which read "Bro.  Bout to pay me and I'll give it rite to u".

## January 6, 2020

### 1:12 a.m.

338.    On January 6, 2020, starting at approximately 1:12 am, BAUER and Eliezer

MORALES had the following exchange of text messages:

**Eliezer Morales (EM):** Where you at. (1:12 a.m.)

**Joshua Bauer (JB):** On my way.  (10:07 a.m.)

**JB:** Here. (10:23 a.m.)

**JB:**  I'm goin to get the 80 I'll be bakc. (10:26 p.m.)

### 10:26 a.m.

339.    On January 6, 2020, at approximately 10:26 a.m., BAUER called Eliezer

MORALES.  The following is a transcript of that call:

**Eliezer Morales (EM):** I'm coming out right now, give me a second.

**Joshua Bauer (JB):**  A'right, a'right.

[End of Call]

### 10:27 a.m.

340.    On January 6, 2020, at approximately 10:27 a.m., BAUER received an

incoming call from Eliezer MORALES:

**Joshua Bauer (JB):**  Yo.

**Eliezer MORALES (EM):**  So are you coming back?

**JB:**  Yeah but, uh, uh- I'll come back after I – I see this last person.

**EM:**  A'right.

**JB:**  A'right.

[End of Call]

**2:31 p.m.**

341.    On January 6, 2020 at approximately 2:31 p.m., BAUER sent text message to Eliezer MORALES which read "I'm outside".

342.    Based on my training and experience, the substance of these and other intercepted communications, I believe that the above-quoted text message and phone conversations between BAUER and MORALES on January 5 and 6 are about BAUER paying Eliezer MORALES for a quantity of narcotics that Eliezer MORALES had previously provided to BAUER.  When BAUER said "I'm goin to get the 80 I'll be bakc", he was telling Eliezer MORALES that he was going to collect another $80 before paying Eliezer MORALES.  When BAUER stated "Yeah but, uh, uh- I'll come back after I – I see this last person", BAUER was reaffirming to Eliezer MORALES that he would come back with the money owed to MORALES after BAUER collected from one more person.

**Intercepted Wire And Electronic Communications with Target Telephone 11 Utilized By Joshua Bauer**

**January 9, 2020 at 3:53 p.m.**

343.    On January 9, 2020, starting at approximately 3:53 p.m., BAUER and an unknown male utilizing telephone instrument (585) 297-2469 had the following exchange of

–118–

text messages:

**Unknown Male (UM2469):**  U gonna be around in a lil bit (3:53 p.m.)

**Joshua Bauer (JB):** Yea (4:24 p.m.)

**UM2469:** How along u think (5:38 p.m.)

**JB:** least a hour (6:05 p.m.)

**UM2469:** Ok. I got one waiting on me rn so…… (6:06 p.m.)


344.    Based on my training and experience, the substance of this and other

intercepted communications, and the information contained in the affidavits submitted with

the prior applications listed above, I believe that when UM2469 said "U gonna be around in

a lil bit", he was inquiring whether BAUER would be available to sell him narcotics that

evening.  When BAUER stated that he would be "least a hour", UM2469 replied "OK. I

got one waiting on me rn so……" in order to tell BAUER that UM2469 had a customer

waiting to be sold narcotics and UM2469 didn't want to keep him waiting and risk losing

the sale.


## January 19, 2020

### 3:36 p.m.

345.    On January 19, 2020, starting at approximately 3:36 p.m., BAUER had the

following exchange of text messages with an unknown male utilizing telephone instrument

(585) 472-9587:

**Unknown Male (UM9587):** Yo (3:36 p.m.)

**Joshua Bauer (JB):** Yo (3:37 p.m.)

**UM9587:** 1 of those 3 was not even.5 (3:42 p.m.)

**3:50 p.m.**

346.    On January 19, 2020, at approximately 3:50 p.m., BAUER called telephone (585) 472-9587, utilized by the unknown male.  The following is a transcript of that call:

**Unknown Male (UM9587):** Yo.... yo!

**Joshua Bauer (JB):** Hello.

**UM9587:** What's up?

**JB:** What happen?

**UM9587:** One of those things was like half of what it should've been.

**JB:** Oh I think you're right yah 'cause there was a half in there.

**UM9587:** Yeah you gave it to me you fuck head.

**JB:** Oh yeah, yeah, a'right well I owe you one more alright, I got a couple of more for you.

**UM9587:** A'right well, are you still working?

**JB:** No, no, no, A's [Phonetic] got the phone so.

**UM9587:** Okay, alright then. I'm- I'm busy for a little bit longer I'll call you later.

**JB:** Well you got my number so you just call me.

**UM9587:** A'right, I'll talk to you in a bit.

**JB:** A'right just don't- you know is just between you and me.

**UM9587:** I know it's just you.

**JB:** A'right bye.

**UM9587:** A'right bye.

[End of call]

347.     Based on my training and experience, the substance of this and other intercepted communications, I believe that when UM9587 texted, "1 of those 3 was not even.5," he was informing BAUER that one of the quantities of narcotics that BAUER supplied him was not full.  Additionally, when UM9587 stated during the call, "One of those things was like half of what it should've been," he is again informing BAUER that a quantity of narcotics obtained from BAUER is short.  When BAUER stated, "Oh yeah, yeah, a'right well I owe you one more alright, I got a couple of more for you," BAUER was informing UM9587 that he would provide UM9587 with additional narcotics.  When UM9587 stated, "A'right well, are you still working," he was asking BAUER if he was available to provide UM9587 with the missing narcotics.  When BAUER responded, "No, no, no, A's [Phonetic] got the phone so," BAUER is informing UM9587 that an additional co-conspirator is currently in possession of an additional phone utilized by the organization to distribute narcotics and BAUER is unavailable to provide the narcotics to UM9587 at this time.

### January 20, 2020 at 8:50 p.m.

348.     On January 20, 2020, at approximately 8:50 p.m., BAUER received an incoming call from telephone instrument (585) 472-9587, utilized by an unknown male. The following is a transcript of that call:

**Unknown Male (UM9587):** How are you doing?

**Joshua Bauer (JB):** Ah... shit, fucking on Conkey right now.

**UM9587:** What the fuck are you doing over there dude?

[Audio Glitch]

**UM9587:** Ah?

**JB:** I'm just getting something from someone really quick.

**UM9587:** That's not a good place for you to be.

**JB:** A minute.

**UM9587:** [Laughs]

**JB:** [Laughs] Yeah I know!

**UM9587:** Umm... I got... I just got my, I just go my check went through.

**JB:** Yeah.

**UM9587:** But I don't know any place I can cash it tonight.

**JB:** That's alright, I'll wait. I just was....

[Voices Overlap]

**UM9587:** I can give it, I can give it to you in the morning for sure.

**JB:** Okay, yeah!

**UM9587:** Do you have anything left?

**JB:** Ah... That's the only thing. Not right now.

**UM9587:** No? Well we are making the arrangements for my grandma, she died last night so...

**JB:** Really? Bro, oh my god.  What the fuck?

**UM9587:** Yeah, it sucks so... Yeah so I'm fucking bumming out and fucking, feeling like balls, but umm...

**JB:** Alright, I'll see what I can do for you.

**UM9587:** Can you find me something out for me? Cause that would really help me tonight.

**JB:** Yeah, yeah I got you, I'll try to see.

**UM9587:** Alright thanks man I appreciate it. I'll throw you a little extra or something.

**JB:** Alright, yeah, yeah. I'll see.

**UM9587:** Alright, thanks.

**JB:** Alright, yep, bye.

**UM9587:** Alright.

[End of call]

349.    Based on my training and experience, the substance of this and other intercepted communications, I believe that when BAUER stated, "Ah... shit, fucking on Conkey right now," and "I'm just getting something from someone really quick," BAUER was informing UM9587 that BAUER was currently on Conkey Avenue in Rochester, conducting a drug deal.  When UM9587 stated, "I just go my check went through," and "I can give it to you in the morning for sure," UM9587 was informing BAUER that he just received his paycheck and that he can pay BAUER for a previously obtained quantity of narcotics.  When UM9587 stated, "Do you have anything left," UM9587 was asking BAUER had any drugs available for UM9587.  When BAUER replied, "That's the only thing. Not right now," and then "Alright, I'll see what I can do for you," BAUER was informing UM9587 that he currently did not have any of the certain type of narcotic that UM9587 wanted, but that BAUER would reach out to associates and attempt to obtain the

narcotic for UM9587.

## January 27, 2020

### 7:00 p.m.

350.    On January 27, 2020, at approximately 7:00 p.m., BAUER received an

incoming text message on **Target Telephone 11** from telephone instrument (585) 472-9587,

utilized by an unknown male, which read, "Yo u good."

### 7:19 p.m.

351.    On January 27, 2020, at approximately 7:19 p.m., BAUER placed an

outgoing call from **Target Telephone 11** to telephone instrument (585) 472-9587, utilized by

an unknown male.  The following is a transcript of that pertinent parts of the call:

**Unknown Male (UM9587):** Hello.

**. . .**

**JB:** Yeah, I [Stutters] I know, I got mixed up. Um, [Pause] um, whereabouts are you?

**UM9587:** Imma be a little while.

**JB:** Uh [Pause], alright, yeah.

**UM9587:** I stopped and picked your money up.

**JB:** Oh, you got some money for me?

**UM9587:** Yes!

**JB:** Oh, okay, yeah, yeah I got something right for you.

**UM9587:** Alright, it'll be a couple of hours.

**JB:** Alright, bye.

**UM9587:** Alright, bye.

[End of call]

352.    Based on my training and experience, the substance of this and other intercepted communications, I believe that when UM9587 texted, "Yo u good," he was asking BAUER if BAUER had narcotics that he could supply to UM9587.  Later during the call when UM9587 stated, "I stopped and picked your money up," UM9587 is informing BAUER that he has money for BAUER from narcotics previously supplied to him on consignment by BAUER.  When BAUER replied, "Oh, okay, yeah, yeah I got something right for you," BAUER is informing UM9587 that he has a quantity of narcotics for UM9587.

**January 30, 2020 at 9:06 p.m.**

353.    On January 30, 2020, at approximately 9:06 p.m., BAUER received an incoming text message on **Target Telephone 11** from an unknown individual utilizing telephone instrument (585) 615-9184, which read, "Where you are."  On the same date at approximately 9:49 p.m., BAUER received an incoming text message on **Target Telephone 11** from an unknown individual utilizing telephone instrument (585) 615-9184, which read, "Come through."  Based on my training and experience, the substance of this and other intercepted communications, I believe that when UI9184 texted, "Where you are," and "Come through," UI9184 was inquiring as to BAUER's location and then asking BAUER if he would travel to UI9184's location in order to complete a drug transaction.

**February 8, 2020 at 12:44 p.m.**

354.    On February 8, 2020, at approximately 12:44 p.m., BAUER received an incoming call on **Target Telephone 11** from telephone instrument (585) 472-9587, utilized by an unknown male.  The following is a transcript of that call:

**Joshua Bauer (JB):** Yo.

**Unknown Male (UM9587):** What's the scoop man?

**JB:** I'm with A right now.

**UM9587:** Oh.

**JB:** But, but he is not in the car.

**UM9587:** Oh!

**JB:** I'm, I'm fucking... they are holding me up cause I got to wait for him that's who I got to see and we got to see the same people. So, I'll just be later just don't, don't forget I got you alright...

**UM9587:** Well I got to go to Buffalo.  I've been waiting on you to go.

**JB:** Fuck man! Yeah its umm...

**UM9587:** Alright, now I gotta come see Alex again, that's fucking retarded.

**JB:** Well, yeah I know well, yeah, yeah yeah, just come see us one more time.

**UM9587:** Where are you? Just where are you? Never mind I'll call him.

**JB:** Okay yeah...

**UM9587:** Don't tell me... don't tell him.  I didn't talk to you. Goodbye.

**JB:** He's got a car that he wants you to look at.

**UM9587:** I know... no shit! I'm trying to get on the road, you are fucking me up.

**JB:** Alright, alright, alright.

−126−

[End of call]

355.    Based on my training and experience, the substance of this and other intercepted communications, I believe that when BAUER stated, "I'm with A right now," and "they are holding me up cause I got to wait for him that's who I got to see and we got to see the same people. So, I'll just be later just don't, don't forget I got you alright," BAUER is informing UM9587 that he is with another individual who is believed to be Alexis MORALES based on previously supplied confidential source information and the investigation to date.  Additionally, BAUER is informing UM9587 that he does not have a previously requested quantity of narcotics for UM9587 yet because he is waiting on Alexis MORALES and the source of supply himself to supply the narcotics.

**<u>Intercepted Wire and Electronic Communications</u>**
**<u>between Joshua Bauer and Eliezer Morales</u>**

**February 13, 2020 at 9:00 p.m.**

356.    On February 12, 2020 at approximately 6:09 p.m., Eliezer MORALES and Joshua BAUER engaged in a series of text messages utilizing **Target Telephones 12** and **Target Telephone 11**:

**Eliezer MORALES (EM)**: Off 1.5 (9:00 p.m.)

**Joshua BAUER (JB)**: Fuk u (9:01 p.m.)

**EM**: For real nigga (9:03 p.m.)

**EM**: 118.5 (9:06 p.m.)

−127−

**EM**: I'll make it happen though… (9:08 p.m.)

**JB**: Dam that's bade.  Thank u. (9:14 p.m.)

357.    Based on my training and experience, the substance of this and other intercepted communications, I believe that when MORALES said "Off 1.5", MORALES was informing BAUER that the quantity of narcotics that BAUER had dropped off was short 1.5 grams.  When MORALES stated "118.5", he was telling BAUER that the weight of the narcotics came to 118.5 grams, which indicates that BAUER was supposed to drop off 120 grams of narcotics to MORALES.  When MORALES stated "Ill make it happen though", he is telling BAUER that he will find a way bag up the narcotics in a manner that being short 1.5 grams will not cause a problem.

### Intercepted Wire And Electronic Communications
### between Eliezer Morales and Alexis Morales

### February 12, 2020

### 6:08 p.m.

358.    On February 12, 2020 at approximately 6:08 p.m., Eliezer MORALES received an incoming call on **Target Telephone 12** from his brother Alexis MORALES using **Target Telephone 14**.  The following is a transcript of that call:

**Alexis Morales (AM)**: [Aside: The wiz about to drop that ball] Yo. [Pause] Yo.

**Eliezer MORALES (EM)**: What's good?

**AM**: What's good? I'm about to pull inside your driveway.

**EM**: Alright, be a second.

**AM**: Go ahead.

[End of Call]

**6:09 p.m.**

359.    A minute later at approximately 6:09 p.m., the two brothers exchanged the

following texts:

**Eliezer MORALES (EM)**: 5? (6:09 p.m.)

**Alexis Morales (AM)**: 10 (6:10 p.m.)

360.    Based on my training and experience, the substance of this and other

intercepted communications, I believe that when Alexis MORALES stated "I'm about to

pull inside your driveway", Alexis MORALES was telling Eliezer MORALES that he was

pulling into Eliezer MORALES' driveway in order to pick up a quantity of narcotics.

When Eliezer MORALES texted "5?" to Alexis MORALES, Eliezer MORALES was

asking Alexis MORALES if he wanted 5 grams of narcotics.  When Alexis MORALES

replied "10", Alexi MORALES was telling Eliezer MORALES that he did not want 5

grams of narcotics, but that he wanted 10 grams of narcotics.

**February 20, 2020 at 10:38 a.m.**

361.    On February 20, 2020 at approximately 10:38 a.m., Alexis called Eliezer.

The following is a transcript of that call:

**Eliezer MORALES (EM)**: Hello.

**Alexis Morales (AM)**: Yo.  [scratches throat].  Yo, you wake, wake... waking up?

**EM:** Yea [Aside: someone coughing]

–129–

**AM:** Alright. I'm just, I'm not there yet. I'm 'bout to be there in 5 minutes. I'm sorry to wake you up but I'm kinda in rush. People fucking rushing me, umm, when i get there just umm, bring out what what umm I gave you last night.  That's it for now. A'right?

**EM:** [Unintelligible]

**AM:** You heard?

**EM:** What did you say?

**AM:** I said that when I get there in five (5) minutes just bring out what i gave you last night and that's it. A'right?

**EM:** A'right.

**AM:** A'right I'm 'bout to be there in five (5) minutes.  You heard?

**EM:** Yes

**AM:** A'right.

[End of Call]

362.     Based on my training and experience, the substance of this and other intercepted communications, I believe that when Alexis MORALES stated, "Alright. I'm just, I'm not there yet. I'm 'bout to be there in 5 minutes. I'm sorry to wake you up but I'm kinda in rush. People fucking rushing me, umm, when i get there just umm, bring out what what umm I gave you last night.  That's it for now. A'right," and "I said that when I get there in five (5) minutes just bring out what i gave you last night and that's it. A'right," Alexis MORALES is informing Eliezer MORALES that his narcotics customers are in a hurry to get their narcotics and Alexis MORALES is informing Eliezer MORALES to just give him the same narcotics that Alexis MORALES gave Eliezer MORALES last night to store at his house located at 83 Springfield Street (**Premises 17**) and Alexis MORALES will

get more narcotics from Eliezer MORALES later if he needs them.

**February 27, 2020**

**8:01 p.m.**

363.   On February 27, 2020 at approximately 8:01 p.m., Eliezer called Alexis.  The

following is a transcript of that call:

**Alexis Morales (AM)**: Yo.

**Eliezer MORALES (EM)**: Yo.

**AM:** Yo, you home?

**EM:** Yeah I'm gonna shower real quick. What up?

**AM:** Alright, I'm outside.

**EM:** A'right I'm in the shower though.

**AM:** Alright, I'm still gonna be right here.

**EM:** Alright, are you good though? You don't need?

**AM:** Huh?

**EM:**  You don't need to re-up?

**AM:** Nah, Devin ne- needs that's why I'm here.

[Voices Overlap]

**EM:** Alright

**AM:** but like you said [Unintelligible].

**EM:** Alright.

**AM:** Bye!

[End of Call]

364.    Based on my training and experience, the substance of this and other intercepted communications, I believe that when Alexis MORALES stated "Alright, I'm outside", Alexis MORALES was telling Eliezer MORALES that Alexis was at Eliezer MORALES' house in order to pick up a quantity of narcotics and Eliezer MORALES responded, "A'right I'm in the shower though." I further believe that when Eliezer MORALES stated, "Alright, are you good though? You don't need," and "You don't need to re-up," Eliezer MORALES was asking Alexis MORALES if he needed to re-up a quantity of narcotics for his customers and Alexis MORALES stated he only needed a quantity of narcotics for a customer named Devin when he stated, "Nah, Devin ne- needs that's why I'm here."

### February 28, 2020 at 11:57 a.m.

365.    On February 28, 2020 beginning at approximately 11:57 a.m., Eliezer and Alexis engaged in the following series of text:

**Eliezer MORALES (EM)**: I'm leaving in few minutes (11:57 a.m.)

**Alexis Morales (AM)**: Leave it in the mailbox plz (11:57 a.m.)

**Eliezer MORALES (EM)**: Not gonna be gone long (11:58 a.m.)

**Alexis Morales (AM)**: Yea but I gotta head there in a few (11:58 a.m.)

366.    Based on my training and experience, the substance of this and other intercepted communications, I believe that when Eliezer MORALES stated "I'm leaving in

few minutes", Eliezer MORALES was telling Alexis MORALES that he was leaving

**Premises 17.**  Alexis MORALES' direction that Eliezer "Leave it in the mailbox plz."

Related to a quantity of drugs which Alexis needed "in a few" and could not wait for

Eliezer to return.


**April 22, 2020 at 8:24 p.m.**

**Bauer Calls An UBER Car To Pick Him Up At 4 Florack And Leaves With Drugs**

367.    On April 22 at 8:24 pm, BAUER used Target Telephone 11 (585-743-9486) to

call for an UBER driver.  During the conversation, BAUER directed the driver to come to

Florack Street and explained to the driver where he (BAUER) would be standing on the

street waiting.

368.    At approximately 8:25 pm, Natasha FIGUEROA arrived at 4 Florack in her

Black Mercedes (**Vehicle 3**) and handed GONZALEZ-RIVERA a black plastic bag which

looked like it had square objects inside.  GONZALEZ-RIVERA took the bag and placed it

in the front passenger seat of his rented Silver Chevy Tahoe and appeared to lock the car.

369.    At 8:32 p.m., BAUER exited 4 Florack and walked to GONZALEZ-

RIVERA's rented Silver Tahoe.  Before BAUER exited the residence, the head lights on the

Tahoe flashed indicating that someone had unlocked the vehicle remotely.  BAUER then

opened the front passenger door and reached inside and pulled out the same black plastic

bag which GONZALEZ-RIVERA had just placed inside the Tahoe after receiving it from

FIGUEROA.  BAUER then carried the black bag to the waiting UBER car and got inside

and left.

370.    Based on my training and experience and my involvement in this investigation, I believe BAUER departed 4 Florack with a quantity of drugs which had been brought there by FIGUEROA a few minutes before.  This appears to be another method by which MEDINA and BAUER transport drugs from Florack to their stash location.  Consistent with prior occasions, MEDINA and another known drug dealer was at Premises 1 when BAUER obtained the drugs from the Chevy Tahoe and left in the UBER.

## KRYSTAL GONZALEZ AND GONZALEZ-RIVERA'S MONEY

371.    Krystal Gonzalez is one of GONZALEZ-RIVERA's girlfriends.  As noted above, she is the registered owner of **Vehicle 1**, the Black Cadillac Escalade which GONZALEZ-RIVERA drives from time to time.  Earnest BAKER has also been observed driving the Escalade during this investigation.

372.    Krystal Gonzalez assists GONZALEZ-RIVERA conceal and launder his drug proceeds.  This investigation has obtained records for two personal bank accounts at ESL Federal Credit Union, a checking and a savings, in the name of KRYSTAL GONZALEZ of 234 Sandalwood Drive, Rochester, NY 14616.  The records cover the period June 2018 to October 2019 and revealed that KRYSTAL GONZALEZ received a total of approximately $51,000 in bi-weekly and/or monthly direct deposits and/or payroll checks as an employee of various chemical dependency counseling organizations.  Further review of these two personal bank accounts reveal that a total of approximately $361,379.75 was deposited into these accounts during the seventeen month time frame.  Cash deposits into the accounts totaled approximately $274,266.00 or 76% of all deposits.  Approximately

$251,341.98 was used to pay various credit card accounts some of which are detailed below.

373. Krystal GONZALEZ' savings account records revealed total deposits of approximately $54,173.98, $8,205.00 in cash deposits, $30,445.00 in transfers from checking account 1377691801 and $15,523.98 consisting of two checks and one official bank check. The official bank check was written in the amount of $3,523.98 and listed the remitter as Krystal Gonzalez written to Krystal Gonzalez. There was a check from Filer's Powersports LLC to Jan Carlos Gonzalez-Rivera in the amount of $9,500.00 and a check from the Town of Sweden Court in the amount of $2,500.00 to Joshua BAUER with the Memo: Bail ret for Shiasia Hill.

374. Capital One credit card records for two accounts listed to JAN CARLOS GONZALEZ-RIVERA were obtained pursuant to a grand jury subpoena for the period January 2018 to December 2019. There were several credit cards linked to these two accounts in the names JAN CARLOS GONZALEZ-RIVERA and KRYSTAL GONZALEZ. A review of one of the credit card accounts revealed total charges for this time period of $218,729.81 and payments of $214,517.81. A closer review of these records revealed charges of approximately $47,342.81 on rental cars, approximately $11,113 on airfare and approximately $23,930 on hotels.

375. A review of another of GONZALEZ-RIVERA's Credit Card account listed in the name of JAN CARLOS GONZALEZ-RIVERA revealed total charges of approximately $38,539.74 and total payments of approximately $37,690.83. Further review showed that charges for rental cars were approximately $7,264.45, for airfare approximately $3,764.56 and hotels approximately $10,794.74. Payments on this credit card account revealed that

–135–

$30,332.38 was paid on this card from KRYSTAL GONZALEZ's above listed ESL account.

## REQUESTED SEARCH WARRANTS

376.    As partly set forth below, there is probable cause to believe that **Premises 1-23** and **Vehicles 1-13** contain drugs, proceeds, instrumentalities, books and records and other evidence of drug trafficking, money laundering and other criminal activity.

### Drug Traffickers Use of Premises and Vehicles in General

377.    Based on my training, experience, and participation in this and other drug trafficking and money laundering investigations and based upon my discussions with other experienced DEA Agents, and Federal, State, and Local drug investigators, I know that:

a.   Traffickers of controlled substances frequently maintain, at their residence, place of business or inside their vehicles quantities of narcotics to maintain their ongoing drug distribution business;

b.   In addition to drugs, traffickers of controlled substances usually keep, at their residence, place of business or inside their vehicles, paraphernalia for the packaging, diluting, cutting, weighing, processing and distributing of controlled substances, including scales, plastic bags, cutting agents and utensils;

c.   Traffickers of controlled substances commonly keep firearms in their homes, vehicles, and businesses to protect themselves, their narcotics, and the proceeds from their narcotics sales, and I am aware that many courts, including the Second Circuit United States Court of Appeals, have found that weapons and firearms are among the "tools of the trade" in the narcotics business;

d.   Traffickers of controlled substances commonly maintain records, notes, and

other papers relating to drug trafficking, some of which may be in code, including but not limited to sales receipts, shipping labels, shipping receipts, shipping boxes, order forms, storage receipts, records, operating manuals, computer records, publications, notes, checks, money orders, and money transfer receipts.  The aforementioned records, notes, and other papers are commonly maintained where the drug possessor/trafficker has ready access to them, such as on their person, or in their homes, vehicles or businesses, or even in electronic storage devices, including, but not limited to computers, computer storage devices, tablets, and cellular telephones;

e.   Traffickers of controlled substances commonly maintain records, books or papers that reflect addresses or telephone numbers for their associates or sources of supply and such items may be in code.  The above addresses and telephone numbers may also be stored in electronic storage mediums, including but not limited to cellular telephones, computers, and computer storage devices;

f.   Traffickers of controlled substances commonly take, or cause to be taken, photographs/videos of themselves, their associates, their property, their drugs, or their firearms, and usually maintain these photographs/videos in their residences.  The above photographs/videos may also be stored in electronic storage mediums, including but not limited to cellular telephones, digital cameras, tablets, home computers, and computer storage devices;

g.   Traffickers of controlled substances commonly maintain cellular telephones and other communication devices on their person, in their residences, in their vehicles, and in their businesses, that are utilized to further their firearm and drug trafficking activities, including contacting other individuals with whom they traffic drugs; certain electronic devices, including i-Phones, Blackberries, i-Pods, and Android phones, store information such as email messages, chats, multimedia messages, installed applications or other electronic communications, calendars, notes, passwords, dictionary entries, Global Positioning Satellite ("GPS") entries, internet protocol connections, and location entries, including cell tower and WiFi entries internet or browser entries or history.  In addition, these devices often contain proprietary software, in the form of system, data, or configuration information, which enable the types of information and data described above to be accessed and analyzed.  These items remained stored on the electronic devices even if the

device in question has lost all battery power, and has not been used for an extended period of time.  In this case, cell phones and smart phones are particularly important to the targets and likely to contain valuable evidence of drug trafficking and other criminal activity by the defendants and other coconspirators.  The investigation has revealed that the great majority of communications between and among the defendants was via end-to-end encrypted media such as FaceTime.  Messages sent via this medium are likely to be maintained in the respective phones of the defendants, which phones are likely to be in the residences and other locations sought to be searched (people keep their cell phones with them).;

h.  Traffickers of controlled substances commonly keep and utilize personal computers and tablets to further their drug trafficking activities.  The use of personal computers and Tablets by drug traffickers, as well as by the general public, has increased dramatically during the past decade.  During the past two years alone, myself and/or other members of the investigative team have participated in investigations where computers, tablets and cellular telephones were seized and searched pursuant to court authorized search warrants that contained digital photographs of drugs, firearms, and bulk cash as well as text messages indicating locations of drug transactions.  I am also familiar that that the search, retrieval, analysis, documentation and authentication of all such electronically stored computer data (to include cellular telephones) requires analysis by a qualified computer specialist to prevent the loss of data either from accidental or deliberate destruction; and

i.  Traffickers of controlled substances must maintain, on hand, United States currency in order to maintain and finance their ongoing drug business and the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers;

j.  When traffickers of controlled substances amass large proceeds from the sale of drugs, they sometimes attempt to legitimize these profits by utilizing banks, and their attendant services: securities, cashiers checks, money drafts, letters of credit, brokerage houses, real estate, and business fronts, and purchase expensive vehicles, among other things;

k.  Traffickers of controlled substances often place assets in names of others and drug proceeds in other people's bank accounts to avoid detection of those

assets by government agencies while continuing to use those assets and exercise dominion and control over them; and

l. Drug traffickers are motivated by the profits that can be generated in the sale of drugs, which they use to enhance their lifestyle or recognition in the community through the purchase of personal assets, including automobiles; and

m. When vehicles are used to conduct drug deals and/or to transport or conceal drugs, evidence of such drugs are often left in the vehicles, including but not limited to empty and used bags with drug residue, cash wrappers, handwritten notes and ledgers and trace amounts of drugs.

## **NO-KNOCK REQUEST**

378. As more fully set forth below, I respectfully request that the search warrants for some of the premises, authorize the agents/officers on the search team to enter the Premises without first knocking and announcing their presence.  In this particular case, I believe that requiring the officers to first knock and announce their presence at these locations would allow the occupants of the Premises an opportunity to dispose of or destroy illegal controlled substances and/or reach for weapons to use against law enforcement officers.

379. The basis of my "No-Knock" request is as follows:

a. Controlled substances are easily and readily disposed of or destroyed. Cocaine/heroin/fentanyl generally comes in powder form and valuable quantities of cocaine/heroin/fentanyl are not particularly large or bulky. Drug traffickers often attempt to dispose of controlled substances by flushing it down the toilet, or sending it down the drain, either within packaging or not, when they are aware of police intent to execute a search warrant;

b.  Moreover, drug traffickers often attempt to flee and/or destroy, carry away, or hide cocaine, heroin, proceeds of drug sales, records, and other evidence upon learning of law enforcement intent to question, search, or arrest;

c.  Drug traffickers often attempt to fortify or barricade locations where they store and distribute controlled substances, as well as locations where they keep proceeds of drug sales.  Drug traffickers frequently utilize surveillance cameras in those locations as well.  These measures serve to protect the drugs and proceeds from the police and individuals seeking to steal them, by attempting to prevent or delay entry into the location and providing notice of the police presence.  The delayed entry and advance notice provide an opportunity to those inside the Premises to destroy evidence, flee, and/or arm themselves with weapons.

d.  Most importantly, drug traffickers frequently protect themselves, their drug product and/or their drug proceeds with firearms.  Armed drug traffickers usually keep their firearms in an area readily accessible to the occupants of the premises.  The firearms are often carried either on the individuals' person or within an arms-length reach of the occupants.  If law enforcement is required to knock and hesitate, it would allow the occupants an opportunity to observe who is coming and potentially arm themselves.  This could create an ambush situation for law enforcement officers.

e.  Finally, one of the drugs distributed by the targets in this investigation is fentanyl.  The potency of this drug has led to an alarming increase in overdose incidents and overdose-related deaths.  Fentanyl poses a significant threat to law enforcement personnel and other first responders who may come in contact through routine law enforcement, emergency or life-saving activities and execution of search warrants at suspected drug locations.  Fentanyl may be ingested orally, inhaled through the nose or mouth, or absorbed through the skin or eyes.  Exposure to a very small amount may lead to significant health-related complications, respiratory depression, or death.  For example, first responders in Wilmington Delaware were exposed to fentanyl and had to be hospitalized during efforts to rescue an overdose victim when a member of the victim's family turned on a fan and blew white powder onto the firefighters and police officers.  In this case, efforts by occupants of the premises to destroy or conceal fentanyl from law enforcement by, for

example, flushing it down the toilet or throwing it out a window risks spreading the substance around the premises and in the air, thereby exposing entering officers and occupants already inside to enhanced danger.  No-Knock authority will minimize the time and opportunity that the occupants have to attempt these concealment efforts.

## PREMISES AND VEHICLES TO BE SEARCHED

### 4 Florack Street, Rochester, New York
### (Premises 1)

380.    **Premises 1** (4 Florack Street, Rochester, New York) is the principal

distribution location for GONZALEZ-RIVERA and the residence of Shaumyk

SANTIAGO.  Records from Rochester Gas and Electric show that utilities at 4 Florack

Street has been in the name of Shaumyk SANTIAGO, DOB xx/xx/1991, SSN# XXX-XX-

8149 since January 7, 2019.

381.    PREMISES 1 is a one story single family dwelling with white siding and

white stucco located on the east side of Florack Street.  The number 4 is in black to the left

of the front door. The front door faces west towards Florack Street. The house has an

unattached garage with two garage doors located behind the residence and the garage doors

face west towards Florack Street.  The area to be searched includes the main house, the

unattached garage and the area within the curtilage including any outbuildings.

382.    No-knock authority requested:  I request that the warrant authorize officers to

enter this location without first knocking and announcing.  The Premises has surveillance

cameras located on the outside of the location. This will afford any occupants inside ample

time to destroy evidence and possibly reach for firearms as agents approach.  Controlled

substances, proceeds of drug sales, records, and other evidence which can be easily and

readily disposed of or destroyed are believed to be inside this location. Members of this

conspiracy are known to carry and/or have been arrested with firearms and at least one

confidential source has observed firearms in that location.


### 35 Northaven Terrace, Rochester, New York
### (Premises 2)

383.    **Premises 2** (35 Northaven Terrace, Rochester, New York) is the principal

stash house of JanCarlos GONZALEZ-RIVERA and the residence of Natasha

FIGUEROA.  Records from Rochester Gas and Electric show that utilities at 35 Northaven

Terrace has been in the name of Natasha FIGUEROA, DOB xx/xx/1993, SSN# XXX-

XX-0129 since May 01, 2019.

384.    PREMISES 2 is a two story single family dwelling with gray siding and white

trim located on the west side of Northaven Terrace.  The number 35 is in black to the right

of the front door. The front door faces east towards Northaven Terrace. The area to be

searched includes the main house and the area within the curtilage including any

outbuildings.

385.    No-Knock Authority is requested for this location.  PREMISES 2 is the

primary stash location for GONZALEZ-RIVERA.  Controlled substances, proceeds of drug

sales, records, and other evidence which can be easily and readily disposed of or destroyed

are believed to be inside this location.  FIGUEROA and other occupants inside will have

time destroy or conceal evidence if officers must first knock, announce their presence and

then wait before entering.

## 769 Lake Shore Boulevard, Rochester, New York
## (Premises 3)

386.    **Premises 3** (769 Lake Shore Boulevard, Rochester, New York) is the

principal residence of Marilin DELEON, a girlfriend of JanCarlos GONZALEZ-RIVERA.

Records from Rochester Gas and Electric show that utilities at 769 Lake Shore Boulevard

has been in the name of Marilin Deleon, DOB xx/xx/1986, SSN# XXX-XX-1384 since

June 19, 2019.   As noted above, DELEON has repeatedly transported drugs for

GONZALEZ-RIVERA and her residence is likely to contain evidence of drug trafficking.

387.    PREMISES 3 is a two story single family dwelling with beige siding and

white trim located on the south side of Lake Shore Boulevard.  The number 769 is in black

to the right of the garage door. The front door faces north towards Lake Shore Boulevard.

The house has one garage door on the east side of the residence and one entrance door to

the right of the garage door facing north towards Lake Shore Boulevard. The area to be

searched includes the main house and the area within the curtilage including any

outbuildings.

**234 Sandalwood, Rochester, New York**
**(Premises 4)**

388.    **Premises 4** (234 Sandalwood Drive, Rochester, New York) is the residence of

Krystal GONZALEZ, a girlfriend of JanCarlos GONZALEZ-RIVERA.  Records from

Rochester Gas and Electric show that utilities at 234 Sandalwood Drive has been in the

name of JanCarlos GONZALEZ-RIVERA, xx/xx/1985, SSN# XXX-XX-7971 since

November 17, 2017.   As noted above, Krystal Gonzalez assists GONZALEZ-RIVERA

conceal and launder his drug proceeds.  Her residence is therefore likely to contain evidence

of money laundering, including cash, bank records, credit card statements, titles and deeds

to real and personal property and other financial documents.

389.    PREMISES 4 is a one story single family dwelling with white siding and

white trim located on the north side of Sandalwood Drive.  The number 234 is in black to

the left of the front door. The front door faces south towards Sandalwood Drive. The house

has one garage door on the west side of the residence facing south towards Sandalwood

Drive. The area to be searched includes the main house and the area within the curtilage

including any outbuildings.

**75 Angelus Drive, Rochester, New York**
**(Premises 5)**

390.    **Premises 5** (75 Angelus Drive, Rochester, New York) is the principal

residence of GONZALEZ-RIVERA.  Records from Rochester Gas and Electric show that

utilities at 75 Angelus Drive has been in the name of Adabell Cruz, DOB xx/xx/1987, SSN# XXX-XX-1970 since December 11, 2019.

391.    Surveillance has shown that, since February 2020, GONZALEZ-RIVERA sleeps at this location most nights (previously he was residing at 769 Lakershore Blvd with Marilin DELEON).

392.    PREMISES 5 is a one story single family dwelling with white siding and white trim located on the north side of Angelus Drive.  The number 75 is in black to the left of the front door. The front door faces south towards Angelus Drive. The house has one garage door on the east side of the residence facing south towards Angelus Drive. The area to be searched includes the main house and the area within the curtilage including any outbuildings.

393.    No-Knock Authority is requested for this location.  This is the primary residence of GONZALEZ-RIVERA where controlled substances, proceeds of drug sales, records, and other evidence which can be easily and readily disposed of or destroyed are believed to be inside this location.  Gonzalez-River and other occupants inside will have time to destroy or conceal evidence if officers must first knock, announce their presence and then wait before entering.

### 10 Strathmore Circle, Apartment D, Rochester, New York (Premises 6)

394.    **Premises 6** (10 Strathmore Circle-Apartment D, Rochester, New York) is a

principal stash house of Jonathan CRUZ-VEGA.  Records from Rochester Gas and Electric show that utilities at 10 Strathmore Circle-Apartment D has been in the name of Sahvana LOPEZ, DOB xx/xx/1995, since December 16, 2019.   As noted in paragraphs 91-95, 100, 146, 231-232, and 248-249 above, CRUZ-VEGA has gone to and from this location on several occasions before and/or after conducting drug deals and after obtaining drugs from GONZALEZ-RIVERA.

395.    PREMISES 6 is in a multi-unit apartment complex. The building has red brick exterior with black trim, the numbers 10 is in white located above the entryway door.  The entry door to the building is facing east.  The area to be searched includes the apartment and any storage areas assigned to it.

396.    No-Knock Authority is requested for this location.  This is one of CRUZ-VEGA's stash locations.  Controlled substances, proceeds of drug sales, records, and other evidence which can be easily and readily disposed of or destroyed are believed to be inside this location.  As stated above, CRUZ-VEGA is a violent individual and known to carry firearms and as recently as January 21, 2020 was arrested for Criminal Possession of a Weapon in the Second Degree, Criminal Possession of a Weapon in the Third Degree-Previous Conviction with a Weapon and Vehicle and Traffic Law infractions after leading New York State Police on a vehicle police pursuit.  It is believed that there are firearms located inside this location in order for CRUZ-VEGA to protect his drugs and/or his drug proceeds.

## 195 Campbell Park-Rear Apartment, Rochester, New York
## (Premises 7)

397.  **Premises 7** (195 Campbell Park-Rear Apartment, Rochester, New York) is

the principal residence of Jonathan CRUZ-VEGA.  Records from Rochester Gas and

Electric show that utilities at 195 Campbell Park-Rear Apartment has been in the name of

Ashley Garcia, DOB xx/xx/1994, SSN# XXX-XX-5166 since September 27, 2019.   As

noted in paragraph 81 above, CRUZ-VEGA went directly from this location to meet with

CS-5 to supply him with drugs.  He returned to his location after the sale.  See ¶ 86.

398.   PREMISES 7 is a two story two family dwelling with beige siding and white

trim located on the west side of Campbell Park.  The number 195 is in black to the right of

the front door. The front door faces east towards Campbell Park. The area to be searched

includes the rear apartment and the area within the curtilage including any outbuildings.

399.   No-Knock Authority is requested for this location.  This is the primary

residence of CRUZ-VEGA.  Controlled substances, proceeds of drug sales, records, and

other evidence which can be easily and readily disposed of or destroyed are believed to be

inside this location.  As noted above, CRUZ-VEGA is a violent individual and known to

carry firearms.  It is believed that there are firearms located inside this location in order for

CRUZ-VEGA to protect his drugs and/or his drug proceeds.

## 128 Clifford Avenue, Rochester, New York
## (Premises 8)

400.   **Premises 8** (128 Clifford Avenue, Rochester, New York) is the residence of Jonathan CRUZ-VEGA's mother, Milagros Vega.  CS-5 advised the investigative team that CRUZ-VEGA stores drug proceeds at this location.  Records from Rochester Gas and Electric show that utilities at 128 Clifford Avenue has been in the name of Yessenia Guzman-Vega, DOB xx/xx/1987, SSN# XXX-XX-2298 since January 9, 2020.

401.   PREMISES 8 is a two story single family dwelling with yellow siding and white trim located on the north side of Clifford Avenue.  The number 128 is in black above the front porch. The front door faces south towards Clifford Avenue. The house has an unattached garage with one garage door located behind the residence and the garage door faces south towards Clifford Avenue.  The area to be searched includes the main house, the unattached garage and the area within the curtilage including any outbuildings.

## 16 Village Way, Rochester, New York
## (Premises 9)

402.   **Premises 9** (16 Village Way, Rochester, New York) is the residence of Jonathan CRUZ-VEGA's girlfriend, Rebecca Junco.  Records from Rochester Gas and Electric show that utilities at 16 Village Way has been in the name of Rebecca Junco, SSN# XXX-XX-4445 since 2014.   As noted above (¶ 27), CS-5 stated that CRUZ-VEGA stores

and processes heroin at this location.  Additionally, in January 2020, CRUZ-VEGA directed CS-5 to go the vicinity of this location sold drugs the CS there.  See ¶¶ 82-83.

403.    PREMISES 9 is in a multi-unit apartment complex. The building has brown brick exterior. The numbers 16 is in black to the left of the door.  The entry door to the building is facing north.  The area to be searched includes the apartment and any storage areas assigned to it.

404.    No-Knock Authority is requested for this location.  This is another of CRUZ-VEGA suspected stash locations and the residence of CRUZ-VEGA's girlfriend, Rebecca JUNCO.  Controlled substances, proceeds of drug sales, records, and other evidence which can be easily and readily disposed of or destroyed are believed to be inside this location. Because CRUZ-VEGA is a violent individual and known to carry firearms, it is believed that there are firearms located inside this location in order for CRUZ-VEGA to protect his drugs and/or his drug proceeds.

### 700 Still Moon Crescent, Apartment 12, Rochester, New York (Premises 10)

405.    **Premises 10** (700 Still Moon Crescent-Apartment 12, Rochester, New York) is a principal residence of Amante SANTIAGO, aka "Cholo."  As noted in paragraph 150-152 above, Amante SANTIAGO went to that location after a drug deal.  Surveillance has shown him staying the night there on a regular basis.  Records from Rochester Gas and Electric show that utilities at 700 Still Moon Crescent-Apartment 12 has been in the name of John Whitney, SSN# XXX-XX-6237 since September 14, 2018.

405a.   Amante SANTIAGO is currently driving a new rental vehicle and it has been observed parked outside building 700.  At 12:30 pm on April 27, he was observed exiting 700 Still Moon Crescent and getting in his new rental vehicle.  Significantly, in his rental contract, Amante SANTIAGO rented the vehicle in his own name but gave a different address to the rental car company, indicating an attempt to distance himself from his real address at 700 Still Moon Crescent, where he has actually resided since at least October of last year.  The credit card used to rent the vehicle is in Amante SANTIAGO's name.  Thus, it is likely that SANTIAGO's residence will contain credit card statements and other records probative of unexplained wealth, among other evidence.

406.   PREMISES 10 is in a multi-unit apartment complex. The building has red brick exterior on the first level and beige siding on the second level. The numbers 700 is on north and south side of the building.  The entry door to the building is facing west.  The area to be searched includes the apartment and any storage areas assigned to it.

### 143 Windmill Trail, Rochester, New York
### (Premises 11)

407.   **Premises 11** (143 Windmill Trail, Rochester, New York) is the principal residence of Enrique MEDINA.  As noted in paragraphs 125-130, 222-225 above, MEDINA went to Premises 11 after obtaining drugs from or delivering money to 4 Florack.  Surveillance has had him staying the night there on a regular basis.  Records from Rochester Gas and Electric show that utilities at 143 Windmill Trail has been in the name of Leeah Speranza, SSN# XXX-XX-4509 since July 30, 2018.

408.    PREMISES 11 is a two story single family dwelling with brown siding on the first level of the dwelling and beige siding on the second level of the dwelling located on the south side of Windmill Trail.  The number 143 is in white above the garage. The front door faces north towards Windmill Trail. The house has a two car garage with one garage door on the east side of the residence facing north towards Windmill Trail. The area to be searched includes the main house and the area within the curtilage including any outbuildings.

409.    No-Knock Authority is ted for this location.  This is the primary residence of Enrique MEDINA.  It is believed that controlled substances, proceeds of drug sales, records, and/or other evidence which can be easily and readily disposed of or destroyed are inside this location.  Additionally, on November 29, 2019, three males attempted to kidnap MEDINA's father, Enrique Medina Sr., resisted and suffered a head injury and was taken to Rochester General Hospital.  Based upon the investigation, it is believed that the attempted kidnappers were trying to locate Enrique MEDINA's drugs and/or his drug proceeds. Based upon this incident, it is believed that there are firearms located inside Enrique MEDINA's residence with which MEDINA can protect his drugs and drug proceeds.

## 28 Blaydon Loop, West Henrietta, New York
## (Premises 12)

410.    **Premises 12** (28 Blaydon Loop, West Henrietta, New York) is one of Lateef BUDD's two residences and he is the owner of the house.  Surveillance via GPS tracker and

agent observation have identified BUDD at this location on multiple occasions. Since April 7 when the GPS trackers were placed on BUDD's vehicles, BUDD has been observed there repeatedly for multiple hours. BUDD has also gone to that location after engaging in drug transactions with GONZALEZ-RIVERA at Florack. See ¶¶ 175-178. Records from Rochester Gas and Electric show that utilities at 28 Blaydon Loop has been in the name of Lateef BUDD, DOB xx/xx/1991, SSN# XXX-XX-7594 since August 13, 2018.

411.    PREMISES 12 is a two story single family dwelling with beige siding and white trim located on the north side of Blaydon Loop. The number 28 is in black on the pole of the front porch of the residence. The front door faces south towards Blaydon Loop. The house has a three car garage with two garage doors on the east side of the residence facing south towards Blaydon Loop. The area to be searched includes the main house and the area within the curtilage including any outbuildings.

412.    No-Knock Authority is requested for this location. PREMISES 12 is the primary residence of Lateef BUDD. Controlled substances, proceeds of drug sales, records, and other evidence which can be easily and readily disposed of or destroyed are believed to be inside. Several Rochester Police FIFs (Field Interview Forms) have been filed on BUDD indicating that he was in possession of firearms. BUDD is the main suspect in a November 3, 2019, shooting at the Barrel of Dolls strip club located at 173 Anderson Street. However, the victim has refused to cooperate with the investigation.

## 20 Heidelberg Street, Rochester, New York
## (Premises 13)

413.     **Premises 13** (20 Heidelberg Street, Rochester, New York) is the principal residence of Earnest BAKER.  Records from Rochester Gas and Electric show that utilities at 20 Heidelberg Street has been in the name of Earnest BAKER, DOB xx/xx/1985, SSN# XXX-XX-149 since October 3, 2019.   Surveillance agents have observed BAKER return to this location after having conducted drug transactions at Florack. See ¶¶ 254-256.  Baker went back to this location after selling drugs to CS-4 in March 2020. See ¶¶ 110-112.  After the February 2020 drug sale to CS-4, the male who sold the drugs to CS-4 went to this location. ¶ 107.  Natasha FIGUEROA has also gone to this location and remaining for only four minutes, consistent with dropping of drugs. ¶ 109.

414.     PREMISES 13 is a two story single family dwelling with white siding and white trim located on the south side of Heidelberg Street.  The number 20 is in black to the right of the front door. The front door faces north towards Heidelberg Street. The area to be searched includes the main house and the area within the curtilage including any outbuildings.

415.     No-Knock Authority is requested for this location.  This is the primary residence of Earnest BAKER.  As stated above, BAKER is a violent individual and is known to carry firearms. On December 2, 2011 BAKER pled guilty to Criminal Possession of a Weapon in the Second Degree and was sentenced to seven years in prison. On April 20, 2004 BAKER pled guilty to Assault in the Second Degree-Intent to Cause Physical Injury

with a Weapon. He has told a confidential source that he enjoys fighting people and has bragged about shooting people in the past.  BAKER is also likely to possess drugs and drug proceeds at this location which he may seek to protect.  I therefore believe that there are firearms located inside this location.

## 182 Avenue D, Apartment 203, Rochester, New York
## (Premises 14)

416.   **Premises 14 (**182 Avenue D, Apartment 203, Rochester, New York is the residence of Marcus JOHNSON.  Records from Rochester Gas and Electric show that utilities at 182 Avenue D, Apartment 203 has been in the name of Roshoda Smith, DOB xx/xx/1993, SSN# XXX-XX-3552 since May 19, 2016.  As set forth above, Johnson is a close associate of GONZALEZ-RIVERA dating back to 2016 and he has repeatedly obtained drugs from GONZALEZ-RIVERA at Florack. See ¶¶ 49-51, 170-174, 202-205 and 262-266.  Johnson has been observed at this location on multiple occasions, including early mornings indicating that he spent the night there.  Roshoda Smith, in whose name the utilities are registered, is also the named renter of the vehicle which JOHNSON was driving on February 5, 2020 when he came to 4 Florack and was supplied drugs by GONZALEZ-RIVERA, as set forth in paragraphs 170-174 above.

416a.   Although residing at this address, JOHNSON has not identified its existence to his New York State Parole officer and continues to have 165 Emerson Street as his parole residence.  This is significant because it strongly indicates that JOHNSON is seeking to conceal the 182 Avenue D address from his parole officer, presumably because he is

–154–

engaging in illegal activity at that address which he does not want his parole officer to discover.

417.    PREMISES 14 is a four story apartment building with brown brick exterior located on the north side of Avenue D.  The number 182 is in black on the southwest corner of the building. The front door faces north away from Avenue D. The area to be searched includes the apartment and any storage areas assigned to it.        .

### 33 Locust Street, Upstairs Apartment, Rochester, New York
### (Premises 15)

418.    **Premises 15** (33 Locust Street, Upstairs Apartment, Rochester, New York) is the principal stash location for BAKER.  Records from Rochester Gas and Electric show that utilities at 33 Locust Street-Upstairs Apartment has been in the name of Phillip Flowers, SSN# XXX-XX-3577 since October 17, 2018.  The male believed to be Philip Flowers went to this location after picking up drugs at Florack. See ¶¶ 237-239, 242 and 294-296.

419.    PREMISES 15 is a two story two family dwelling with white siding and white trim located on the south side of Locust Street.  The number 33 is in black above the front door of the residence. The front door faces north towards Locust Street.  The area to be searched includes the upstairs apartment and the area within the curtilage including any outbuildings.

420.    No-Knock Authority is requested for this location.  This is a stash location for BAKER.  Controlled substances, proceeds of drug sales, records, and other evidence which

can be easily and readily disposed of or destroyed are believed to be inside this location. Given BAKER's violent tendencies, it is likely that this location contains firearms.

## 14 Galusha Street, Rochester, New York
## (Premises 16)

421.    **Premises 16** (14 Galusha Street, Rochester, New York) is the residence of Vanesly LOPEZ.  As noted in paragraphs 137-139, 185-187 and 284-290 above, LOPEZ has repeatedly used transported drugs from 4 Florack to her residence at 14 Galusha Street. Records from Rochester Gas and Electric show that utilities at 14 Galusha Street has been in the name of Sandra Lopez, SSN# XXX-XX-4766 since March 11, 1985.

422.    PREMISES 16 is a two story two family dwelling with beige siding and white trim located on the east side of Galusha Street.  The number 14 is in black on the pole of the front porch of the residence. The front door faces west towards Galusha Street. The area to be searched includes both family units of the main house (one is occupied by LOPEZ and the other one is used by her) and the area within the curtilage including any outbuildings.

423.    No-Knock Authority is requested for this location.  This is the primary residence of Vanesly LOPEZ.  Controlled substances, proceeds of drug sales, records, and other evidence which can be easily and readily disposed of or destroyed are believed to be inside this location.   Based upon my training and experience, it is common for drug dealers to have firearms located inside their residences in order to protect their drugs and/or drug proceeds.

**83 Springfield Avenue, Rochester, New York**
**(Premises 17)**

424.    **Premises 17** (83 Springfield Avenue, Rochester, New York) is the residence of Eliezer MORALES.  This is the principal stash location for MEDINA.   Records from Rochester Gas and Electric show that utilities at 83 Springfield Avenue has been in the name of Eduardo Morales, SSN# XXX-XX-9162 since June 17, 2010.

425.    PREMISES 17 is a two story single family dwelling with white siding and white trim located on the south side Springfield Avenue.  The number 83 is in black to the left of the front door. The front door faces north towards Springfield Avenue. The house has an unattached garage with one garage door located behind the residence and the garage doors face north towards Springfield Avenue.  The area to be searched includes the main house, the unattached garage and the area within the curtilage including any outbuildings.

426.    No-Knock Authority is requested for this location.  This is the principal stash location for MEDINA and the primary residence of Eliezer MORALES.  Controlled substances, proceeds of drug sales, records, and other evidence which can be easily and readily disposed of or destroyed are believed to be inside this location.  As noted above, on November 29, 2019, three males attempted to kidnap MEDINA's father.  It is likely that MEDINA has sought to better protect his stash location as a result of this threat.

**37 Avenue D, Downstairs Apartment, Rochester, New York**
**(Premises 18)**

427.   **Premises 18** (37 Avenue D, Downstairs Apartment, Rochester, New York) is

the residence of Alexis MORALES.  Records from Rochester Gas and Electric show that

utilities at 37 Avenue D has been in the name of Dominique Ragland, DOB xx/xx/1993,

SSN# XXX-XX-7638 since April 1, 2018.   Surveillance has observed MORALES' car

parked at this location on multiple occasions.  As noted above, Alexis MORALES (along

with BAUER) is the principal distributor of drugs which MEDINA obtains from

GONZALEZ-RIVERA.

428.   PREMISES 18 is a two story two family dwelling with green siding and white

trim located on the south side of Avenue D.  The number 37 is in black on the pole of the

front porch of the residence. The front door faces north towards Avenue D. The area to be

searched includes the downstairs apartment and the area within the curtilage including any

outbuildings.

428a.  No-Knock authority is requested for this location:  This is residence of Alexis

MORALES.  Controlled substances, proceeds of drug sales, records, and other evidence

which can be easily and readily disposed of or destroyed are believed to be inside this

location.  Alexis MORALES is suspected of having supplied the fentanyl in a fatal narcotics

overdose occurring in March of 2020 in Rochester.  Allowing law enforcement to make

entrance into Premises 18 without first knocking and announcing their presence would limit

MORALES' ability to dispose of drug products, records, and other evidence relating to both

this conspiracy and the fatal narcotics overdose of March 2020.

**330 Rosewood Terrace, Rochester, New York**
**(Premises 19)**

429.   **Premises 19** (330 Rosewood Terrace, Rochester, New York) is the residence

of Joshua BAUER.  A GPS tracker placed on BAUER's 2009 Acura (Vehicle 7) shows that

BAUER was at Premises 19 on an almost daily basis.  Records from Rochester Gas and

Electric show that utilities at 330 Rosewood Terrace has been in the name of Martha

Homner, SSN# XXX-XX-6073 since December 3, 1992.

429a.   Agents installed a GPS tracking device on BAUER's 2009 Acura TSX

(Vehicle 7) on the morning of February 27, 2020 while it was parked in the vicinity of his

residence at 330 Rosewood Terrace (Premises 19).  The GPS tracking device remained on

Vehicle 7 until March 6, 2020, and was removed before the expiration of the authorized

monitoring period because agents became concerned about BAUER making repairs to

Vehicle 7 and discovering the tracking device.  After a review of the GPS data, it was

determined that:

> On February 27, 2020, at approximately 10:43 a.m., Vehicle 7
> departed 330 Rosewood Terrace (Premises 19) and traveled directly to 83
> Springfield Avenue (Premises 17), Eliezer MORALES' residence and the
> stash location for MEDINA.

> On February 28, 2020, at approximately 2:49 a.m., Vehicle 7 departed
> a location known to the investigative team as an active drug distribution spot,
> and traveled directly to 330 Rosewood Terrace (Premises 19).

> On March 6, 2020, at approximately 4:18 a.m., Vehicle 7 departed the
> same drug distribution location and traveled to Premises 19, arriving at
> approximately 4:45 a.m.  While traveling to Premises 19, Vehicle 7 traveled in
> the manner consistent with conducting counter surveillance measures, to

include taking indirect routes of travel and completing U-turns and reversing direction before ultimately arriving in the roadway outside of Premises 19.

429b. That Bauer travelled directly from PREMISES 19 to a known drug storage location (Eliezer's residence) and that he travelled directly from a known drug distribution location back to PREMISES 19, strongly indicates that PREMISES 19 will contain evidence of drug dealing such as unsold drugs, cash proceeds and/or notes and ledgers indicating amounts due and owed for drug, among other evidence.   Additionally, on March 1, 2020, at approximately 11:07 a.m., Vehicle 7 departed Premises 19 and traveled directly to the vicinity of 37 Avenue D (Alexis MORALES' house, Premises 18), arriving at approximately 11:17 a.m. and remaining for approximately four minutes.  This suggests that BAUER went to that location to drop off cash proceeds to Alexis MORALES, proceeds which BAUER would have earlier possessed at his residence.

430.   PREMISES 19 is a two story single family dwelling with beige siding on the lower level of the dwelling and light gray siding on the upper level of the dwelling located on the north side of Rosewood Terrace.  The number 330 is in black above the front door of the residence. The front door faces south towards Rosewood Terrace. The house has an unattached garage with one garage door located behind the residence and the garage door faces south towards Rosewood Terrace.  The area to be searched includes the main house, the unattached garage and the area within the curtilage including any outbuildings.

**79 Branch Street, Rochester, New York**
**(Premises 20)**

431.    **Premises 20** (79 Branch Street, Rochester, New York) is the residence of

Merlin DELEON.  Records from Rochester Gas and Electric show that utilities at 79

Branch Street has been in the name of Efrain Figueroa, SSN# XXX-XX-699 since January

7, 2003.   As noted in paragraphs 233-236, 242, 248-249, 262-266, 275-277 and 302-305,

above, GONZALEZ-RIVERA has gone to this location on multiple occasions to pick up

drugs or to drop off money.

432.    PREMISES 20 is a one story single family dwelling with white siding  and

white trim located on the west side of Branch Street.  The number 79 is in black above the

front door of the residence. The front door faces east towards Branch Street. The house has

one garage door on the south side of the residence facing east towards Branch Street. The

area to be searched includes the main house and the area within the curtilage including any

outbuildings.

**300 Shady Run Lane, Apartment #210, Penfield, New York**
**(Premises 21)**

433.    **Premises 21** (300 Shady Run Lane, Apartment 210 in Penfield) is one of

Lateef BUDD's residences.  Records from Rochester Gas and Electric show that utilities at

300 Shady Run-Apartment #210 is in the name of Robert Baamkamm, SSN# XXX-XX-

4422.  As noted in paragraphs 321-322 above, BUDD left from and returned to this

residence on the day that he travelled in tandem with Vehicle 11 to supply Tommy

BRUNSON in Syracuse.

434.    PREMISES 21 is in a multi-unit apartment complex. The building is four

story multi-colored located on the east side of Shady Run Lane. The numbers 300 is in black

on the west side of the building above the front door.  The entry door to the building is

facing west. The area to be searched includes the apartment and any storage areas assigned

to it, including the garage.

435.    No-Knock Authority is requested for this location.  This is one of Lateef

BUDD's residences.  Controlled substances, proceeds of drug sales, records, and other

evidence which can be easily and readily disposed of or destroyed are believed to be inside.

As noted above, several Rochester Police FIFs (Field Interview Forms) have been filed on

BUDD indicating that he was in possession of firearms.  BUDD is also the main suspect in

a November 3, 2019, shooting at the Barrel of Dolls strip club located at 173 Anderson

Street.


### 161 Fishermans Cove, Rochester, New York
### (Premises 22)


436.    **Premises 22** (161 Fisherman's Cove, Rochester, New York) is the residence

of Brittney F. FELDER and a male believed to be Jerrell J. INGRAM.  Records from

Rochester Gas and Electric show that utilities at 161 Fisherman's Cove has been in the

name of Brittney Felder, SSN# XXX-XX-2412 since June 26, 2017.   As noted in

paragraphs 321-322, this is the address to which Vehicle 11 (which accompanied BUDD to

–162–

Syracuse to supply BRUNSON) is registered.  Vehicle 11 was observed at Premises 22 the morning following the Syracuse trip indicating that this is where the male believed to be INGRAM (who drove Vehicle 11 to Syracuse in tandem with BUDD) lives with Brittney FELDER.   On Thursday April 23, 2020, members of the surveillance team observed Brittney Felder exit 161 Fisherman's Cove and get into Vehicle 11.  Vehicle 11 has continued to be observed at 161 Fisherman's Cove.  It was there Friday April 24, and was there as recently as April 27 in the morning.

436a.  Brittney Felder has a history of assisting boyfriends traffic drugs.  In May 2014, she was arrested at the Elmira Correctional Facility for trying to smuggle approximately 50 grams of marijuana into the prison for her baby's father who was housed there.  She ultimately pled guilty in March 2015 to introducing contraband into prison, 2d degree.  Additionally, as noted in paragraph 323 above, in 2016, a Field Interview Form (FIF) was written by the Rochester Police Department wherein Brittney FELDER was identified as living with her boyfriend Jerrell J. INGRAM who stayed with her in the apartment in Greece and it was believed that INGRAM kept drugs at the apartment.   This is consistent with Felder allowing her car to be used by Ingram more recently to travel to Syracuse to conduct a drug deal.

437.  **PREMISES 22** is in a multi-unit apartment complex. The building has beige siding and white trim. The numbers 161 is on a white post located on the north side of the building.  The entry door to the apartment faces north.

438.  The area to be searched includes Unit 161 and any storage areas assigned to it.

## 45 Southview Terrace, Rochester, New York
## (Premises 23)

439.   **Premises 23** (45 Southview Terrace, Rochester, New York) is the residence associated with the narcotics trafficking of Lateef BUDD.  Records from Rochester Gas and Electric show that utilities at 45 Southview Terrace has been in the name of Marcus Young, SSN# XXX-XX-0307 since September 29, 2017.   This is a location where BUDD is believed to have conducted a drug transaction on April 15. ¶¶ 306-307, 311.  The male believed to be INGRAM also stopped at this location after BUDD and Vehicle 11 returned from supplying BRUNSON in Syracuse on his way from BUDD's apartment in Penfield to Premises 22. ¶¶ 328-329, 334.

440.   **PREMISES 23** is a two story single family dwelling with green siding and white trim located on the west side of Southview Terrace.  The number 45 is in black on the front of the residence and the front door faces south. The house has an unattached garage with one garage door located behind the residence and the garage door faces east towards Southview Terrace.  The area to be searched includes the main house, the unattached garage and the area within the curtilage including any outbuildings.

**2016 black Cadillac Escalade**
**NY registration number GXN-4213**
**VIN# 1GYS4JK4GR441655**
**<u>(Vehicle 1)</u>**

441.    **Vehicle 1,** a 2016 Cadillac Escalade, color black, bearing New York State

license plate GXN-4213, vehicle identification number 1GYS4JK4GR441655, is registered

to Krystal M Gonzalez.  As noted in paragraphs 170-172 and 211-213 above, GONZALEZ-

RIVERA has used this vehicle to conduct drug transactions and to store and transport

narcotics from 4 Florack to his drug customers.  Earnest Baker has also used Vehicle 1 to

travel to and from 4 Florack. <u>See</u> ¶ 207 above.

**2017 red Mercedes Benz**
**NY registration number HJA-5076**
**VIN# 4JGED6EB0HA058750**
**<u>(Vehicle 2)</u>**

442.    **Vehicle 2,** a 2017 Mercedes Benz, color red, bearing New York State license

plate HJA-5076, vehicle identification number 4JGED6EB0HA058750, is also registered to

Krystal M Gonzalez.  This is one of Krystal Gonzalez' vehicles and she has been observed

driving it and meeting GONZALEZ-RIVERA in it.  As noted above, Krystal Gonzalez

assists GONZALEZ-RIVERA conceal and launder his drug proceeds, and her car is likely

to contain evidence such as cash, bank and credit card records and other financial records.

443.    GONZALEZ-RIVERA has also used this car.  On February 5, 2020, he drove

it to 4 Florack.  GONZALEZ-RIVERA exited **Vehicle 2**, carrying two plastic shopping bags

(consistent with the types of bags used to transport drugs in this case), which he carried

inside the residence.  At approximately 2:05 p.m., GONZALEZ-RIVERA exited **Premises**

1 carrying a large gold chain and he depart in **Vehicle 2**.  Vehicle 2 was observed parked in

the driveway of Krystal Gonzalez' residence at 234 Sandalwood Drive later that evening.

444.    Given the foregoing, I believe that **Vehicle 2** is likely to contain evidence of

drug trafficking and/or evidence of money laundering and of GONZALEZ-RIVERA's

unexplained wealth.

**2008 blue Mercedes Benz C30**
**NY registration number HZB-3678**
**VIN# WDDGF81X88F156776**
**<u>(Vehicle 3)</u>**

445.    **Vehicle 3,** a 2008 Mercedes Benz C30, color blue, bearing New York State

license plate HZB-3678, vehicle identification number WDDGF81X88F156776, registered

to Merilin Deleon.  As noted above, this is the vehicle that Natasha FIGUEROA repeatedly

used to transport drugs from her residence at 35 Northaven (Premises 2) to 4 Florack and

other locations.

**2015 dark gray Lexus SUV**
**NY registration number HRA-7431**
**VIN# JTJBM7FXXF5112405**
**<u>(Vehicle 4)</u>**

446.    **Vehicle 4,** a 2015 Lexus SUV, color dark gray, bearing New York State

license plate HRA-7431, vehicle identification number JTJBM7FXXF5112405, registered to

Marilin R. Deleon.  As noted in paragraphs 142-146, 168-169, 212-216, 220-221, 226-229

and 281 above, Marilin DELEON has used this vehicle to transport narcotics from stash

locations to GONZALEZ-RIVERA.

**2014 black Ram 1500**
**NY registration number JNC-2568**
**VIN# 1C6RR7VT7ES420947**
**(Vehicle 5)**

447.   **Vehicle 5,** a 2014 Ram 1500, color black, bearing New York State license

plate JNC-2568, vehicle identification number 1C6RR7VT7ES420947, registered to Joann

Cai.  This is Earnest BAKER's principal vehicle.   As noted in paragraphs 103-105 above,

this is the car which BAKER drove when he met with CS-4 in February to arrange a sale of

drugs to CS-4.  BAKER has repeatedly used Vehicle 5 to go to and from Florack to obtain

drugs and to arrange the sale of drugs.  GONZALEZ-RIVERA has also used Vehicle 5,

including to store the two suitcases of suspected drug proceeds and/or drugs before turning

them over to FIGUEROA. See ¶¶ 193-196, 198-201, 237-239, 254-256.

**2009 white Audi A4**
**NY registration number HRA-4865**
**VIN# WAULF68K39N066852**
**(Vehicle 6)**

448.   **Vehicle 6,** a 2009 Audi A4, color white, bearing New York State license plate

HRA-4865, vehicle identification number WAULF68K39N066852, registered to Sandra

Rios-Lopez.   This is Vanesly LOPEZ' car.  As noted in paragraphs 137-139, 185-187, 284-

290 above, LOPEZ has repeatedly used this vehicle to transport narcotics from 4 Florack to

her residence at 14 Galusha Street and to supply drug customers.

–167–

**2009 white Acura TSX**
**NY registration number JDT-4149**
**VIN# JH4CU26699C009119**
**(Vehicle 7)**

449.    **Vehicle 7,** a 2009 Acura TSX, color white, bearing New York State license

plate JDT-4149, vehicle identification number JH4CU26699C009119, registered to

Mehmedina D. Bijelic.  This is Joshua BAUER's car.  As noted in paragraphs 227-229, 243-

249-253 above, Joshua BAUER has repeatedly used this vehicle to transport narcotics from

Florack.  BAUER also drove this car when he supplied the unwitting cooperator with

Fentanyl on February 27. See ¶¶ 121-122

**2003 white Chevrolet Tahoe**
**NY registration number GUU-7114**
**VIN# 1GNEK13Z23R282195**
**(Vehicle 8)**

450.    **Vehicle 8,** a 2003 Chevrolet Tahoe, color white, bearing New York State

license plate GUU-7114, vehicle identification number 1GNEK13Z23R282195, registered

to Maria M. Deleon.  This is Alexis MORALES' car.  As noted in paragraphs 117-120 and

123, this is the car which MORALES used when he supplied the unwitting cooperator with

Fentanyl. This car was also used to transport drugs from and to bring cash to 4 Florack. See

¶¶ 135-136, 153-154.

**2018 white Lexus L57**
**NY registration number JDY-6775**
**VIN# JTJHY7AX6J4261429**
**(Vehicle 9)**

451.    **Vehicle 9,** a 2018 Lexus L57, color white, bearing New York State license

plate JDY-6775, vehicle identification number JTJHY7AX6J4261429, registered to Lateef

Robree Budd.  As noted in paragraphs 175-181 above, Lateef BUDD has used this vehicle

to travel to and from 4 Florack to arrange drug transactions and transport drugs.


**2017 black Honda Accord**
**NY registration number JGE-9382**
**VIN# 1HGCR2F50HA061230**
**(Vehicle 10)**

452.    **Vehicle 10,** a 2017 Honda Accord, color black, bearing New York State

license plate JGE-9382, vehicle identification number 1HGCR2F50HA061230, registered to

Herman L. Parson Jr.  As noted in paragraphs 273-274, 298-300, 306-311 above, Lateef

BUDD has used this vehicle to transport narcotics to 4 Florack and to meet with drug

customers.

**2012 burgundy Nissan Maxima**
**NY registration number JRE-8629**
**VIN# IN4AA5AP5CC869793**
**(Vehicle 11)**

453.    **Vehicle 11,** a 2012 Nissan Maxima, color burgundy, bearing New York State

license plate JRE-8629, vehicle identification number IN4AA5AP5CC869793, registered to

Brittney F. Felder.  As noted in paragraphs 322-335 above, this is the vehicle which drove in

tandem with BUDD's rental to and from Syracuse on April 18 to supply Tommy

BRUNSON.


**2004 white Chevrolet Tahoe**
**NY registration number JRE-7904**
**VIN# 1GNEK13Z84R283837**
**(Vehicle 13)**

454.    **Vehicle 13,** a 2004 Chevrolet Tahoe, color white, bearing New York State

license plate JRE-7904, vehicle identification number 1GNEK13Z84R283837, registered to

Philip H. Flowers.  As noted in paragraphs 157-158, 200-201, 237-242, 294-296 above, this

is the car which has been repeatedly used by the male believed to be Philip FLOWERS to

transport drugs from 4 Florack and to assist in the processing of drugs there.  This was also

the car used by Baker's associate during the February 2020 controlled purchase by CS-4. See

¶¶ 102-107.


**CONCLUSION**

WHEREFORE, based upon the foregoing, I respectfully submit that there is

probable cause to believe that from in or about 2016 to the present, in the Western District

of New York and elsewhere, defendants JANCARLOS GONZALEZ-RIVERA a/k/a

"Los," JONATHAN CRUZ-VEGA a/k/a "Tego," EARNEST BAKER a/k/a "Slay,"

AMANTE SANTIAGO a/k/a "Cholo," SHAUMYK SANTIAGO, NATASHA

FIGUEROA,  ENRIQUE MEDINA a/k/a "Ricky Rose," ALEXIS MORALES a/k/a

"A," ELIEZER MORALES, JOSHUA BAUER a/k/a "White Boy," MARILIN

DELEON a/k/a/ "Beba," VANESLY LOPEZ, LATEEF BUDD a/k/a "LT", MARCUS

JOHNSON and TOMMY BRUNSON, JR., have conspired to possess with intent to

distribute and to distribute 400 grams or more of fentanyl, 1 kilogram or more of heroin and

5 kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)

I further respectfully submit that there is probable cause to believe that the items

listed on the annexed Schedule of Items to be Seized will be found at **Premises 1-23** and in

**Vehicles 1-13.** Therefore, I respectfully request that search warrants be issued for these

premises and vehicles.

I further request that the Court authorize officers and agents executing the Search

Warrant at **Premises 1-2, 5-7, 9, 11, 13 and 15-18 and 21** to make entry without first

knocking and announcing their presence.

Finally, I respectfully requests that the Court order that this affidavit and the

applications, complaint and warrants it supports remain sealed until further order of this

Court.

SABATINO SMITH
SPECIAL AGENT, DEA

Affidavit submitted electronically by email in .pdf format. Oath administered, and contents
and signature attested to me and before me as true and accurate by telephone pursuant to
Fed.R.Crim.P. 4.1 and 41(d)(3), this 28th day of April, 2020.

HONORABLE MARK W. PEDERSEN
U.S. MAGISTRATE JUDGE

−171−